# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

2015-1129

## INDACON, INC.,

*Plaintiff-Appellant*,

v.

## FACEBOOK, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the Western District of Texas in No. 5:10-cv-00966, Judge Orlando L. Garcia.

## INDACON'S PRINCIPAL BRIEF

Pratik A. Shah
pshah@akingump.com
Emily C. Johnson
johnsone@akingump.com
James E. Tysse
jtysse@akingump.com
Z.W. Julius Chen
chenj@akingump.com
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC  20036-1564
Phone:   (202) 887-4000
Fax:      (202) 887-4288

*Counsel for Indacon, Inc.*

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Indacon, Inc.                      v. Facebook, Inc.

No. 15-1129

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant                        certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Indacon, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Attorneys from Akin Gump Strauss Hauer & Feld LLP:  Pratik A. Shah, James E. Tysse, Emily C. Johnson, Z.W. Julius Chen, R. Laurence Macon, Daniel L. Moffett, Janie A. Shannon, and Kirt S. O'Neill.

03/26/2015
Date

/s/ Pratik A. Shah
Signature of counsel

Pratik A. Shah
Printed name of counsel

Please Note: All questions must be answered
cc: All counsel of record.

124

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ................................................................2

STATEMENT OF ISSUES ON APPEAL ................................................................3

INTRODUCTION ................................................................4

STATEMENT OF THE CASE................................................................5

      A.    Technological Background ................................................................5

             *1.*    *State of the Art* ................................................................ 5

             *2.*    *The Claimed Invention*................................................................ 7

             *3.*    *Preferred Embodiments* ................................................................ 11

      B.    Procedural History ................................................................14

SUMMARY OF THE ARGUMENT ................................................................19

STANDARD OF REVIEW ................................................................21

ARGUMENT ................................................................21

    I.    THE DISTRICT COURT INCORRECTLY EXCLUDED GRAPHICAL ELEMENTS FROM "ALIAS" ................................................................22

      A.    "Alias" Encompasses Graphical Elements ................................................................24

             *1.*    *The specification discloses that "alias" can be a graphic.* ................................................................ 24

             *2.*    *"Alias" must be construed in light of the prior art cited on the face of the patent.* ................................................................ 27

      B.    The District Court Erred In Equating "Alias" With "Term," As Narrowly Construed ................................................................30

             *1.*    *"Alias" is more closely tied to "link term" than "term."* ................................................................ 30

2.     *The district court's construction of "term" is itself too narrow.*............................................................. 33

3.     *The district court failed to confront the prior art intrinsic evidence.*........................................................ 35

II.     THE DISTRICT COURT INCORRECTLY CONSTRUED "CUSTOM LINK," "CUSTOM LINKING RELATIONSHIP," AND "LINK TERM" TO EXCLUDE CREATION OF A LINK FOR LESS THAN ALL INSTANCES OF A DEFINED TERM ...........................................................................................36

A.     The Claim Language And The Doctrine Of Claim Differentiation Compel Indacon's Construction ....................37

B.     The District Court's Reasoning Contravenes Basic Claim Construction Principles ................................................39

CONCLUSION ......................................................................................42

ADDENDUM

Order Adopting in Part Memorandum and Recommendation

Order of Dismissal of the '043 Claims and Final Judgment of Non-Infringement on the '276 Claims

Judgment in a Civil Action

U.S. Patent No. 6,834,276

# TABLE OF AUTHORITIES

<u>C</u>ASES:

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013) .......................................................40

*Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*,
    674 F.3d 1365 (Fed Cir. 2012) .........................................................21

*Aventis Pharm. Inc. v. Amino Chems. Ltd.*,
    715 F.3d 1363 (Fed. Cir. 2013) .......................................................30

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012) .......................................................35

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003) .......................................................21

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) .......................................................34

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009) .......................................................28

*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*,
    265 F.3d 1311 (Fed. Cir. 2001) .......................................................30

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) .................................................33, 34

*In re Cuozzo Speed Techs., LLC*,
    --- F.3d ----, 2015 WL 448667 (Fed. Cir. Feb. 4, 2015)....................21

*In re Packard*,
    751 F.3d 1307 (Fed. Cir. 2014) .......................................................22

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) .......................................................37

*Kumor v. Ovonic Battery Co.*,
    351 F.3d 1364 (Fed. Cir. 2003) .......................................................35

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ............................................................40, 41, 42

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)..................................................................................15, 21

*McCarty v. Lehigh Valley R.R. Co.*,
   160 U.S. 110 (1895).........................................................................................40

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .................................................................*passim*

*Seachange Int'l, Inc. v. C-COR, Inc.*,
   413 F.3d 1361 (Fed. Cir. 2005) .......................................................................39

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
   726 F.3d 1306 (Fed. Cir. 2013) ..................................................................39, 40

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015)......................................................................................21

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ..................................................................33, 34

*V-Formation, Inc. v. Benetton Group SpA*,
   401 F.3d 1307 (Fed. Cir. 2005) .......................................................................35

*Vederi, LLC v. Google, Inc.*,
   744 F.3d 1376 (Fed. Cir. 2014) .......................................................................24

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .........................................................................24

## STATUTES AND RULES:

28 U.S.C.
   § 1295(a)(1) ....................................................................................................2
   § 1331...............................................................................................................2
   § 1338(a) .........................................................................................................2

35 U.S.C. § 112 (2010) ......................................................................................18

FED. CIR. R. 47.5 ................................................................................................1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff-Appellant Indacon, Inc. states that no other appeal arising out of this action has come before this or any other appellate court, and that no case known to counsel pending in this or any other court will directly affect or will be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The U.S. District Court for the Western District of Texas had jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).  This Court has jurisdiction over an appeal from a final judgment of the district court under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES ON APPEAL

I.      Whether the district court erred in construing "alias," as used in claims 1-4 and 8-11 of U.S. Patent No. 6,834,276, to exclude any graphical elements.

II.     Whether the district court erred in construing "custom link," "custom linking relationship," and "link term," as used in claims 1-4 and 8-11 of U.S. Patent No. 6,834,276, to exclude a product that allows creation of a hyperlink for some instances, but not *each* instance or *all* instances, of a defined term.

# INTRODUCTION

In response to the rapid growth of the Internet in the 1990s, Plaintiff-Appellant Indacon, Inc. developed software technology that permitted computer users both to create their own database of locally saved or remotely accessed files, *and* to search, index, peruse, and manipulate those files—including through the insertion of automatically generated hyperlinks. A571-572. That cutting-edge technology was claimed in U.S. Patent No. 6,834,276 (filed Feb. 25, 1999) ("the '276 Patent"). A48. The software architecture for Defendant-Appellee Facebook, Inc.'s online social network service infringes certain claims of the '276 Patent, which captures the core of Indacon's innovative technology.

The sole issue on appeal is the district court's construction of key '276 Patent claim terms underlying the stipulated judgment of non-infringement. Those constructions impose limitations on the asserted claims that appear nowhere in the language of those claims, arise from a cramped reading of the preferred embodiments that overlooks the specification's broader discussion of the invention, and depart from other basic canons of claim construction. In particular, because an "alias" functions as a hyperlink, and because a hyperlink was well recognized both in the art and specification to encompass text as well as graphics, the district court erred in limiting "alias" to non-graphical elements. Likewise, in contravention of the doctrine of claim differentiation, the district court erred in

construing "custom link," "custom linking relationship," and "link term" to exclude a product that allows creation of a hyperlink for less than *all* instances of a defined term. Indacon's proffered constructions are more faithful to the claimed invention and require remand to the district court to assess infringement on a proper construction of the claims at issue.

## STATEMENT OF THE CASE

### A.     Technological Background

#### 1.     *State of the Art*

Prior to the advent of the claimed invention, a computer's ability to search files was limited. At the most basic level, a user could open an individual file, search for a given piece of information within that file, and move sequentially from one result to the next—much like the search function of WordPerfect or Microsoft Word. '276 Patent col. 1 ll. 15-28. While a user could employ a computer application (of which the Windows toolbar search option is a present-day example) to "search all available files"—rather than a single file—that method would return only a list of files. To locate the relevant information within each file, the user would "still [be] require[d] *** to open each of the files of interest in a word processor, viewer or other application" and apply the basic search method. *Id.* col. 1 ll. 29-37.

A more advanced method allowed for searches of "many thousands of files simultaneously and very quickly by using pre-generated indexes of the data" to return results. '276 Patent col. 1 ll. 41-43. A user, for example, could "query an encyclopedia converted to an indexed database, *** quickly determine every place a word or phrase occurs in the text, and *** instantly view those occurrences as desired." *Id.* col. 1 ll. 38-51. In addition, a user could use "hypertext links" to "instantly view related data for which [the user] had not searched." *Id.* col. 2 ll. 49-51. That process was accomplished by identifying "pointers" within files that corresponded to other "target" files containing the related data. *Id.* col. 2 ll. 57-59. Because the index was either "generated according to a rationale applied when the database index was prepared" or created manually with "human intervention," however, the universe of files needed to be known and static in order for the search and insertion of links to be practical. *Id.* col. 2 ll. 51-52, 67.

Using those existing methods, Indacon successfully developed software products including "Q'Case"—a collection of 40 years of Texas case law interlinked to permit easy searching and perusal that was ultimately sold to Thomson Corporation (now Thomson Reuters, the purveyor of Westlaw). A572. But even the more advanced search methods proved ill-equipped to "deal with the internet" or other "extensive repositories of information stored in electronic form that may contain information an authorized user may desire and want to locate and

access." '276 Patent col. 2 ll. 11-42.  A user was no longer searching a fixed, known universe of files; rather, a user was confronting a "vast and burgeoning source" containing "unknown or forgotten data." *Id.* col. 2 ll. 15, 41.

That exponential growth in information made it impractical to rely on a pre-generated or manually created index to conduct searches and insert hyperlinks.  A pre-generated index could not be customized to account for new or unknown files, and might "include links that [we]re not important to the user" but "not include links that would have been important." '276 Patent col. 3 ll. 26-27.  Manually inserting links allowed for some customization, but that method "require[d] a substantial amount of time and trouble that quickly outweigh[ed] any potential benefit," particularly "as the quantity of data increase[d]" (even assuming the data was known to the user).  *Id.* col. 3 ll. 30-31.  Modern computer networks instead required a system—not known in the art at the time—that would "allow someone to create [a] custom, organized database" with known and unknown files that could be "indexed and made available for use," *id.* col. 3 ll. 45-49, and "to create links by designating 'pointers' and 'targets' and having the program automatically create links that are all valid," *id.* col. 3 ll. 31-34.

### 2.    The Claimed Invention

The '276 Patent claims a "data acquisition and perusal system" fit for searching and organizing data in the Internet age, thus unlocking the information

potential of the burgeoning World Wide Web and other digital repositories.  Using the claimed invention, a user lacking the "substantial programming skills to incorporate reference links within [a] database" could, for example, "produce a monthly searchable, linked database containing issued United States patents, *** a linked database containing decisions of appellate courts, *** [or] a linked database containing documents required to be filed by various regulatory agencies, etc." '276 Patent col. 4 ll. 46-58.  The system would "automatically create[] only valid and verified links."  *Id.* col. 4 ll. 57-58.

Claim 1 is exemplary:

**1.**  A data acquisition and perusal system, comprising:

a database selection module that enables selection of a plurality of files for inclusion into at least one selectable database;

a link module that enables custom links to be defined between selected terms of selected files of the at least one database;

> wherein the link module enables association of any link term with any of the plurality of files in the at least one selectable database; and

> wherein the link module enables at least one alias term to be defined for the any link term to enable a link to be established between the at least one alias term and the any of the plurality of files;

a database index generator module that enables generation of a searchable index of the data contained in the at least one selectable database, including the custom links, the generator module enabling only valid custom links to be added to the searchable index; and

a search module that enables a search of the searchable index to be
performed according to a search criterions.

'276 Patent col. 34 l. 55 to col. 35 l. 9.

As Claim 1 states and Figure 1C (as corrected) depicts, the claimed "data

acquisition and perusal system" involves four interacting "modules," each

"represent[ing] any combination of hardware and software implemented to achieve

the desired functions." '276 Patent col. 11 ll. 2-4.



**FIG. 1C**

*First*, a database selection module organizes "files, objects, or documents" into one or more databases that the user may include in the search. '276 Patent col. 5 ll. 36-38. The "different file types" are diverse and may be commingled in a single database. *Id.* col. 5 l. 47. They may include "internet formatted files, objects, or documents, including HTML type formats, and word processor formats, text formats, RTF formats, etc." *Id.* col. 5 ll. 47-61. And they may be accessed locally on a computer's memory or remotely via a network, such as the Internet. *See id.*

*Second*, a link module "enables custom links to be defined between selected terms of selected files of the selectable database." '276 Patent col. 5 ll. 39-40. The links are "custom" because a user has the ability to create an "association" between a defined "link term" appearing in a file and another file in the database, *id.* col. 5 ll. 61-62. If the user determines that other related terms or objects should share the same pointer/target linking relationship, the link module allows the user to define an "alias." *Id.* col. 5 ll. 64-67. As the specification instructs, "[t]he system and method may automatically, unambiguously, and accurately place reference links" for the defined link terms and aliases "among documents within a database it creates according to a schema controlled by the user." *Id.* col. 6 ll. 32-35.

*Third*, a database index generator module facilitates the search of the files by "generat[ing] *** a searchable index of the data contained in the selectable

database." '276 Patent col. 5 ll. 40-42.  The index includes the "custom links" and ensures that "the searchable index includes only valid links."  *Id.* col. 5 ll. 43-44.

*Fourth*, a search module "enables a search to be performed of the searchable index according to a search criterion."  '276 Patent col. 5 ll. 45-46.  The returned "files of the selectable database that meet the search criterion" may then be reviewed and, in some instances, sorted.  *Id.* col. 6 ll. 7-12 ("For example, the files may be sorted by date, by name, or by any other field types or descriptions.").

The operation of these four modules may be facilitated by "a display utility including a graphic user interface."  '276 Patent col. 6 ll. 13-15.  That interface allows the user to view "at least portions of files in the selectable database that meet the search criterion."  *Id.* col. 6 ll. 18-19.  In addition, any "selected link terms" or "alias link terms if defined" are "usually graphically indicated, such as via color, style highlighting, etc."  *Id.* col. 6 ll. 21-24, 31.  Because the link terms and their aliases present in the form of hyperlinks, clicking on them "jumps to and displays the linked file."  *Id.* col. 6 ll. 27-30; *see also id.* col. 6 ll. 35-37 (clicking on the "link term" allows "the user to instantly view a file, object, or document referenced by another file, object, or document currently being viewed").

### 3.    *Preferred Embodiments*

The '276 Patent specification discloses several computer programs as exemplary preferred embodiments.  In the first, a user would begin by registering

or selecting the database(s) of files to be searched using a "database display window." '276 Patent col. 25 l. 45, fig. 5. After ensuring that a searchable index had been generated for the selected universe of files, *see id.* col. 25 l. 57 to col. 26 l. 56, figs. 6-7, a user would enter search terms into a "search/retrieval dialog," *see id.* col. 26 l. 57 to col. 28 l. 6, fig. 8. The relevant files in the database would be listed in a "documents found window," *id.* col. 27 ll. 46-47, fig. 8, for the user to select and view in a "document display window *** [that] displays text and graphics of a selected document," *id.* col. 28 ll. 10-11, fig. 9. At that point, the user could encounter a "field link"—*i.e.*, "text *** shown highlighted with selectable color and font different from the surrounding text to indicate the link"— which, when double-clicked, would take the user to "the document that the field link *** targets." *Id.* col. 28 ll. 31-37. Searched-for "terms" would also be indicated in the document display window according to the font, color, or weight preferences set by the user. *See id.* col. 28 ll. 50-65, col. 29 l. 59 to col. 30 l. 18.

With respect to the creation of links, the embodiment allowed the user to create "[a]n essentially unlimited number" of relationships between user-selected pointers and target files. '276 Patent col. 30 l. 32. Links could be established based on a "pattern sequence found in a file that exactly matches the same pattern sequence that is found in the appropriate field in another file in the database source files." *Id.* col. 30 ll. 49-51. A user, for example, could use "wildcard" characters

(where, in a preferred embodiment, each wildcard acts as a placeholder for a particular type of character or characters) such that a search for "# s*d #" would return "9 sand 977" and "843 S.W.2d 955" as results.  *Id.* col. 31 ll. 7-8.  In addition, links could be established for a defined "alias" associated with the defined "link term."  These attributes of the embodiment allowed for the following "example":

> whenever the term "vine fruit" appears in any of the database files, the user may want the term to be linked to a glossary file that defines the term.  By setting or defining aliases for "vine fruit" to include alias terms "grape", "tomato", and "raspberry", those words also have a link generated to the glossary file just as "vine fruit" does.

*Id.* col. 32 ll. 24-29.

Another preferred embodiment included a "Browser Mode" that "works in a similar manner as commonly used browsers, such as Netscape Navigator or Microsoft® Explorer."  '276 Patent col. 32 ll. 36-38.  Beyond retrieving and displaying an "HTM document *** from the internet," however, "Browser Mode" allowed a user to "save[] the displayed document, along with all of its pictures, graphics, images, hypertext links, and layout into [a] database."  *Id.* col. 32 ll. 33-35, col. 32 l. 66 to col. 33 l. 1.  A user could then edit the HTM document by rearranging its text and graphics—a process that "automatically makes all adjustments to HyperText links and other HTM codes associated with text or graphic elements that are added, deleted, or moved."  *Id.* col. 33 ll. 57-60.

A further preferred embodiment "uses multiple external search engines during the same search." '276 Patent col. 34 ll. 17-18. Because each search engine used a different "search syntax," it "respond[ed] with different search results." *Id.* col. 34 ll. 19-21. And those results could "have different contents and formats" and could "include graphics and text." *Id.* col. 34 ll. 21-23.

Having provided these examples, the inventors recognized that the claimed "data acquisition and perusal system" could be applied more broadly:

> The above-listed sections and included information are not exhaustive and are only exemplary of the invention. The particular sections and included information in a particular embodiment may depend upon the particular implementation and the included devices and resources. Although a system and method according to the present invention have been described in connection with the preferred embodiments, it is not intended to be limited to the specific form set forth herein, but, on the contrary, it is intended to cover such alternatives, modifications, and equivalents, as can be reasonably included within the spirit and scope of the invention as defined by the appended claims.

'276 Patent col. 34 ll. 42-53.

## B.    Procedural History

**1.** In 2010, Indacon brought a patent infringement suit against Facebook in the U.S. District Court for the Western District of Texas. A131. The operative third amended complaint alleges that Facebook infringed and continues to infringe claims 1-4 and 8-11 of the '276 Patent by "making, using, selling, or offering for sale the Facebook system incorporating linking, perusal and search features, and/or services offered in relation to the Facebook system." A157. In particular, the

complaint alleges, the Facebook system included the following "features and functionality" claimed in the '276 Patent: (i) "a module that enables the selection of a plurality of profiles to be included among a user's friends or interests"; (ii) "a module that enables defining a display name associated with a profile and defining text or graphics as an alias for the display name"; (iii) "a module that enables generation of a searchable index of data in the profiles, including the display name"; and (iv) "a module that enables searching of data in the profiles." A157-158.

Facebook filed an answer, raising affirmative defenses of (i) non-infringement, (ii) invalidity, (iii) prosecution history estoppel, (iv) limitation on damages, and (v) laches, estoppel, waiver, and acquiescence. A5584. It did not assert any counterclaims.[1]

**2.** The district court set a hearing to construe the '276 Patent claims pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), and referred the case to a magistrate judge. A134, 365-366. The parties disputed the

---

[1] Indacon also alleged infringement of U.S. Patent No. 7,836,043 ("the '043 Patent"), which was similarly directed to a database system and method for data acquisition and perusal. A159-161. The PTO later canceled the asserted claims of the '043 Patent following an *inter partes* re-examination. A5585. The PTO did not address the construction of the claim terms at issue here, only one of which ("link term") appeared in the asserted '043 Patent claims. The count of the complaint concerning the '043 Patent was dismissed with prejudice and is not at issue on appeal. A5590.

meaning of several claim terms, two sets of which are relevant here.

**a.** Facebook proposed that "alias," as used in the '276 Patent, be construed as limited to a textual expression, while Indacon proposed that it be construed as a textual and graphical hyperlink. Rejecting the magistrate judge's recommendation that Indacon's construction be adopted, A3035-3039, the district court held that "'alias' [should] be construed to mean a 'textual expression that the user can define to serve as an alternative name or label.'" A25. In the district court's view, because (i) an "'alias' is used to define a term," and (ii) "a 'term' is [defined as] a '[t]extual expression, such as words, symbols, or characters,'" it followed that "alias" was "limited to a textual expression only." A26 (emphasis omitted). The district court further noted that the "examples" of aliases provided in the specification's discussion of the preferred embodiments "utilize[] the term 'alias' in the context of textual expressions only." *Id.* (emphasis omitted).

The district court rejected Indacon's argument (accepted by the magistrate judge, A3037-3039) "that 'alias' is a hyperlink," which ordinarily includes graphics. A27. The district court acknowledged that two prior art references cited on the face of the '276 Patent established that a "hypertext link can be both textual and graphical." *Id.* But unlike the magistrate judge—which found the references to demonstrate that a person having ordinary skill in the art would have understood "alias," like "link term," to encompass "a textual or graphical object," A3039—the

district court deemed these references "extrinsic evidence" and concluded that construing "alias" to include a graphical hyperlink would give the claim term a meaning "broader than the specification," A27-28.

**b.** With respect to "custom link," "custom linking relationship," and "link term," as used in the '276 Patent, Facebook proposed that the claimed invention must be capable of establishing a link for "each instance" of a defined term appearing in a database (thereby excluding from its scope a product that allowed creation of a hyperlink for only some instances). In response, Indacon argued that the asserted claims contain no such limitation, unlike other unasserted claims that refer expressly to the generation of links for "all" instances of a defined term.

The district court acknowledged that, under the doctrine of claim differentiation, the use of "different words or phrases *** in separate claims [is] presumed to indicate that the claims have different meanings and scope." A31 (citation and quotation marks omitted). The court nonetheless found the doctrine to be "trumped by other considerations"—namely, that "Indacon cites no instance of a link term that cannot be displayed as a link when encountered in the files"— and held that the disputed terms "must be construed so that 'each instance' of the custom link can be displayed as a link whenever the user encounters the term." A32. To hold otherwise, the court reasoned, would provide the claim terms with a "constru[ction] broader than [the] specification." *Id.* In response to Indacon's

17

argument that the imposed limitation was imported impermissibly from the preferred embodiments, the district court stated that "the patents['] written description does not support a broader meaning." A33.

**3.** The parties stipulated that "[u]nder the Court's construction of the terms 'Alias,' 'Custom Link,' 'Custom Linking Relationship,' and 'Link Term,' *** Facebook's accused instrumentalities"—including the "Facebook social networking system's 'profile picture'" and "user display names"—"do not infringe the asserted claims of the '276 Patent." A5586. Accordingly, in order to permit Indacon to appeal the district court's construction of those claim terms, the parties jointly requested that the district court "enter a Stipulated Final Judgment of Non-Infringement on all of Indacon's claims relating to the '276 Patent." A5586-5587.

The district court accepted the parties' stipulation and entered a final judgment of non-infringement as to the '276 Patent. A45-47; *see also* note 1, *supra* (noting cancellation of asserted '043 Patent claims and dismissal with prejudice). Indacon appealed the stipulated judgment of non-infringement based on the district court's claim constructions. A5592.[2]

---

[2] Facebook cross-appealed the district court's denial of summary judgment on its affirmative defense that claims 1-4 of the '276 Patent were indefinite and thus invalid under 35 U.S.C. § 112 ¶ 2 (2010). This Court dismissed the cross-appeal for lack of jurisdiction. Dkt. No. 24, slip op. at 4 (Feb. 24, 2015) (Because

## SUMMARY OF THE ARGUMENT

This Court should adopt Indacon's construction of the claims at issue and thus reverse the stipulated judgment of non-infringement.

**I.**  The '276 Patent's intrinsic evidence establishes that "alias" means a "textual or graphical hyperlink," rather than only a "textual expression."  Drawing from its discussion of "link term," the specification teaches that an "alias" is a hypertext link (or hyperlink) that associates a file, object, or document to another file, object, or document—including HTML and RTF files that contain graphics and images capable of being displayed, identified, and sequenced.  And the prior art references cited on the face of the '276 Patent, which acknowledge in terminology echoed in the '276 Patent specification that hypertext links are commonly attached to text *and* graphics, reinforce an intention to claim the ordinary meaning and full functionality of hyperlinks.

The district court erred in concluding that "alias" is limited to textual elements because "term" must be given that scope.  The specification is explicit that "alias" or "alias term" corresponds to a "*link* term," *i.e.*, a hyperlink, which the district court itself recognized can be broader than "term" unmodified.  In any event, the district court's text-only construction of "term" was too limited.

"Facebook asserted invalidity only as an affirmative defense and no judgment was entered as to the issue of invalidity, a cross appeal on the issue is improper.").

Nothing in the '276 Patent disclaims a graphical element, and a non-exclusive list of exemplary "terms" appearing in the discussion of a preferred embodiment's search module is far too slender a reed for finding lexicography—let alone importing that lexicography to "alias" hyperlinks.

**II.**  The district court erred in construing "link term," "custom link," and "custom linking relationship" as imposing a limitation that the invention allow creation of a hyperlink for *each* instance of a defined term, thereby excluding a product that allows creation of a hyperlink for less than all instances of a defined term.  The asserted claims refer to the ability to generate hyperlinks in "instances" of a defined term, in contrast to other unasserted claims that distinctly refer to the ability to generate links for "*all* instances."  Under the doctrine of claim differentiation and the canon disfavoring superfluity, "instances" cannot be made to do the same work as "all instances."

The district court declined to apply the doctrine of claim differentiation in this case because Indacon pointed to no example in the specification in which a link term cannot be displayed as a link when encountered in a file.  Beyond overlooking the fact that the specification discloses the ability to tailor the scheme under which links are generated, the district court's reasoning impermissibly rewrites the unmodified use of "instances" and incorrectly presumes that the specification (or a preferred embodiment) limits otherwise broad claim language.

20

## STANDARD OF REVIEW

This Court reviews *de novo* a "grant of summary judgment \*\*\* predicated on the parties' stipulation of the factual component of the infringement question, leaving only the issue of claim construction for appeal." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003). "Because there is no issue here as to extrinsic evidence, [this Court] review[s] the claim construction[s] de novo." *In re Cuozzo Speed Techs., LLC*, --- F.3d ----, 2015 WL 448667, at \*8 (Fed. Cir. Feb. 4, 2015); *see Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) ("[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*.").

## ARGUMENT

The "ultimate goal" of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1374 (Fed Cir. 2012) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)). The inquiry "focus[es] on the claim language, and what one of ordinary skill in the art would understand the claim to mean,

viewed in the light of any language in the written description that explained or defined the claim." *In re Packard*, 751 F.3d 1307, 1317 (Fed. Cir. 2014). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citation and quotation marks omitted).

In construing the key '276 Patent claim terms—including "alias," "custom link," "custom linking relationship," and "link term"—the district court misapplied these and other "basic principles of claim construction." *Phillips*, 415 F.3d at 1312. Accordingly, the stipulated judgment of non-infringement, which is predicated on the district court's erroneous claim constructions, should be reversed.

## I. THE DISTRICT COURT INCORRECTLY EXCLUDED GRAPHICAL ELEMENTS FROM "ALIAS"

The '276 Patent is directed to a "data acquisition and perusal system," which includes as one of its elements a "link module that enables custom links to be defined between selected terms of selected files of the at least one database." '276 Patent col. 34 ll. 55, 60-62 (claim 1). In addition to "enabl[ing] association of any link term with any of the plurality of files in the at least one selectable database," the "link module enables at least one *alias* term to be defined for the any link term to enable a link to be established between the at least one *alias* term and the any of the plurality of files." *Id.* col. 34 l. 63 to col. 35 l. 2 (emphasis added); *see, e.g.*, *id.*

col. 24 ll. 46-48 ("For example, a user may want to use *aliases* or synonyms so that 'equine' is also linked when 'horse' is the primary pattern.") (emphasis added); *id.* col. 32 ll. 20-29 (preferred embodiment example where "vine fruit" term has "*alias* terms 'grape', 'tomato', and 'raspberry'") (emphasis added). That association helpfully expands a user's search capability so that a search returns relevant known and unknown information, even in the absence of a "strict correlation between terms linked to target files." *Id.* col. 32 ll. 22-23.

The district court construed "alias" as limited to a "textual expression" (as proposed by Facebook), rather than a "textual or graphical hyperlink" (as proposed by Indacon and construed by the magistrate judge). A24-28. That construction improperly imposes a negative limitation on the claim language in the absence of disavowal or independent lexicography, and disregards intrinsic evidence establishing that an "alias" (or "alias term") presents as a textual or graphical hyperlink.[3]

---

[3] The district court did not separately construe "alias term," as "alias" and "alias term" are used interchangeably throughout the patent claims and specification.

## A.    "Alias" Encompasses Graphical Elements

### 1.    *The specification discloses that "alias" can be a graphic.*

The language of the claims and the specification establish that the claimed invention permits an "alias" to be comprised of either a textual or graphical hyperlink. To begin with, nothing in the language of the asserted claims excludes "alias" from having a graphical element. Those claims require that the "alias" be "defined," "identif[ied]," or "display[ed]," or that the user have the ability to "interact[]" with it. '276 Patent col. 34 l. 66, col. 35 l. 45, col. 36 l. 2, col. 38 l. 8. A graphical "alias" on its face meets each of these criteria. Accordingly, the district court's text-only limitation cannot be grounded in the words that "define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The specification's summary of the invention likewise "does not contain any disclaimer, let alone a clear and unmistakable disavowal," of a graphical "alias." *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1384 (Fed. Cir. 2014). As generally described there, an "alias" or "alias term"—like its associated "link term"—is a "link[]" that "enable[s] the user to instantly view a file, object, or document referenced" not only by defined text but also by "another file, object or document currently being viewed." '276 Patent col. 6 ll. 35-37; *see also id.* col. 5 ll. 63-66 ("The link module may further enable at least one alias term to be defined for any

24

selected link term to enable a link to be established between each alias term and any of the files in the database.").

That latter category broadly "encompasses documents and any other digital object that contains machine or individual readable or searchable information," '276 Patent col. 9 ll. 20-22; *see also* col. 5 ll. 47-50 (providing non-exhaustive list of exemplary file types), including two file formats that incorporate graphical elements: (1) "HTML format files used over the internet" that may "include display codes for *** graphics," which "a system according to the present invention" is equipped to "handl[e]," *id.* col. 10 ll. 14-17; and (2) Rich Text Format (RTF) files that may contain "an image" that the invention is capable of identifying and sequencing, *id.* col. 22 l. 59. These statements provide "dispositive" support for the conclusion that a graphic (or file, object, or document containing a graphic) may serve as an "alias." *Phillips*, 415 F.3d at 1315 (citation and quotation marks omitted).

Beyond the general description of the invention, the exemplary preferred embodiments further disclose that an "alias" may take the form of a graphic. The specification describes the ability to view a "document *** retrieved" in the course of a search, for which "[a] document display window *** displays text *and* graphics." '276 Patent col. 28 ll. 7-8 (emphasis added); *see also id.* col. 34 ll. 17, 21-23 (describing multiple-external-search-engine "implementation of the

invention" where search results "may include graphics and text"). The user then has the option to define an alias term. *See id.* col. 32 ll. 20-22. To be sure, the example given—"defining aliases for 'vine fruit' to include alias terms 'grape', 'tomato,' and raspberry'"—teaches that all of "those words" would "have a link generated to the glossary file." *Id.* col. 32 ll. 26-29. But nothing in the specification casts doubt on—let alone manifestly disavows—the ability of the program (or a variation of it) to use a graphic of a grape, tomato, or raspberry displayed in the document as an alias. *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *see* pp. 33-34, *infra*.

To the contrary, the specification expressly contemplates the ability to edit graphics and their underlying coding. In the embodiment's "Browser Mode," the user may search for documents and webpages on the Internet, '276 Patent col. 32 ll. 32-65, and "immediately save[] the displayed document, along with all of its *pictures, graphics, images*, hypertext links, and layout into the database," *id.* col. 32 l. 66 to col. 33 l. 1 (emphasis added). The program then allows the user to "manipulate[], delete[], or change[]" both the text and graphics of the webpage. *Id.* col. 33 ll. 34-38. That "editing process automatically makes all adjustments to HyperText links and other HTM codes associated with text or *graphic* elements

26

that are added, deleted, or moved." *Id.* col. 33 ll. 57-60 (emphasis added). That functionality strongly reinforces Indacon's construction allowing a graphic to serve as an "alias."

### 2. *"Alias" must be construed in light of the prior art cited on the face of the patent.*

The prosecution history of the '276 Patent provides additional intrinsic evidence that "alias" or "alias term" includes a graphical element that serves as a hyperlink. *See Phillips*, 415 F.3d at 1317 ("The prosecution history, which we have designated as part of the '*intrinsic* evidence,' *** includes the prior art cited during the examination of the patent.") (emphasis added).

An "alias" in the claimed invention creates an association between a displayed file, object, or document and another file, object, or document in a database. That association necessarily takes the form of a "custom link[] between selected files of the selected database" that "are typically referred to as hypertext links." '276 Patent col. 11 ll. 20-23; *see id.* col. 11 ll. 35-36 (extending discussion to "alias"). In every instance "alias" or "alias term" appears in the asserted claims and the specification, it is discussed in the context of establishing a hypertext link to a file.[4] That "context" is "highly instructive," as "[t]his court's cases provide

---

[4] *See* '276 Patent col. 5 ll. 64-67 ("The link module may further enable at least one alias term to be defined for any selected link term to enable a link to be established between each alias term and any of the files in the database."); *id.* col.

numerous similar examples in which the use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314; *see also Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) ("The interchangeable use of the two terms is akin to a definition equating the two.").

The phrase "hypertext links," as used in the '276 Patent, had an ordinary meaning in the art. Two patents—both cited as references on the face the '276 Patent and considered by the examiner during prosecution, *see* '276 Patent, at [56] ("References Cited")—used "hypertext links" to describe both text and graphics in a closely analogous context:

> One technique for using keywords has become commonplace on the global computer network known as the Internet. Stored on database/servers on the Internet are thousands of data records which

---

6 ll. 30-31 ("Operation is similar for alias link terms if defined."); *id.* col. 24 ll. 46-48 ("For example, a user may want to use aliases or synonyms so that 'equine' is also linked when 'horse' is in the primary pattern."); *id.* col. 32 ll. 20-23 ("An Alias Control section *** allows the user to define an unlimited number of aliases in a Current Aliases window *** for a link term so that strict correlation between terms linked to target files is not necessary."); *id.* col. 34 l. 66 to col. 35 l. 2 ("wherein the link module enables at least one alias term to be defined for the any link term to enable a link to be established between the at least one alias term and the any of the plurality of files"); *id.* col. 35 l. 45 ("at least one selected link term including at least one alias"); *id.* col. 37 ll. 6-9 ("wherein said link definition step includes defining at least one alias term for at least one of the selected terms to establish linking relationships between the at least one alias term and one of the designated files"); *id.* col. 38 ll. 8-10 ("identifying at least one alias of at least one of the selected terms for which custom linking relationships with designated files are defined"); *id.* col. 38 ll. 12-13 ("enabling interaction with the at least one alias via at least one input device to enable perusal of linked files").

> contain references to still other data records in the form of textual or
> *graphic* "hypertext links." These hypertext links are merely
> *associations* between keywords in a data file and an address *pointer*
> which *points* to another data record, or file. *** Upon viewing a file
> in HTML format with a "browser" software package, a user can
> readily identify the keywords and *graphic* images which point to
> another file on the Internet, i.e., constitute a hypertext link.

A2706, U.S. Patent No. 5,895,461, col. 2 ll. 52-59, 62-66 (filed Oct. 9, 1996)

(emphasis added); *see also* A2733, U.S. Patent No. 5,890,172, col. 1 ll. 45-47, 53-

54 and col. 2 ll. 40-41 (filed Oct. 8, 1996) (describing "hypertext link within a file

to another file," and stating that "HTML describes the structure of a file ***

includ[ing] titles, paragraphs, images and any pointers to other files," and that "[a]

hot-link displays at the user level as text or graphic").

Despite the fact that "hyper*text* link" itself incorporates the word "text," that

expression was well understood to denote graphical elements in addition to textual

elements at the time of invention. Even Facebook conceded as much, stating in its

opening claim construction brief that "[t]he term 'hypertext link' generally refers to

a button, icon, or textual expression that appears on a user's web browser on which

the user can 'click' to jump to another location or perform some action." A803 n.5.

The fact that the '276 Patent's use of "alias" and "alias term" comports with

that description is a firm indication that the inventors intended to employ the

"ordinary meaning" of "hypertext link" when discussing them. *Phillips*, 415 F.3d

at 1313 ("[W]e must look at the ordinary meaning in the context of the written

description and the prosecution history.") (citation and quotation marks omitted). The asserted claims and specification refer to the establishment of an "association," '276 Patent col. 34 l. 63, using links that designate "pointers" to other files, *id.* col. 2 ll. 59-62, col. 3 ll. 31-34. Because the '276 Patent employs the cited prior art's terminology for describing hypertext links, "alias" should be interpreted to have the same "text or graphic" scope. *See Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1374 (Fed. Cir. 2013) (construing claim term in light of prior art patent in light of what "a person of ordinary skill in the art would recognize"); *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1319 (Fed. Cir. 2001) (using "prior art reference cited during the prosecution" to "confirm[] \*\*\* the meaning" of disputed claim term "to people of ordinary skill in the art").

## B. The District Court Erred In Equating "Alias" With "Term," As Narrowly Construed

Citing a handful of lines from the specification and giving short shrift to the prosecution history, the district court construed "alias" as limited to textual elements because, in its view, the specification refers to an "alias term" and a "term" is "defined" as a "[t]extual expression, such as words, symbols, or characters." A26. That reasoning disregards several established tenets of claim construction and misinterprets the specification.

### 1. *"Alias" is more closely tied to "link term" than "term."*

As a threshold matter, the district court was wrong to predicate its

construction of "alias" on its definition of "term." The claim language and the specification demonstrate that the inventors did *not* equate "alias" with "term" standing alone. Because "alias" is not coextensive with or dependent on the meaning of "term," whether "term" (unmodified) must be limited to text is not significant, let alone dispositive.

Consistent with the fact that an "alias" presents as a hyperlink that was known in the art to encompass both text and graphics (*see* pp. 27-30, *supra*), the inventors described "alias" and "alias term" as corresponding to "*link* term." *See, e.g.*, '276 Patent col. 34 ll. 66-67 ("the link module enables at least one alias term to be defined for the any *link* term") (emphasis added); *id.* col. 11 ll. 35-36 ("Each alias is treated in a *similar* manner as its corresponding *link* term.") (emphasis added). Indeed, in noting the similarity between "alias" and "link term," the specification refers to "alias" as an "alias link term[]." *Id.* col. 6 ll. 30-31. And even the specification passages cited by the district court repeatedly refer to "alias term" hand-in-hand with "link term," not with "term" in isolation. A26 (citing '276 Patent col. 5 l. 62 to col. 6 l. 6, col. 11 ll. 32-37, col. 24 ll. 46-48); *see also* A28 (noting that "an 'alias' was created for any 'link term'"); *accord* A3039 (same for magistrate judge).

Given the breadth of "link term," that distinction is a meaningful one in the context of the asserted claims. "Link term" is plainly identified in the specification

as a hypertext link:

> The system **170** may further include a link module **177** that enables a user to define one or more custom links between selected files of the selected database **175**. *Such links are typically referred to as hypertext links.* For example, the user may choose one or more *link terms* that should be linked to at least one file, either in the same database or a different database, in the selectable database **175**. The link module **177** allows an essentially unlimited number of such *link term/file* pairs to be created. As further described below, when a *link term* is encountered in a file or document, the *link term* is indicated or otherwise highlighted so that the user can select the indicated *link term* to jump to the *linked file*.

'276 Patent col. 11 ll. 19-32 (emphasis added). As the magistrate judge reasoned, "link term" and "hypertext link," as used in the '276 Patent, are interchangeable. A3038-3039 (noting that "specification refers to ['hypertext links'] as the more commonly referred to name for link terms that have been defined," and concluding that "it appears that a [person having ordinary skill in the art] would have understood 'link term' to include a textual or graphical object").

The district court itself presumed that "link term" supplies a "broader" meaning than the unmodified use of "term." A23; *see id.* (deeming "irrelevant that the modifier changes the scope of the word 'term', [when] the word 'term' is at issue, not its modifier, nor the word 'term' coupled with its modifier"). Because "alias" and "alias term" are more closely associated with "link term," it follows from the district court's own logic that they must be given a broader construction than "term" as well. *A fortiori* the definition of "term" does not control the

construction of "alias."

> 2. *The district court's construction of "term" is itself too narrow.*

In any event, the passage the district court (A20, 26) relies upon for its purported "definition" of "term"—and, by (erroneous) extension, its construction of "alias"—falls short of the "exacting" standard "for finding lexicography." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). It reads:

> The user makes an inquiry about specific words or phrases by entering those specific words or phrases via the search module **183**. The search module **183** first parses the inquiry into a list of its discrete terms, i.e., words, numbers, spaces, etc., and then accesses the database index **200** to locate the terms in various files/documents of selected databases.

'276 Patent col. 12 ll. 51-57. A non-exhaustive list of possible "terms" in the context of an example neither "clearly set[s] forth a definition" of "term"—let alone "alias"—nor "clearly express[es] an intent to redefine th[ose] term[s]." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-1366 (Fed. Cir. 2012) (citation and quotation marks omitted). The specification provides that example, moreover, in the context of explaining how the "search module" finds "terms," '276 Patent col. 12 ll. 53-57, not how the "link module" defines an "alias," *id.* col. 32 ll. 15-31 (discussing "Alias Control" in embodiment).

Because the purported definition appears in a description of a preferred embodiment, it is even less likely that the reference to "words, numbers, spaces, etc." was intended to redefine "term" and, again by extension, "alias." To hold

otherwise, as the district court did, would contravene this Court's "repeated[] warn[ings] against confining the claims to those embodiments" set forth in the specification. *Phillips*, 415 F.3d at 1323. Indeed, in assessing whether an inventor intended to act as a lexicographer, "[i]t is not enough for a patentee to *** use a word in the same manner in all embodiments." *Thorner*, 669 F.3d at 1365. The patentee must "demonstrate[] a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction," *Hill-Rom Servs.*, 755 F.3d at 1372 (citation and internal quotation marks omitted)—a showing absent here.

Here, the specification makes clear that the description of the embodiment relied upon by the district court is illustrative, rather than restrictive, of the type of "aliases" that may be defined. The discussion appears in the section entitled "Detailed Description of the Preferred Embodiment," '276 Patent col. 5 ll. 64-65 (capitalization omitted), and is twice prefaced by the caveat that Figures 1C and 2, on which the explanation is based, are "exemplary," *id.* col. 12 ll. 27, 45; *see id.* col. 7 ll. 6-11 (captioning Figure 1C as "a block diagram illustrating" the present invention, and Figure 2 as "a block diagram of an exemplary searchable database index"). *See also Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012) (giving effect to similar caveat). The specification cautions against reading the description of the preferred embodiments as limiting the "system and method according to the present invention *** to the specific form set forth herein," to the

34

exclusion of "such alternatives, modifications, and equivalents, as can be reasonably included within the spirit and scope of the inventions as defined by the appended claims." '276 Patent col. 34 ll. 42-53; *see also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1331 (Fed. Cir. 2012) (describing specification with similar caution).

### 3. *The district court failed to confront the prior art intrinsic evidence.*

The district court incorrectly dismissed prior art references establishing that "hypertext links"—including an "alias" hypertext link—were naturally understood by those familiar with the state of the art to include graphics. Contrary to the district court's label (A27), these references were not less-favored "extrinsic evidence." *See V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (existing patent "listed as a reference on the face of the [patent at issue] *** is not extrinsic evidence"); *Kumor v. Ovonic Battery Co.*, 351 F.3d 1364, 1367-1368 (Fed. Cir. 2003) ("Our cases also establish that prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.").

In any event, the district court did not dispute that "an 'alias' functions as a hyperlink and that hyperlinks were known in the art to be both textual or graphical." A27-28. The court instead reasoned that crediting the context in which "alias" uniformly appears in the asserted claims and the specification, as well as

the prior art references on hyperlinks, would give "alias" a meaning "broader than the specification." A28. For the reasons just explained, however, the discussion of a single preferred embodiment does not provide the clear indication necessary for construing "alias"—which in all instances serves as a hypertext link—more narrowly than its established scope.

## II. THE DISTRICT COURT INCORRECTLY CONSTRUED "CUSTOM LINK," "CUSTOM LINKING RELATIONSHIP," AND "LINK TERM" TO EXCLUDE CREATION OF A LINK FOR LESS THAN ALL INSTANCES OF A DEFINED TERM

Beyond improving the effectiveness of a user's search for information in the Internet age by allowing target files to be associated with link terms and aliases, the claimed "data acquisition and perusal system" placed additional pertinent information at the user's fingertips through the automated generation of hyperlinks. *See* '276 Patent col. 6 ll. 32-38. A user could efficiently establish these hyperlinks and tailor them to a particular need, obviating prior reliance on a third-party or manually generated index. *See* pp. 7, 10, *supra*. The invention denotes these attributes in the asserted claims by referring to a "link term," a "custom link," and a "custom linking relationship."

Accepting Facebook's view, the district court held that those terms "must be construed so that 'each instance' of the custom link can be displayed as a link whenever the user encounters the term." A32. Once again channeling a preferred embodiment, the court failed to give due weight to the language of unasserted

36

claims expressly adding a limitation (absent in the asserted claims) that provides for generation of links in "*all* instances" of a defined term. The court committed reversible error in disregarding the presumption afforded by the doctrine of claim differentiation that the asserted claims contain no such "each instance" or "all instances" limitation.

### A.    The Claim Language And The Doctrine Of Claim Differentiation Compel Indacon's Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). It is equally axiomatic that "claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Id.* at 1116 (alterations in original) (citation and quotation marks omitted). Here, the language of the '276 Patent claims read together supports a construction under which the asserted claims would cover a product that allows less than all instances of a defined term to be displayed as a hyperlink.

The asserted claims address the extent to which links are generated for defined terms. Claims 2 and 9 respectively describe the related processes of defining custom links by "designat[ing] *** a pattern that corresponds to one or

37

more text strings," and "defining custom linking relationships between selected terms and designated files of the selected database" where the term at issue consists of "a pattern that corresponds to one or more text strings." '276 Patent col. 35 ll. 15-19, col. 37 ll. 27-31. Both of those steps involve "linking *instances* of the one or more text strings in the selected files with other of said selected files," *id.* col. 35 ll. 20-22, col. 37 ll. 31-33 (emphasis added). That is precisely the construction that Indacon proposed and the district court rejected. *See* A28 ("A link the user can define using a chosen term that allows *instances* of the term *** to be identified and displayed[.]") (emphasis added).

Other unasserted claims confirm that the unmodified use of the word "instances"—as opposed to "each instance" or "all instances"—was purposeful. *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment ***. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.") (internal citation omitted). In contrast to the reference to "instances" in claims 2 and 9, claims 14 and 15 refer to the capability of "generating links between *all* instances of the [link or alias term]." '276 Patent col. 38 l. 65, col. 39 l. 3, col. 40 l. 1 (emphasis added). Under the doctrine of claim differentiation, "common sense" dictates that the insertion of "all" in claims 14 and

15 indicates that the asserted claims—which refer only to "instances"—"have different meanings and scope." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) (citation and quotation marks omitted); *see also* A31-32. At the very least, the fact that only unasserted claims 14 and 15 refer to the generation of links in "all instances"—the construction Facebook proposes— strongly implies that the inventors did not intend to impose such a limitation in the asserted claims.

## B. The District Court's Reasoning Contravenes Basic Claim Construction Principles

The district court's justification for overriding the plain language of the asserted claims and the doctrine of claim differentiation consisted of a single sentence: "Throughout the patent, Indacon cites no instance of a link term that cannot be displayed as a link when encountered in the files (docket no. 98 at 3), and the term cannot be construed broader than [the] specification." A32. That scant reasoning cannot bear the weight the district court places on it.

The district court's construction inserts the modifier "each" into the asserted claims so that "instances" would mean "each instance," thereby imposing a new limitation. Relatedly, the district court's construction of "instances" effectively excises the distinct use of "all" from "*all* instances" in claims 14 and 15. A district court, however, has no authority to rewrite patent claims or render certain words meaningless. *See Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1321

39

(Fed. Cir. 2013) ("Taurus's proposed construction conflicts with the plain language of [the] claim ***. By accepting Taurus's proposed construction, the district court would have effectively rewritten the claim language from 'user-defined relationship information' to '*system*-defined relationship information.'"); *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1329 (Fed. Cir. 2013) (stating that term "should be understood in a way that does not render the actual words of the claim superfluous"). As the Supreme Court long ago explained, focusing the inquiry on the words the inventor chose is fundamental to claim construction:

> we know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement. The difficulty is that, if we once begin to include elements not mentioned in the claim, in order to limit such claim, *** we should never know where to stop.

*McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895), *quoted in part in Phillips*, 415 F.3d at 1312.

In addition to that error, the district court's reasoning subverts the claim language in other ways. Because the difference in language between the asserted and unasserted claims triggers the doctrine of claim differentiation—a point that the district court did not dispute—it became *Facebook's* burden to make an affirmative showing that "the circumstances suggest a different explanation." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). In

*Liebel-Flarsheim*, for example, this Court rejected an alleged infringer's proposed construction because the presumption afforded by the doctrine remained "unrebutted in th[e] case, as [the alleged infringer] had offered no alternative explanation for why the 'pressure jacket' limitation is found in the dependent claims but not in the corresponding independent claims." *Id*. The district court effectively flipped that presumption here by relying on *Indacon's* supposed failure to make a showing from the specification beyond what the claim language itself required. *See* A32 ("Indacon cites no instance of a link term that cannot be displayed as a link when encountered in the files.").

To the extent a clear indication in the specification could overcome the presumption from the doctrine of claim differentiation, no such indication can be found here. To the contrary, the specification discloses the ability to link only some instances of a defined term. As the summary of the invention states, when a "link term" is defined "[t]he system and method may automatically, unambiguously, and accurately place reference links among documents within a database it creates *according to a schema controlled by the user*," including through the use of "patterns" and "wildcard characters." '276 Patent col. 6 ll. 4-5, 32-35 (emphasis added). A user, for example, could instruct the system to generate hyperlinks for instances of a given term that appear only in conjunction with other words, leaving other instances of the term unlinked. *Cf. id.* col. 31 ll. 7-

8 ("For example, a pattern '# s*d #' matches '9 sand 977', '843 S.W.2d 955', etc.").

The district court, however, failed even to cite that portion of the specification. Instead, it apparently looked only to a preferred embodiment.[5] As explained above (pp. 33-34, *supra*), "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim*, 358 F.3d at 913. Although the district court purported to recognize that "broad claims should not be limited by the specification," A33, it contradicted that principle through its application here, A32 ("the term cannot be construed broader than [the] specification").

## CONCLUSION

For the foregoing reasons, this Court should adopt Indacon's proffered claim constructions, reverse the stipulated judgment of non-infringement, and remand the case for further proceedings.

---

[5] The court's parenthetical citation to "docket no. 98 at 3," A32, corresponds to Facebook's Response to Indacon's Objections to the magistrate judge's claim construction recommendation, A3970. That document, in turn, discusses and cites only a preferred embodiment. A3975.

Dated:  March 26, 2015

Respectfully submitted,

*/s/ Pratik A. Shah*
Pratik A. Shah
pshah@akingump.com
Emily C. Johnson
johnsone@akingump.com
James E. Tysse
jtysse@akingump.com
Z.W. Julius Chen
chenj@akingump.com
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC  20036-1564
Phone:   (202) 887-4000
Fax:       (202) 887-4288

*Counsel for Indacon, Inc.*

# ADDENDUM

FILED

SEP 0 6 2013

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| INDACON, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Cause No. SA-10-CA-00966-OLG |
| | § | |
| FACEBOOK, INC., | § | |
| Defendant. | § | |
| | § | |

## ORDER ADOPTING IN PART MEMORANDUM AND RECOMMENDATION

On this date came on to be considered the Memorandum and Recommendation (docket no. 80) of United States Magistrate Judge John W. Primomo filed in this cause on December 16, 2011 in which he recommends that US Patents No. 6,834,276 (the '276 patent) entitled "Database System and Method for Data Acquisition and Perusal", and its continuation, US Patent No. 7,836,043 (the '043 patent) be construed in various ways. The parties have filed voluminous objections (docket no. 91 & 93) to the Magistrate Judge's claim construction. When such objections are filed, the Court reviews the matters raised by the objections *de novo*. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings and recommendations to which objection is made."). After reviewing the Memorandum and Recommendation and the papers on file in this case, the Court concludes that the Magistrate Judge's recommendations should be accepted in part and rejected in part as outlined below, and that this.

### I.  Background

The two patents in suit, Patent '276 and '043, are related and claim priority to a common original application filed February 25, 1999. Further, both patents share substantially the same

1

**A003**

description of the preferred embodiments. The patents-in-suit disclose a method and a system for acquiring, creating, manipulating, indexing and perusing data. The system is based on four modules: a database selection module; a link module; a database index generator module; and a search module.

The parties have agreed to two of the claim constructions as proposed by the Magistrate Judge, the remaining twelve constructions are in dispute.

## II.   **Claim Construction Principles**

The construction of a patent claim is a matter of law exclusively for the Court to decide. *Markman v. Westview Instr., Inc.,* 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). In construing claim language to ascertain its meaning of a word or phrase, the court looks at three sources: the specification, the claims, and the prosecution history. *Markman*, 52 F.3d at 979. However, "[e]xpert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used." *Markman*, 52 F.3d at 979 (quoting *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed.Cir.1987)).

The claims of a patent must be read in light of the specification of which the claims are a part. *Markman*, 52 F.3d at 979 (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 397 (Ct. Cl. 1967)); *see also Winans v. Denmead*, 56 U.S. 330, 338, (1853); *Bates v. Coe*, 98 U.S. 31 at 38-39 (1878). The specification is the written description of the claimed invention, which enables one of ordinary skill in the art to make and use the invention. *Markman*, 52 F.3d at 979. For claim construction purposes, the specification can constitute a "sort of dictionary, which explains the invention and may define terms used in the claims" *Id*. The specification itself does not restrict the right to exclude; rather, that is the function and purpose of claims. *Id*. at 980.

A004

Claim terms are typically given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

To ascertain the "ordinary and customary meaning" of a claim term, "the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). The sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.. However, extrinsic evidence is less significant than the intrinsic record in determining the legally operative meaning of patent claim language. *Id.* at 1317. Extrinsic evidence in the form of expert testimony is beneficial "for [a] variety of purposes, such as to provide background on [the] technology at issue, to explain how [an] invention works, to ensure that [a] court's understanding of [the] technical aspects of [a] patent is consistent with that of person of skill in the art, or to establish that [a] particular term in [a] patent or prior art has [a] particular meaning in [a] pertinent field." *Id.* at 1318.

Similar to the specification, the prosecution history of a patent attempts to explain the patent and provide evidence of how the PTO and the inventor understood the patent. *Phillips*, at 1317. The prosecution history of a patent is often referred to as the Patent File Wrapper upon the issuance of a patent. Black's Law Dictionary defines the Patent File Wrapper as:

3

> The complete record of proceedings in the [United States] Patent and Trademark Office from the initial application to the issued patent . . . ; specif., a patent . . . application together with all documentation, correspondence, and any other record of proceedings before the [United States Patent and Trademark Office] concerning that application. — Also termed file history; prosecution history.

BLACK'S LAW DICTIONARY 704 (9th ed. 2009). Additionally, the prosecution history of a patent, is designated as part of the "intrinsic evidence," and consists of the complete record of the proceedings before the United States Patent and Trademark Office ("USPTO") and includes the prior art cited during the examination of the patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 399 (Ct. Cl. 1967)).

The prosecution history of a patent often lacks the clarity of the specification, and thus is less useful for claim construction purposes. *See Phillips* at 1317 ("The prosecution history comprises an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation."). The prosecution history of the patent often provides advice as to the meaning of the claim language, by demonstrating how the inventor understood the invention and whether said inventor limited the invention during the prosecution of the patent, whereby the patents scope is narrower than it otherwise would be. *See Phillips* at 1317; *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'") (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

Therefore, in construing the meaning of the claims in the case at bar, all the aforementioned sources (the specification, the claims, and the prosecution history), including extrinsic evidence can be used. *Markman* at 979.

4

**A006**

III.    **Disputed Terms & Phrases Construction**

The Magistrate Judge's Memorandum and Recommendation (docket. No. 80) adopted fourteen constructions of various term phrases that are in dispute within the '276 Patent and '043 Patent. The parties objected to twelve terms and phrases, and agree on two claim constructions by the Magistrate Judge.

a.    **"File"**

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent '276 | Claim No. 1-4 & 8-11 | Any digital object that contains machine or individual readable or searchable information, including composite files comprised of multiple elements stored in separate files. | A document or digital object, **other than a database**, that contains machine or individual readable or searchable information | **Any digital object that contains machine or individual readable or searchable information, including a composite file comprised of multiple elements stored in separate files.** | Adopt Magistrate Judge's construction |
| Patent '043 | Claim No. 19 & 21 | | | | |

The Memorandum and Recommendation (docket no. 80) adopts the construction of the term "File" within the claims in the aforementioned location, similar to the proposed construction of Indacon.

The Magistrates construction of the term 'File' is adopted in its entirety.

Facebook objects to the Memorandum and Recommendation (docket no. 80) on three grounds. First, Facebook argues that a 'file' is distinct from a 'database'. Second, the

5

construction of the phrase 'composite file' is inaccurate. Finally, Facebook argues that the term "database" should not be construed at the present time claiming it is not ripe for construction.

First, Facebook objects to the Memorandum and Recommendation (docket no. 80) claiming that a 'file' is distinct from a 'database' by arguing that the claims would make no sense "if a file could be a database or vis-versa." (Docket no. 91). Facebook correctly noted that claim terms are typically given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). However, a person of ordinary skill in the art is to read the claim term not only in the context of a particular claim but also in the context of the entire patent, including the specification. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005). Furthermore, the Federal Circuit has stated that it "cannot look at the ordinary meaning of the term ... in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed.Cir.2005). Additionally, the specification "is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Even though claims are typically given their ordinary and customary meaning to a person skilled in the art at the time of the invention, an inventor is allowed to define certain terms within the specification. The Federal Circuit, in *Phillips v. AWH Corp.,* claimed that "our cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." 415 F.3d 1303, 1316 (Fed. Cir. 2005).

The specification, for claim construction purposes, can constitute a "sort of dictionary, which explains the invention and may define terms used in the claims" *Markman*, 52 F.3d at 979. The term "file", is expressly defined in the specification as "encompass[ing] documents and any other digital object that contains machine or individual readable or searchable information." U.S. Patent No. 6,834,276 col.9 ll.20-24 (filed Feb. 25, 1999). The specification further provides examples of various file types that can be contained within a file database: "internet or HTML format (or simply HTM), word processor format including DOC files generated by MS-Word, or similar word processing files generated by WordPerect®, text format, RTF (Rich Text Format) files, drawing files, *database files, etc.*" '276 Patent, col.10 ll.51-56 (emphasis added). Basically, the specification states that a 'file' can include various internet file types, word processing file types, drawing files as well as database files. Therefore, specifically excluding the term 'database' from the definition of a 'file' is inconsistent with the definition of a 'file' as defined in the patents at issue.

Second, Facebook further objects to the Memorandum and Recommendation claiming that it mischaracterized what a 'composite file' is. Facebook does not dispute that a composite file is a type of file; rather Facebook claims that "elements stored in different files are not part of the composite file." (docket no. 91 at 18).

The court finds Facebook's objection unpersuasive as the specification coupled with the preferred embodiment teaches away from said objection. The specification explains that a 'composite file' "appears to be a single document presented on the computer monitor but which actually may be a compilation of multiple text and graphic elements stored in separate files." '276 Patent, col.10 ll.16-23. The specification teaches that a 'composite file' is a compilation of many elements which *may* be stored as separate files. '276 Patent, col.10 ll.16-23. The

7

**A009**

specification further lists "HTML format files used over the internet" as an example of a composite file, as HTML files *include* "display codes…, graphics, fonts, hyperlinks, and other characteristics…". '276 Patent, col.10, ll.15-19. Furthermore, the issue as to whether the elements stored as separate files are part of the 'composite file' is addressed by the preferred embodiment of the invention as the specification states that the "system according to the present invention *includes special features for handling composite file types*". '276 Patent, col.10 ll.15-16 (emphasis added). Fig. 4a, of the '276 patent illustrates the application the invention regarding HTML files (an example of a 'composite file'). '276 Patent, cols.22-24. The Federal Circuit in *Adams Respiratory Therapeutics v. Perrigo*, held that excluding the preferred embodiment from construction is "rarely if ever correct". 616 F.3d 1283, 1290 (Fed. Cir. 2010). Therefore, a composite file can include multiple elements stored in separate files.

Similarly, the Court finds Facebook's third argument, that the term 'database' is not ripe for construction, to be irrelevant in construing the term 'file,' and regardless, finds the argument unpersuasive.

b. **"Selectable Database"**

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent | Claim No. | One of More databases comprising files selected by a user | A database that **includes one or more distinct databases selected by the user** containing one or more files selected by the user | **A database that includes one or more databases selected by the user containing one or more files selected by the user** | Adopt Magistrate Judge's construction |
| '276 | 1-4 & 8-11 | | | | |

**A010**

The Memorandum and Recommendation (docket no. 80) adopts the construction of the term "Selectable Database" within the claims in the aforementioned location, similar to the proposed construction of Facebook.

Both Facebook and Indacon agree that the aforementioned phrase includes files selected by the user, however, both parties object to the Memorandum and Recommendation on various grounds. The objections are overruled and the Magistrate Judge's construction of the term 'Selectable Database' is adopted in its entirety.

Indacon objects to the Memorandum and Recommendation claiming that the word 'selectable' refers to the selectability of files in the database not the selectability of a particular database from among a group of databases (docket no. 93 at 12). However, both the claims and the specification teach away from what Indacon suggests.

The claimed invention is comprised of four modules; the first module is entitled "a database selection module." The specific claim language describing said module, provides for "… *a database selection module that enables selection of a plurality of files for inclusion into at least one selectable database*…". '276 Patent, col.34 ll.56 (emphasis added). The claim inserts the word 'selectable' to describe the database, implying that there are multiple databases. Conversely, Indacon asserts that the term 'selectable' assists in identifying the database, as it refers to the user selected files within the database. The specification, in describing the 'database selection module,' supports the former rather than the later.

The specification, in describing the 'database selection module,' states: "The system shown in FIG. 1C includes a database selection module that enables a user to *select any number of any type of files from the file database for inclusion into a selectable database.* . . ." '276 Patent, col.10 ll.66-67, col.11 ll.1-2. The specification describes the 'database selection module'

9

as having two particular databases, (1) a 'file database' and (2) a '*selectable* database'; whereby files are selected by the user in the 'file database' to be included into the '*selectable* database(s)'. The specification further describes the '*selectable* database' as comprising: "…one or more databases…" '276 Patent, col.11 ll.8-9. The files selected from the 'file database' to be included into the 'selectable database(s)' can include one or more databases.

The constant use of 'selected' and its counterpart 'selectable' throughout the patent specification and claims indicate that the term refers to selectability of a particular database not the selectability of files to be included in a database.

Facebook objects to the Memorandum and Recommendation claiming that the claim construction should include the term 'distinct'—thereby further distinguishing the databases. (docket no. 91 at 8). Facebook's proposed modification is unnecessary.

c. **"Database Selection Module"**

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent | Claim No. | Any combination of hardware and software implemented to enable a user to select files for inclusion in to a selectable database | No construction offered | **Any combination of hardware and software implemented to enable a user to select files for inclusion in to a selectable database** | Adopt Magistrate Judge's construction |
| '276 | 1-4 | | | | |

The Memorandum and Recommendation adopts the construction of the phrase "Database Selection Module" within the claims in the aforementioned location, analogous to the proposed construction of Indacon.

For the reasons stated below, the Magistrate's construction of the phrase "Database Selection Module" is adopted in its entirety.

Facebook objects to the Memorandum and Recommendation claiming that the phrase "Database Selection Module" is indefinite and therefore invalid as argued in Facebook's Motion for Summary Judgment. (docket Nos. 40, 51). Facebook argues that the term, 'Module', is purely functional thereby the term fails to point out the scope of the alleged invention.

A patent is presumed valid, and Facebook, as the party seeking to invalidate a patent, bears the burden of overcoming the presumption of validity by clear and convincing evidence. 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. Partnership,* 131 S.Ct. 2238, 2243, (2011); *United Sates Gypsum Co. v. Nat'l Gypsum Co.,* 74 F.3d 1209, 1212 (Fed. Cir. 1996); *Hibritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed. Cir. 1986). Close questions of indefiniteness "are properly resolved in favor of the patentee." *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1348 (Fed.Cir.2005); *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1380 (Fed.Cir.2001)

To rule "on a claim of patent indefiniteness, a court must determine whether one skilled in the art would understand what is claimed when the claim is read in light of the specification." *Bancorp. Servs., L.L.C. v. Hartford Life Ins. Co.,* 359 F.3d 1367, 1372 (Fed.Cir.2004). The Magistrate Judge found that the term 'Module' as used in the claims at issue indicates sufficient structure to one of ordinary skill in the art, thereby resolving Facebook's argument that the term was purely functional. (docket 79 at 10-13).

This court affirms the Magistrate's denial of Facebook's summary judgment motion (docket no. 79). Further, since Facebook did not offer any subsequent construction, the Court adopts Indacon's construction for the phrase "Database Selection Module".

d. **"enables selection of a pularity of files for inclusion into at least one selectable database"**

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent '276 | Claim No. 1-4 | Allows the user to choose multiple files to be <u>included</u> into at least one selectable database, <u>either by copying files into local storage or maintaining a link to files of interest</u> | Allows the user to choose multiple files to be <u>captured and deposited</u> into a selectable database <u>as opposed to accessing and retrieving data from other databases</u> | **Allows the user to choose multiple files to be included into at least one selectable database, either by copying files into local storage or maintaining a link to files of interest** | Adopt Magistrate Judge's Construction |

*See Infra* Section III(e).

e. **"Selecting a plurality of the located files... for automatic inclusion into at least one selectable database"**

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent '276 | Claim No. 8-11 | Choosing multiple files to be automatically <u>included</u> into <u>at least one</u> selectable database, <u>either by copying files into local storage or maintaining a link to files of interest</u> | Choosing multiple files to be automatically <u>captured and deposited</u> into a <u>distinct</u> selectable database, <u>as opposed to accessing and retrieving data from another database</u> | **Choosing Multiple files to be automatically included into at least one selectable database, either by copying files into local storage or maintaining a link to files of interest** | Adopt Magistrate Judge's Construction |

The Memorandum and Recommendation adopts the construction of the phrases *"enables selection of a pularity of files for inclusion into at least one selectable database"* and *"Selecting a plurality of the located files... for automatic inclusion into at least one selectable database"* within the claims in the aforementioned location, analogous to the proposed construction of Indacon.

Just as the Magistrate Judge, in the Memorandum and Recommendation, combines two disputed claim phrases into one analysis as they share a common clause: *"for [automatic] inclusion into at least one selectable database"*, this Court does so as well.

The Magistrate's construction of the phrases *"enables selection of a pularity of files for inclusion into at least one selectable database"* and *"[s]electing a plurality of the located files... for automatic inclusion into at least one selectable database"* is adopted in its entirety.

Facebook objects to the Memorandum and Recommendation claiming that (1) the claim language itself supports Facebook's construction; and (2) the prosecution history of the patent confirms Facebook's construction of the terms.

Frist, Facebook asserts that the plain language of the claims support its claim construction, Because the claim terms "file" and "inclusion into . . . [a] database" support a showing that the file is placed *inside* the database, not that the file is left *outside* of the database, whereby the database contains merely a link to that file. (docket no. 91 at 8-9).

However, the claims of a patent must be read in light of the specification to which the claims are a part of. *Markman*, 52 F.3d at 979. For claim construction purposes, the specification can constitute a "sort of dictionary, which explains the invention and may define terms used in the claims" *Id.* "[T]he specification...is the single best guide to the meaning of a

**A015**

disputed claims". *Phillips*, at 1315. The specification of the '276 patent reveals that files included in a database can be maintained by a link to such files.

> The database selection module may be configured to enable selection of the plurality of files both locally and remotely via a network. For example the data acquisition and perusal system and method may be implemented on a computer coupled to a network, where the network may further be connected to the internet. The data acquisition and perusal system and method may be configured to *copy* internet files to a local storage disk, *or to simply maintain a link to the internet files of interest.*
>
> . . .
>
> Files may be copied into local storage *or may be simply accessed via an existing link to that file.*
>
> . . .
>
> If the documents of the database index are located remotely, e.g., on the World Wide Web (WWW) of the internet, the source file location edit box contains a hypertext transfer protocol address, i.e., an 'http' (HyperText Translation Protocol) address to the location. Of course, other types of addresses/designations are available for remotely accessible files, and these various types of addresses/designations are entered into the source file location edit box in a similar manner.

'276 Patent col.5 ll.53-61, col.10 ll.60-65, col.26 ll.34-46.

As explained in the specification, the patent teaches similarly to Indacon's proposed construction, where "files can be included into a selectable database" compared to Facebook's proposed claim construction which asserts files are "*captured and deposited into a distinct selectable database.*" Further, the patent also purports that files in a database can be maintained by a link to said files, as portrayed that the patents emphasis on including internet files into the users database.

Secondly, Facebook argues that during the prosecution of the patent, Indacon disclaimed certain subject matter that they rely on for this claim construction, thereby, allowing Facebook to limit the claimed language. Facebook asserts that the Magistrate Judge in his Memorandum and

14

**A016**

Recommendation "was looking for magic 'disclaimer' language . . ." (docket 91 at 2) in finding a clear and unmistakable disclaimer of subject matter in the prosecution history.

The prosecution history of the patent often advises to the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention during the prosecution of the patent, whereby the patents scope is narrower than it otherwise would be. *See Phillips* at 1317. Further, the prosecution history of a patent constitutes a public record of the patentee's representations concerning the scope and meaning of the claims within the patent, allowing competitors to rely on those representations when ascertaining the degree of lawful conduct. *Searchange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372 (2005). The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent. *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003). Further, prosecution history prevents a patentee from stating during prosecution that the claims do not cover a particular device and then later changing his position by suing a party who makes that same device for infringement. *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003). More simply, "prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

The doctrine of prosecution disclaimer "is well established in Supreme Court precedent", in which it precludes a patentee from recapturing through claim interpretation specific meanings disclaimed during prosecution. *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). In order for prosecution disclaimer to attach, precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.

15

**A017**

*Omega Eng'g, Inc., v. Raytek Corp.,* 334 F.3d 1314, 1325-26 (Fed. Cir. 2003); *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008). However, the doctrine of prosecution disclaimer does not apply in a situation where the "disavowal of claim scope is *ambiguous*." *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (emphasis added); *see also Serrano v. Telular Corp.*, 111 F.3d 1578, 1584 (Fed. Cir. 1997); *cf. Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998) (noting that "explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art *may* serve to narrow the scope of a claim") (emphasis added). For example, the Federal Circuit declined to apply the doctrine of disclaimer, as the court refused to limit the ordinary meaning of a claim, because the alleged disclaimer in the file wrapper was at best "inconclusive." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1347 (Fed.Cir.2001).

The doctrine of prosecution disclaimer narrows the ordinary meaning of a claim where the patentee has unequivocally disavowed a certain meaning to obtain a patent. For example, in *Rheox, Inc. v. Entact, Inc.*, the Federal Circuit ruled that the scope of the patent in suit did not cover "triple superphosphate"—an embodiment expressly disclosed in the written description— because the patentee cancelled a claim covering "triple superphosphate" and expressly disclaimed that compound in his arguments to the examiner to gain patent allowance. 276 F.3d 1319, 1325 (Fed. Cir. 2002).

The Federal Circuit balances the 'importance of public notice' with the 'right of patentees to seek broad patent coverage', and thus has "consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope". *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003). *E.g., Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002) ("[P]rosecution history . . . cannot

16

**A018**

be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter.").

The Court has considered Facebook's objections based on prosecution history and prior art and finds them to be without merit for purposes of this Claim Construction. The Magistrate Judge's construction is adopted and the objections are overruled.

### f.  "Term"

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Courts Construction |
|---|---|---|---|---|---|
| Patent '276 | Claim No. 1-4 & 8-11 | Textual or graphical object | Textual expression, such as a word | **Textual or graphical object** | **Textual expression, such as words** |
| Patent '043 | Claim No. 19&21 | | | | |

The Memorandum and Recommendation adopts the construction of the word "term" within the claims in the aforementioned location, similar to the proposed construction of Indacon.

For the reasons below, the Court finds that Facebook's objection to the construction of this term has merit and it should be sustained; the Magistrate Judge's construction of the word "term" is rejected. The Court finds that the word "term" shall be construed to mean a "textual expression, such as words."

Facebook objects to the Memorandum and Recommendation claiming that the proposed construction improperly broadens the meaning of the word 'term' when there is no basis to do

17

**A019**

so, particularly, (1) the patent defines 'term' with only a textual implication rather than covering both text and graphics, and (2) the prosecution history does not broaden the word 'term' to encompass graphics.

Claim terms must be construed as they would be understood by a person of ordinary skill in the art to which the invention pertains. *Searfoss v. Pioneer Consol Corp.*, 374 F.3d 1142, 1149 (Fed. Cir. 2004). To ascertain the "ordinary and customary meaning" of a claimed term, "the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips* at 1314. The words used in a claim are interpreted in light of the intrinsic evidence of record, which includes the written description, the drawings, and the prosecution history, of a patent. *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1149 (Fed. Cir. 2004).

The word 'term' is defined and described in the specification of the patent as: "[t]he user makes an inquiry about specific *words or phrases* by entering those specific words or phrases via the search module. The search module first parses the inquiry into a list of its discrete terms, i.e., *words, number, spaces, ect.*, and then accessing the database index to locate the terms in various files/documents of selected databases." '276 Patent, col.12 ll.51-57. Particularly, the patent explains that the word 'term' is defined in the association of, "*words, number, spaces, etc.*". *Id.* Indacon argues that the use of 'etc' expresses that the list is non-exclusive and therefore cannot be limited to textual expressions only. It is true, that the use of the word abbreviation 'etc' indicates that the list is non-exclusive; however analysis should not end based on the applicants use of 'etc'. The words utilized by the patent to define 'term', deal only with textual entities and not graphical objects, ie – "*words, number, spaces*". Therefore, the word '*term*' should be defined based on its context, "*words, number, spaces, etc.*" The insertion of the non-exclusive

phrase '*etc*' appears to only elaborate on articles similar in nature, for example symbols or special characters, whereas a graphical object is outside the context of the patent as utilized in the patent.

Indacon also argues that the above passage, "*words, number, spaces, etc.*" relates only to FIG. 2 which is exemplary and therefore should not be used to limit the definition of 'term'. (docket no. 100 at 10)  Indacon asserts that their use of only textual descriptions are only exemplary embodiments and therefore cannot be used to narrow the meaning of the word 'term' in all contexts. (docket no. 100 at 10)   However, throughout the patent itself, the Court finds no other use of "term" to expand its definition beyond textual expressions or to incorporate graphical elements. *See*, '276 Patent col.11 ll.33-36 (". . . the user may define the terms 'grape', 'tomato', 'raspberry', etc., as aliases for a link term 'vine fruit'"); '276 Patent, fig. 11 (the repeated use of the word 'term' portrays solely a textual expression); '276 Patent col.11 ll.57-61 ("The search criterion may be according to any desired function or defined expression(s), such as a *single term, literal phrases or terms comprising text in quotes, multiple words and Boolean operators* (e.g. AND, OR, XOR, etc.), etc.") (emphasis added); '276 Patent col.12 ll.53-57 ("The search module 183 first parses the inquiry into a list of its discrete *terms, i.e., words, numbers, spaces, etc.*, and then accesses the database index 200 to locate the terms in various files/documents of selected databases.") (emphasis added); '276 Patent col.12 ll.58-65 ("In operation, the search module 183 first *compares each term* of the search query *against 'words' contained in a stop word list* 201 of the database index 200. The stop word list 201 is a file containing a list of 'noise words', or words that frequently occur in a file/document that do not contain distinguishable characteristics. For example, *stop words are 'words' such as 'and', 'as', 'the', 'a', 'I', 'for', certain punctuation, etc.*") (emphasis added); '276 Patent col.18 ll.41-47

19

("Thus, the word lists structure 214 is useful when a *search query includes terms* such as leading conflation searches, i.e., searches that call for all *words meeting a search criteria* in which only the last few letters of the search term are required to be met in the search query. For example, *a search for '*ample' creates a hit for the words 'sample', 'example', 'ample', etc.*") (emphasis added).

Indacon also relies on intrinsic evidence, in particular prior art, in arguing that some uses of the word 'term' throughout the patents include a graphical element such as: 'link term' or 'alias term.' Indacon asserts that the Hobbs reference explains that a 'link term' can and should refer to still pictures, moving pictures or graphics.

As stated before, the prosecution history of a patent often advises to the meaning of the claim language by demonstrating how the inventor understood the invention". *Phillips*, 415 F.3d at 1317. Indacon relies on the Hobbs reference where states:

> . . . the present invention concerns a multi-tier client/server model for record retrieval wherein optimum record retrieval from a database is achieved based on embedded expert judgments linked to words, phrases, sentences and paragraphs of text; or numbers; or maps, charts, and tables (*including spread sheet; or still pictures and/or graphics; or moving pictures and/or graphics; or audio elements (hereinafter sometimes collectively referred to as the "links" or "Linked Terms," or when any one of the aforementioned elements are used singly, as the "link" or "Linked Term"*).

U.S. Patent No. 5,987,454 Col.1 ll.13-24 (filed June 9, 1997) (emphasis added). Indacon uses the Hobbs patent to portray that "linked terms" contained both graphical and textual objects according to one of ordinary skill in the art. However, the patents at issue lack any indication that Indacon adopted the definition as used in the Hobbs Patent. "[W]ords in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning." *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999). Even though the Hobbs patent was discussed

during the prosecution of the patents, those communications did not include a definition of the word 'term.' Rather, Indacon defined the word 'term' in the context of textual expressions without indicating it could also include graphical objects. *Supra* (Section III(f)). Finally, the use of "links" or "linked terms" does not indicate the common understanding of a person skilled in the art.

Indacon also asserts (docket no. 100 at 11) that the word 'term' as used throughout the specification is modified by a verity of various words: "Search, Chosen, Alias, and Link", and those words should not be used in an analysis to limit the meaning of the word term.

Claim terms are typically given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. However, "[W]ords in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning." *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999).

Even though, as Indacon argues, that 'Search Term' and 'Link Term' have different scopes, narrower and broader, respectively; it is irrelevant that the modifier changes the scope of the word 'term', as the word "term" is at issue, not its modifier, nor the word 'term' coupled with its modifier.

Indacon uses the Hobbs patent to argue that "linked terms" contained both graphical and textual objects according to one of ordinary skill in the art; however, it appears that Hobbs was

21

A023

acting as his own lexicographer for the words 'link(s)' and 'link term(s)'. The Hobbs patent described various items (including text and graphics) and referred to them as 'link(s)' and 'link term(s)', for the remainder of his patent.

Further, the Memorandum and Recommendation relates 'link terms' to 'hypertext links' to depict that the word term contains graphical elements. If according to the Memorandum and Recommendation, 'hypertext links' (which is understood to contain graphics per the M&R) is more commonly referred to as 'link term,' the patent should have used the word 'hypertext links' rather than 'link term.' Further, no being construed is the word 'term,' not 'link term' nor 'hypertext links'; therefore, to modify the word 'term' with the prefix 'link,' and then relate 'link term' to 'hypertext links' (to argue that the word term contains textual expressions and graphics) goes beyond the scope of the word 'term.'

Based on the prior references it appears that the word 'term' is to be construed as solely a textual expression. Construing 'term' to include both words and graphical objects enlarges what the inventors conceived as their invention at time of issue. The court adopts the interpretation proposed by Facebook.

### g. "Alias"

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent '276 | Claim No. 1, 4, 8, 11 | **Textual or graphical hyperlink** that the user can define to serve as an alternative name or label | **Textual expression** that the user can define to serve as an alternative name or label | **Textual or graphical hyperlink that the user can define to serve as an alternative name or label** | **Textual expression that the user can define to serve as an alternative name or label** |

**A024**

The Memorandum and Recommendation adopts the construction of the phrase *"alias"* within the claims in the aforementioned location, similar to the proposed construction of Indacon.

For similar reasons to those stated above, the Court sustains Facebook's objection to the construction of this term and rejects the Magistrate Judge's construction of the word "alias." The term "alias" shall be construed to mean a "textual expression that the user can define to serve as an alternative name or label."

Facebook objects to the Memorandum and Recommendation claiming that the Magistrate Judge's construction improperly broadens the meaning of the word 'alias' when there is no basis to do so, particularly, (1) an 'alias' is a specific kind of 'term', and thus, is a textual expression, and (2) an 'alias' is not a 'hyperlink.'

This construction of the term 'alias' is similar to the dispute concerning the word 'term,' in that both disputes concern whether the phrase should include both textual and graphical objects or hyperlink or whether their meaning is limited to textual expressions only.

Courts must interpret claims from the perspective of "how a person of ordinary skill in the art understands a claim term . . . in the context of the entire patent". *Philips* at 1313. This frame of reference "is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.* Since claim interpretation is highly context-dependent, the person of ordinary skill in the art "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field". *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

A025

Under the summary of inventions, the inventor lays the foundation of defining what an alias is:

> The link module enables association of any selected link term with any of the plurality of files in the selectable database. The link module may further enable at least one *alias* term to be defined for any selected link term to enable a link to be established between each *alias* term and any of the files in the database. Each of the files may further include one or more fields. The link module further enables field links to be defined between any two or more of the plurality of files. Such field links may be defined according to patterns, where the patterns may further be defined using wildcard characters that each replace one or more digits or characters.

'276 Patent, col.5, ll.62-67 – col.6, ll.1-6. (emphasis added). Under the Link Module, the word 'alias' is used to define a term whereby creating a link between the *alias* term and any file within the database. As defined supra (§III(f)), a '*term*' is a "Textual expression, such as words, symbols, or characters" (see this courts construction of the word 'term'). Therefore, based on the prior construction, 'alias,' which represents a term is limited to a textual expression only.

Additionally, throughout the patent, the word alias is further defined via examples supporting a construction of textual expressions.

> The link module 177 may further enable the user to define one or more *aliases* for each link term. For example, *the user may define the terms "grape", "tomato", "raspberry", etc., as aliases of a link term "vine fruit"*. Each alias is treated in a similar manner as its corresponding link term.
>
> . . .
>
> For example, a user may want to use aliases or synonyms so that "equine" is also linked when "horse" is the primary pattern

'276 Patent col.11 ll. 32-37, col.24 ll.46-48. As portrayed by the two examples above, the patent utilizes the term '*alias*' in the context of textual expressions only. An 'alias' is just a word, name, or symbol that serves as an alternative name or label representing a larger searchable category—but not a graphical object.

24

**A026**

The next argument raised in construing the word 'alias' is whether an alias is a hyperlink. Facebook asserts that an 'alias' is not a hyperlink based on the claims of the '276 patent, whereas Indacon claims that 'alias' is a hyperlink supported the intrinsic evidence.

To ascertain the "ordinary and customary meaning" of a claim term, "the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, at 1314. The sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

Indacon relies on extrinsic evidence—in particular, a patent issued to De La Huerga—to argue that a hypertext link can be both textual and graphical: "One technique for using keywords has become common place on the global computer network known as the internet. Stored on database/servers on the Internet are thousands of data records which contain references to still other data records in the form of *textual or graphic* 'hyperlinks.'" U.S. Patent No. 5,895,461 (De La Huerga) Col.2 ll.52-56 (filed 1996) (emphasis added). Further, Indacon also relies on another source of extrinsic evidence, a patent issued by Borman, in arguing that hypertext link can be both textual and graphical:

> With a markup language such as HTML (*hypertext* markup language) both amateurs and professionals become authors and the footnotes on the printed page become the hypertext of the electronic page. What was a passive reference now becomes an accessible link to a related file. A markup language describes the structure of a file including headings, paragraphs, images and what are called hot-links. A *hot-link* displays at the user level as *text or graphic* and is processed for communication purposes as an URL. It is these hot-links which provide the interactive footnotes described above.

U.S. Patent No. 5,890,172 (Borman) Col.2 ll.33-43. (filed 1996) (emphasis added). Under both the De La Huerga patent and the Borman patent, Indacon attempts to portray that an

'alias' functions as a hyperlink and that hyperlinks were known in the art to be both textual or graphical. Thereby arguing that an 'alias' is broader than the specification. The specification clearly shows the close relationship between an 'alias' and a 'term.' Therefore, since a term is limited to textual expressions only, the word 'alias' must also be construed to mean textual expressions only.

The court is persuaded that the term 'alias' should be construed to mean textual expressions only. Since an 'alias' was created for any 'link term', and 'term' was construed to be textual expressions only, the court adopts Facebook's proposed construction for the term 'alias.'

### h. "Custom Link"

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent | Claim No. | A link the user can define using a chosen term that allows **instances** of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user | A link the user can define using a chosen term that allows **each instance** of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user, **without modifying the files** | **A link the user can define using a chosen term that allows <u>each instance</u> of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user, <u>without modifying *the original database* files</u>** | Adopt Magistrate Judge's construction |
| '276 | 1 - 4 | | | | |

See Section III(j), *Infra*.

**A028**

### i. "Custom Linking Relationship"

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent '276 | Claim No. 8 - 11 | A linking relationship the user can define using a chosen term that allows **instances** of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user | A linking relationship the user can define using a chosen term that allows **each instance** of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user, **without modifying the files** | **A linking relationship the user can define using a chosen term that allows <u>each instance</u> of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user, <u>without modifying the original database files</u>** | Adopt Magistrate Judge's construction |

See Section III(j), *Infra*.

### j. "Link Term"

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent '043 | Claim No. 19&21 | A term chosen by a user that can be displayed as a link to a file specified by the user in the plurality of files | A term chosen by a user that can be displayed as a link to a file specified by the user **whenever the user encounters the term** in the plurality of files | A term chosen by a user that can be displayed as a link to a file specified by the user **whenever the user encounters the term** in the plurality of files | Adopt Magistrate Judge's construction |

The Memorandum and Recommendation adopts the construction of the phrases *"Custom Link"*, *"Custom Linking Relationship"* and *"link Term"* within the claims in the aforementioned location, similar to the construction proposed by Facebook.

The Magistrates construction of the phrases *Custom Link"* and *"Custom Linking Relationship"* and *'Link Term'* is adopted in its entirety. The objections to the construction of these phrases are overruled for the reasons outlined below.

Both parties object to the Magistrate Judge's construction of these phrases. Facebook contends that its proposed claim construction was clear and does not require the modification the Magistrate Judge made by changing "without modifying the files" to "without modifying the *original database* files" regarding the construction of both terms *'Custom Link'* and *'Custom Linking Relationship.'* Facebook suggests that the construction the Magistrate Judge drafted creates confusion, and thus requests this court to modify the construction by replacing "...original database files", as construed by the Magistrate Judge, to either "the files" (as Facebook originally proposed) or "the plurality of files" (an alternative).

Indacon also objects to the aforementioned limitation on two grounds. First, Indacon argues that the limitation of "each instance" as utilized in the Magistrate Judge's construction is an improper limitation. Second, Indacon argues that the limitation of "without modifying the original database" in the construction of *'Custom Link'* is too narrow and not in line with the specification.

### "Instances" [Magistrates construction] v. "Each Instance" [Indacon suggested construction]

Indacon argues that the Magistrates construction of 'custom link', 'custom linking relationship,' and 'link term' improperly incorporated a limitation of "each instance" into every asserted claim throughout the construction. Indacon bases its argument on Doctrine of Claim

Differentiation, the preferred embodiment, and a wrongful interpretation of an admission Indacon made in its claim construction brief.

Indacon argues that the Magistrate Judge improperly found a limitation in dependent claim 22 and applied the limitation to independent claim 19 of the '043 patent, in violation of the doctrine of claim differentiation.

The doctrine of claim differentiation provides that "each claim in a patent is presumptively different in scope." *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003) (quoting *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001)). The doctrine is premised on "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Andersen Corp. v. Fiber Composites, LLC.*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (quoting *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999)). Claim differentiation gives rise to a rebuttable presumption for claim construction purposes, especially when comparing the scope of an independent claim in view of its dependent claims: "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).

Further, in *Marine Polymer Technologies, Inc. v. HemCon, Inc.*, the Federal Circuit stated that "claim differentiation is 'not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history.'" 672 F.3d 1350, 1359 (Fed. Cir. 2012) (quoting *Seachange Int'l, Inc. v. C–COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005)); see also *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) ("Claim differentiation is a guide, not a rigid rule.").

Claim differentiation commonly refers to the situation where there is not a meaningful difference between an independent claim and its dependent claim, except for the presence of an added limitation in the dependent claim. Thus, in that situation, the presumption is especially strong that the independent claim is not restricted by the added limitation in the dependent claim. *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007). Thus, in those situations, construing the independent claim to share that limitation would render the dependent claim "superfluous." *Andersen*, 474 F.3d at 1369-70 (Fed. Cir. 2007).

However, the doctrine of claim differentiation can be trumped by other considerations; for instance, the doctrine cannot broaden claims beyond their correct scope. *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006). "[T]he written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation." *Andersen*, 474 F.3d at 1369-70 (quoting *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362 (Fed. Cir. 2000)).

Throughout the patent, Indacon cites no instance of a link term that cannot be displayed as a link when encountered in the files (docket no. 98 at 3), and the term cannot be construed broader than specification. *Irdeto Access, Inc. v. Ecgistar Satellite Corp*, 383 F.3d 1295, 1300 (Fed Cir. 2004). Thus, the term must be construed so that 'each instance' of the custom link can be displayed as a link whenever the user encounters the term—as the Magistrate Judge correctly ruled.

Indacon also argues that the Magistrate Judge improperly relied on the preferred embodiment to support the additional limitation of 'each instance' in the construction of 'custom link' terms. Indacon asserts that the magistrate improperly uses the description contained in the preferred embodiment to narrow the meaning of the term 'custom link' as found in the claims.

30

**A032**

Regardless of what the Magistrate Judge relied on, the patents do not contemplate a broader meaning than described in the Memorandum and Recommendation. It is true, as Indacon asserts, that broad claims should not be limited by the specification, however, the patents written description does not support a broader meaning.

For the aforementioned reasons, the court affirms the magistrates construction of "each instance" over "instances".

## "Without modifying the original database files"

Both parties argue and object to the magistrate's construction of the phrases '*Custom Link*' and '*Custom Linking Relationship*' regarding the ending phrase "…without modifying the original database files." Facebook asserts that an ambiguity can arise, based on the Magistrate Judge's construction, if Indacon attempts to argue that the 'original database files' can refer to files other than the files expressly referenced in the perspective claims (docket 91 at 6). Indacon, on the other hand, asserts that the ambiguity is not as Facebook proposes, but rather that the limitation "…without modifying…" is contrary to the intent of the patent.

Facebook requests that this court to modify the construction by replacing ". . . the original database files," as construed by the Magistrate, to either "the files" (as Facebook originally proposed—and which Facebook asserts is clear in the context of the claim language) or "the plurality of files." Indacon disagrees, claiming that Facebook wants to narrow the claim even further than the Magistrate Judge's construction in order to fix an ambiguity that does not exist. Facebook's argument is premised on the premise that the phrase 'original database files' (even though that language does not appear in the claims) can and will create confusion if Indacon attempts to argue that the construction can refer to other than those expressed in the claim.

31

Facebook's assertion of a potential ambiguity has no basis as claims are to be construed with intention focusing on the relevant text, i.e. the claims. See, e.g., *Interactive Gift Express, Inc. v. CompuServe, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (citing 35 U.S.C. § 112 (2000)). ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point . . . out and distinctly claim. . . . [T]he subject matter which the patentee regards as his invention.'"). Further, in construing claim terms in view of the claims themselves ensures that the claims, rather than some other source, dictate the metes and bounds of the invention. See, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." ')); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 336 U.S. 271, 277 (1949) ("We have frequently held that it is the claim which measures the grant to the patentee."). Even within a given claim, "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. Therefore, no ambiguity can exist since the term 'files' in the claims cannot refer to other files not expressly referenced within the claim language itself.

Indacon objects to the same limitation same limitation as Facebook ("without modifying the original database files"); however, Indacon is of the opinion that this limitation is improperly narrow. Indacon argues that "files can be modified once they have been added to the database, and further, that nothing precludes adding custom links to these files." Indacon bases its argument on both the specification which "suggests that the files do not necessarily need to be modified i.e., converted to a different format, to be included in the database," (docket no. 93 at 11). Indacon's argument is premised on the Summery of Invention which states, "[t]he system

and method *may* automatically unambiguously, and accurately place reference links *among* documents within a database it creates according to a schema controlled by the user." '276 Patent at col.6, ll.32-35 (emphasis added).

Facebook counters that further in the Summary of Invention (particularly the same paragraph of the above quote), the patent states "The system and method does *not modify* or make extraneous copies of the contents of the original database files, objects, or documents." '276 Patent at col.6, ll.38-41 (emphasis added). Here, the patent stresses that the system as a whole does not modify database files (not certain embodiments), just as placing links among the documents does not modify said documents. Facebook also relies on the prosecution history to emphasize that the 'custom links' do not modify the files in the database. For example, during prosecution of the '276 patent, Indacon asserts that it's "system creates a virtual custom links for the original source files. The custom links are not inserted into the original source files themselves" (docket 41 at 19, citing Mead Decl. Ex. 16 (07/07/03 Amendment and Remarks) at 34). Indacon argued to the USPTO that the original source files were not modified and the invention relies on a separate index to keep track of the custom links. Therefore, in reviewing the prosecution history, Indacon asserted that the custom links do not modify the files in the database. However, as the Magistrate Judge indicated in the Memorandum and Recommendation (docket no. 80 at 27-28), the statement Facebook relies on was made in relation to the preferred embodiment and thus should not be used to limit a claim. See *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1151-52 (Fed. Cir. 2003) (broad claims supported by the written description should not be limited to the preferred embodiment). The mere fact of a particular embodiment being taught (or even "preferred") is generally not sufficient to justify limiting otherwise broad claim scope to the particular embodiment taught.

33

*See, e.g., Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807–08 (Fed. Cir. 2007) (finding that a claimed "transverse" hole in a bone nail was not limited to the particular "perpendicular" orientation shown in the specification); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306-1307 (Fed. Cir. 2006) (finding that a claimed "geometry" of orthodontic teeth was not limited to the geometries of orthodontics shown in the specification); *Agfa Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1375–76 (Fed. Cir. 2006) (finding that a claimed "stack" of printing plates was not limited to the particular horizontal stack shown in the specification).

Further in the patent, Indacon maintains the view that files, objects or documents can be modified once in the database as "the database (i.e. the index) will be regenerated, or an error message will be presented" altering the user to the change. '276 Patent at col.6, ll.41-46. Indacon admitted that the specification does suggest that the files do not necessarily need to be modified, i.e. converted to a different format, to be included in the database. (docket no. 100 at 5). Therefore some modification is allowed. The Magistrate Judge stated in his Memorandum and Recommendation (docket no. 80 at 27) "that the specification distinguishes between 'original' database files, and 'data sources' where the former is not modified by the system, and the later can be modified by a user." Therefore, this Court adopts the construction of the Magistrate Judge as to the construction of the phrases '*Custom Link*' and '*Custom Linking Relationship*' regarding the limitation "without modifying the original database files."

### "Link Terms"

Indacon objects to the Magistrate judge's construction of this term. However, no arguments regarding this construction were proffered by either party. Therefore, the Magistrates construction is adopted in its entirety.

For the aforementioned reasons, the court adopts the magistrates construction of "*Custom Link*" "*Custom Linking Relationship*" and '*Link Term*' and the objections to the construction of each term are overruled.

**k.   "Custom Annotation"**

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent | Claim No. | Notes specified by the user | Notes specified by users **that do not modify any of the selected files** | **Notes specified by users that do not modify any of the original database files** | Adopt Magistrate Judge's construction |
| '043 | 19&21 | | | | |

See Section III(k), *Infra*.

**l.   "Incorporating any user generated custom annotations into the index"**

| Location | | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | District Court's Construction |
|---|---|---|---|---|---|
| Patent | Claim No. | If users have generated custom annotations, incorporating those annotations into the index | If users have generated custom annotations, incorporating those annotations into the index **without modifying any of the selected files** | **If users have generated custom annotations, incorporating those annotations into the index without modifying any of the original database files** | Adopt Magistrate Judge's construction |
| '043 | 19&21 | | | | |

The Memorandum and Recommendation (docket no. 80) adopts the construction of the phrases "*Custom Annotation*" and "*Incorporating any user generated custom annotations into the index*" similar to the construction proposed by Facebook.

35

The Magistrates construction of the phrases "*Custom Annotation*" and "*Incorporating any user generated custom annotations into the index*" is adopted in its entirety.

The objections and arguments proffered by both parties are identical to the arguments the parties assert *supra* in sections III(h, i, and j) ("*Custom Link*" "*Custom Linking Relationship*" and "*link Term*") under the heading "*Without modifying the original database files,*" except for one argument Facebook makes regarding prosecution history of the patent. Facebook argues that the construction creates an unnecessary confusion whereas Indacon objects to the construction arguing that it is too narrow.

Even though the same arguments are made (for sections III(h–l) the Magistrate's construction could create an ambiguity), here, Facebook relies on a different segment of the prosecution history as the basis its argument concerning the terms at issue ("*Custom Annotation*" and "*Incorporating any user generated custom annotations into the index*"). Again, Facebook asserts that that the use of the term "original database files" could create an unnecessary confusion, as claims 19 sand 21 in the '043 patent refer only to "selected source files." Facebook relies on part of prosecution history, in particular an Appeal Brief, where Facebook asserts that Indacon disclaimed any and all modification of the selected files. Facebook relies on an appeal brief in which Indacon stated during prosecution that's its claimed invention "stor[es] the user-generated annotations in the searchable index, as opposed to simply storing the annotation within the annotated files themselves." (docket no. 91 at 7, quoting docket no. 41, exh. 31 (04-15-09 Appeal Brief at 33). The Magistrate Judge correctly stated that the prosecution history cited by Facebook is not a complete disclaimer or surrender of a claim that '*Custom Annotations*' could not be added to files. In order for disclaimer to attach, the alleged disavowing actions or statements made during prosecution must be both clear and unmistakable.

36

**A038**

*Omega Eng'g, Inc., v. Raytek Corp.,* 334 F.3d 1314, 1325-26 (Fed. Cir. 2003); *Cordis Corp. v.*

*Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008)

As discussed above, the specification discusses some modification to files, but that modification does not apply to the terms 'Custom Annotations' or 'Custom Links'. The Magistrate Judge stated in his Memorandum and Recommendation "the specification distinguishes between 'original' database files, and 'data sources' where the former is not modified by the system, and the later can be modified by a user." This Court agrees.

Therefore, for the aforementioned reasons coupled with the reasons located in section III (h-j) the Magistrate Judge's construction is adopted in its entirety and the parties' objections to the construction of these phrases are overruled.

## IV.    Terms Not Construed

The parties agree on two claim constructions by the Magistrate Judge.

**a.  "Display and/or Displaying"**

**b.  "Accurately high-lighting the located terms and phrases"**

As neither party submitted objections and/or arguments for the aforementioned terms, the court adopts the Magistrate Judges construction of these phrases.

## V.    Conclusion

Having considered all of the papers on file in this case, and having specifically considered the objections of the parties to Magistrate Judge's Memorandum and Recommendation, for the forgoing reasons, it is ORDERED that the United States Magistrate Judge's Memorandum and Recommendation is ACCEPTED IN PART and REJECTED IN PART pursuant to 28 U.S.C. § 636(b)(1) as described in this order and as summarized in the

A039

chart attached to this order as Addendum A.  All objections not expressly sustained are hereby

DENIED.  This order shall serve as the claim construction for this case moving forward.

IT IS SO ORDERD.

SIGNED this ____ day of _____, 2013.

_____

United States District Judge Orlando L. Garcia

A040

Addendum A

| Claim Term / Phrase / Clause | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | W.D. of T.X. Construction |
|---|---|---|---|---|
| "File" | Any digital object that contains machine or individual readable or searchable information, including composite files comprised of multiple elements stored in separate files. | A document or digital object, **other than a database**, that contains machine or individual readable or searchable information | **Any digital object that contains machine or individual readable or searchable information, including a composite file comprised of multiple elements stored in separate files.** | Adopt Magistrate Judge's construction |
| "Selectable Database" | One of More databases comprising files selected by a user | A database that includes **one or more distinct** databases selected by the user containing one or more files selected by the user | **A database that includes one or more databases selected by the user containing one or more files selected by the user** | Adopt Magistrate Judge's construction |
| "Database Selection Module" | Any combination of hardware and software implemented to enable a user to select files for inclusion in to a selectable database | No construction offered | **Any combination of hardware and software implemented to enable a user to select files for inclusion in to a selectable database** | Adopt Magistrate Judge's construction |

39

**A041**

| Claim Term / Phrase / Clause | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | W.D. of T.X. Construction |
|---|---|---|---|---|
| "Enables selection of a purality of files for inclusion into at least one selectable database" | Allows the user to choose multiple files to be included into at least one selectable database, either by copying files into local storage or maintaining a link to files of interest | Allows the user to choose multiple files to be captured and deposited into a selectable database as opposed to accessing and retrieving data from other databases | Allows the user to choose multiple files to be included into at least one selectable database, either by copying files into local storage or maintaining a link o files of interest | Adopt Magistrate Judge's construction |
| "Selecting a plurality of the located files... for automatic inclusion into at least one selectable database" | Choosing multiple files to be automatically included into at least one selectable database, either by copying files into local storage or maintaining a link to files of interest | Choosing multiple files to be automatically captured and deposited into a distinct selectable database, as opposed to accessing and retrieving data from another database | Choosing Multiple files to be automatically included into at least one selectable database, either by copying files into local storage or maintaining a link to files of interest | Adopt Magistrate Judge's construction |
| "Term" | Textual or graphical object | Textual expression, such as a word | Textual or graphical object | Textual expression, such as words |
| "Alias" | Textual or graphical hyperlink that the user can define to serve as an alternative name or label | Textual expression that the user can define to serve as an alternative name or label | Textual or graphical hyperlink that the user can define to serve as an alternative name or label | Textual expression that the user can define to serve as an alternative name or label |

40

**A042**

| Claim Term / Phrase / Clause | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | W.D. of T.X. Construction |
|---|---|---|---|---|
| "Custom Link" | A link the user can define using a chosen term that allows instances of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user | A link the user can define using a chosen term that allows **each instance of** the term in the plurality of files to be identified and displayed as a link to a file chosen by the user, **without modifying the files** | **A link the user can define using a chosen term that allows each instance of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user, without modifying the original database files** | Adopt Magistrate Judge's construction |
| "Custom Linking Relationship" | A linking relationship the user can define using a chosen term that allows instances of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user | A linking relationship the user can define using a chosen term that allows **each instance of** the term in the plurality of files to be identified and displayed as a link to a file chosen by the user, **without modifying the files** | **A linking relationship the user can define using a chosen term that allows each instance of the term in the plurality of files to be identified and displayed as a link to a file chosen by the user, without modifying the original database files** | Adopt Magistrate Judge's construction |
| "Link Term" | A term chosen by a user that can be displayed as a link to a file specified by the user in the plurality of files | A term chosen by a user that can be displayed as a link to a file specified by the user **whenever the user encounters the term** in the plurality of files | A term chosen by a user that can be displayed as a link to a file specified by the user **whenever the user encounters the term** in the plurality of files | Adopt Magistrate Judge's construction |

41

A043

| Claim Term / Phrase / Clause | Indacon Suggested Construction | Facebook Suggested Construction | Magistrate Judge's Construction | W.D. of T.X. Construction |
|---|---|---|---|---|
| "Custom Annotation" | Notes specified by the user | Notes specified by users that do not modify any of the selected files | **Notes specified by users that do not modify any of the original database files** | Adopt Magistrate Judge's construction |
| "Incorporating any user generated custom annotations into the index" | If users have generated custom annotations, incorporating those annotations into the index | If users have generated custom annotations, incorporating those annotations into the index without modifying any of the selected files | **If users have generated custom annotations, incorporating those annotations into the index without modifying any of the original database files** | Adopt Magistrate Judge's construction |
| "Display and/or Displaying" | N/A | N/A | **To visually present to a computer user. Merely delivering information to a computer is not displaying information** | Adopt Magistrate Judge's construction |
| "Accurately high-lighting the located terms and phrases" | N/A | N/A | **Visually presenting to the user the located terms and phrases so they are visually distinguished from surrounding text appearing on the screen** | Adopt Magistrate Judge's construction |

42

**A044**

FILED

SEP **0 8** 2014
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

INDACON, INC.,                              )
                                            )
                Plaintiff,                  )
                                            )
        v.                                  )    Civil Action No. 5:10-cv-966-OLG
                                            )
                                            )    **JURY TRIAL DEMANDED**
FACEBOOK, INC.,                             )
                                            )
                Defendant.                  )
_____)

### ORDER OF DISMISSAL OF THE '043 CLAIMS AND FINAL
### JUDGMENT OF NON-INFRINGEMENT ON THE '276 CLAIMS

On this date, the Court considered the parties' Stipulation to Dismissal of the '043 Claims

and to Final Judgment of Non Infringement on the '276 Claims (Dkt. No. 204), and based

thereon, hereby **ORDERS** as follows:

1.      All claims asserted by Indacon in this matter relating to U.S. Patent No. 7,836,043

are hereby dismissed with prejudice.

2.      Final judgment of non-infringement is hereby entered as to U.S. Patent No.

6,834,276 based upon the parties' stipulation and the Court's Claim Construction Order at Dkt.

111, thus disposing of all claims for relief alleged in the Third Amended Complaint. This Order

constitutes a final, appealable judgment disposing of all claims for relief in this case.

3.      In the event that the Claim Construction Order is vacated, reversed, or otherwise

modified on appeal such that this matter is remanded to this Court for further proceedings, all of

the parties' respective arguments and defenses are preserved and may be reasserted in this

litigation except to the extent addressed and resolved by the Court of Appeals.

1

**A045**

4.    The time for filing any petition, bill and/or motion under FED. R. CIV. P. 54(d) to recover costs and/or attorneys' fees shall be tolled pending any appeal of this Order of Dismissal. In the event no appeal is filed, any such petition, bill and/or motion for costs and/or attorneys' fees may be filed within fourteen (14) days after the last day for filing a notice of appeal.

**IT IS SO ORDERED**.

SIGNED this __8__ day of __Sept__. , 2014.

_____

The Honorable Orlando L. Garcia
United States District Judge

2

**A046**

AO 450 (Rev. 01/09) Judgment in a Civil Action

**FILED**

# UNITED STATES DISTRICT COURT
### for the
### Western District of Texas

SEP 8 – 2014

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| Indacon, Inc. | ) |
| *Plaintiff* | ) |
| v. | )  Civil Action No.  SA-10-CV-966-OLG |
| Facebook, Inc. | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐  the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus postjudgment interest at the rate of _____ %, along with costs.

☐  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

☑  other:  Order on Stipulation of Dismissal, all claims asserted by Plaintiff, Indacon, Inc. relating to U.S. Patent
7,836,043 are hereby DISMISSED WITH PREJUDICE, and Final Judgment entered on Non-Infrigement
Claim 276, dated September 8, 2014. The Court Order constitutes a final judgment disposing of all claims
for relief in this matter. This case is CLOSED.

This action was *(check one)*:

☐  tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐  tried by Judge _____ without a jury and the above decision
was reached.

☑  decided by Judge  Orlando L. Garcia's Order dated 9/8/2014.

Date: _____09/08/2014_____

*CLERK OF COURT*

_____
Wayne Garcia, U.S. Deputy Clerk
*Signature of Clerk or Deputy Clerk*

**A047**



US006834276B1

(12) **United States Patent**  (10) Patent No.: **US 6,834,276 B1**
Jensen et al.  (45) Date of Patent: **Dec. 21, 2004**

(54) **DATABASE SYSTEM AND METHOD FOR DATA ACQUISITION AND PERUSAL**

(75) Inventors: **Robert Leland Jensen**, San Antonio, TX (US); **Daniel Victor Smith**, San Antonio, TX (US)

(73) Assignee: **Integrated Data Control, Inc.**, San Antonio, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/257,714**

(22) Filed: **Feb. 25, 1999**

(51) Int. Cl.$^7$ .............................. G06F 17/30; G06F 7/00

(52) U.S. Cl. ........................ 707/2; 707/6; 707/10; 707/102; 715/501.1; 715/513; 709/217

(58) Field of Search .................... 707/1–7, 10, 513, 707/501, 102, 104; 709/217, 219

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,955,056 A | * | 9/1990 | Stentiford | 704/239 |
| 5,544,352 A | * | 8/1996 | Egger | 707/5 |
| 5,678,041 A | * | 10/1997 | Baker et al. | 707/9 |
| 5,822,539 A | * | 10/1998 | van Hoff | 709/236 |
| 5,832,494 A | * | 11/1998 | Egger et al. | 707/102 |
| 5,832,499 A | * | 11/1998 | Gustman | 707/103 |
| 5,842,206 A | * | 11/1998 | Sotomayor | 707/5 |
| 5,875,441 A | * | 2/1999 | Nakatsuyama | 707/1 |
| 5,889,958 A | * | 3/1999 | Willins | 709/229 |
| 5,890,172 A | * | 3/1999 | Borman et al. | 707/501 |
| 5,895,461 A | * | 4/1999 | De La Huerga et al. | 707/1 |
| 5,920,859 A | * | 7/1999 | Li | 707/5 |
| 5,924,090 A | * | 7/1999 | Krellenstein | 707/5 |
| 5,961,602 A | * | 10/1999 | Thompson et al. | 709/229 |
| 5,987,454 A | * | 11/1999 | Hobbs | 707/4 |
| 6,012,053 A | * | 1/2000 | Pant et al. | 707/3 |
| 6,038,668 A | * | 3/2000 | Chipman et al. | 713/201 |
| 6,092,074 A | * | 7/2000 | Rodkin et al. | 707/102 |
| 6,092,080 A | * | 7/2000 | Gustman | 707/103 |
| 6,098,064 A | * | 8/2000 | Pirolli et al. | 707/2 |

| | | | | |
|---|---|---|---|---|
| 6,101,492 A | * | 8/2000 | Jacquemin et al. | 707/3 |

(List continued on next page.)

OTHER PUBLICATIONS

Rus, D. and Subramanian, D. "Information Retrieval, Information Structure, and Information Agents", in "Intelligent Hypertext:Advanced Techniques for the World Wide Web", Nicholas, C. and Mayfield, J., eds., Berlin:Springer–Verlag, 1997, pp. 145–182.*

(List continued on next page.)

*Primary Examiner*—Luke S Wassum
(74) *Attorney, Agent, or Firm*—Charles W. Hanor, P.C.

(57) **ABSTRACT**

A data acquisition and perusal system and method including a database selection module, a database index generator module and a search module. The database selection module enables selection of a plurality of files for inclusion into at least one selectable database. The database index generator module enables generation of a searchable index of the data contained in the selectable database. The search module enables a search to be performed of the searchable index according to search criteria. The data acquisition and perusal system and method may also allow users to view, append, and generate single- or multiple-data sources locally or remotely, and allow users to compile, index, modify, and append the data sources according to default or user defined criteria. The data acquisition and perusal system and method may also selectively acquire and display data contained within remote databases depending upon the user's access permissions to such databases. Such a system allows for the capture of hypertext data which is automatically indexed without human intervention and has the ability to automatically and accurately locate or "pinpoint," and highlight specific text or groups of text designated by the user within the resulting database. Such a system contains a link module that enables custom links to be defined between selected terms of selected files of the selectable database including the custom links so that the searchable index includes only valid links.

**15 Claims, 18 Drawing Sheets**



US 6,834,276 B1

Page 2

### U.S. PATENT DOCUMENTS

| 6,112,203 A | * | 8/2000 | Bharat et al. | .............. | 707/5 |
|---|---|---|---|---|---|
| 6,122,647 A | * | 9/2000 | Horowitz et al. | ............ | 715/513 |
| 6,134,584 A | * | 10/2000 | Chang et al. | ............ | 709/219 |
| 6,138,113 A | * | 10/2000 | Dean et al. | ................ | 707/2 |
| 6,163,779 A | * | 12/2000 | Mantha et al. | ............ | 707/100 |
| 6,199,060 B1 | * | 3/2001 | Gustman | ................ | 707/3 |
| 6,212,527 B1 | * | 4/2001 | Gustman | ................ | 707/102 |
| 6,247,018 B1 | * | 6/2001 | Rheaume | ................ | 707/102 |
| 6,272,534 B1 | * | 8/2001 | Guha | ................ | 709/216 |
| 6,292,894 B1 | * | 9/2001 | Chipman et al. | ............ | 713/168 |

### OTHER PUBLICATIONS

Hastings, B. "WebEx: Download Now, Hyperbrowse Later", PC World, vol. 14, No. 10, Oct. 1996, p. 98.*

Bethoney, H. "Save it for Later with WebClip; Offline Browser Eases Organization of Downloaded Pages", PC Week, vol. 13, No. 33, Aug. 19, 1996, p. N3.*

Wang, W. and Rada, R. "Experiences with Semantic Net Based Hypermedia", International Journal of Human–Computer Studies, vol. 43, No. 3, 1995, pp. 419–439.*

Ellis, D. et al. "On the Measurement of Inter–Linker Consistency and Retrieval Effectiveness in Hypertext Databases", Proceedings of the 17th Annual Int'l ACM–SIGIR Conference on Research and Development in Information Retrieval, Aug. 1994, pp. 51–60.*

Zheng, M., and Rada, R. "Text–Hypertext Mutual Conversion and Hypertext Interchange through SGML", Proceedings of the 2nd International Conference on Information and Knowledge Management, Nov. 1993, pp. 139–147.*

Rada, R. "Converting a Textbook to Hypertext", ACM Transactions on Information Systems, vol. 10, No. 3, Jul. 1992, pp. 294–315.*

Coombs, J.H. "Hypertext, Full Text, and Automatic Linking", Proceedings of the 13th International Conference on research and Development in Information Retrieval, Dec. 1989, pp. 83–98.*

Duncan, T. and McKell, M. "Making Network Information Accessible with FolioViews 4.11", Novell NetNotes, Apr. 1998, pp. 79 82.*

Mendelson, E. "Off–Line Browsers", in The 1997 Utility Guide, PC Magazine, vol. 16, No. 7, Apr. 8, 1997, pp. 207–218.*

Haskin, D. "Taming the Net", Computer Shopper, vol. 16, No. 12, Dec. 1996, pp. 576–583.*

Folio Corporation, "Folio announces new IomegaReady software version of Folio Web Retriever is now available", press release, Dec. 5, 1996.*

Folio Corporation, "Folio Views 4.0: Getting Started", Oct. 25, 1996. QA76.755.F65 1996.*

Heck, M. "Web Retriever Converts Sites into Editable Databases", InfoWorld, Oct. 7, 1996, p. IW4.*

Seybold Publications Inc., "Editorial Aid—The Offline Browser", Seybold Report on Desktop Publishing, vol. 10, No. 11, Jul. 8, 1996.*

Folio Corporation, "Folio Corporation announces Folio Web Retriever 2.0", press release, Jun. 17, 1996.*

Bethoney, H. "Folio Views Creates Info Databases", PC Week, vol. 11, No. 44, Nov. 7, 1994, p. 129.*

Folio Corporation, "Folio Views 3.1 Infobase Management Software: Infobase Production Kit Version 3.1", Chapter 6, pp. 117–142, Sep. 8, 1994. QA76.755.F655 1994.*

Folio Corporation, "Folio Views 2.1 Infobase Users Guide", Jun. 1991. QA76.7555.F65 1991.*

Sheryl Canter, Folio Web Retriever, PC Magazine "The 1997 Utility Guide", 1997, Ziff–Davis Inc., New York, NY.

* cited by examiner



**FIG. 1A**

Case Case-15-01256-OLD Document 25t 13 Page F99d 02/28d 03/26/2015 of 43



**FIG. 1B**



**FIG. 1C**

Searchable
Database
Index
**200**



**FIG. 2**

Case 1:15-cv-01286-ODC Document 25-1 Page: Filed 03/26/2015 5 of 43

220     222     224     226

219



| Character Positions | Word Slots List | Locator String | Number of Elements in Locator String |

**Fig. 2A**

228     230     232

224



| Word Number | Character Position Index | Slot Position Index |

**Fig. 2B**



**FIG. 3**



**FIG. 4**



**FIG. 4A**

Case 1:15-cv-01055-OLD Document 251-13 Page 106 Filed 03/26/2025 of 43



**Fig. 5**



**Fig. 6**

Case Case 05-0105-01986-OLD Document 13 Page 107 02 Filed 10/26/2015 of 43

707   700   701   702   703   706   708



704   705

# *Fig. 7*



*Fig. 8*



*Fig. 9*



*Fig. 10*



*Fig. 11*

CaseCase-15-0196-OLDocumentm25t 13PageFi1e2 02F28d103/26/2015of 43

1200  1201  1202  1203  1204  1205



1206  1207  1208  1209  1210  1211  1212

# Fig. 12



1300

1301

1303

1302

# *Fig. 13*

Case Case 1:05-cv-01096-OLD Document 25 13 Page 114 Filed 02/18/10 Page 20 of 43



## Fig. 14



**Fig. 15**

US 6,834,276 B1

1

# DATABASE SYSTEM AND METHOD FOR DATA ACQUISITION AND PERUSAL

## FIELD OF THE INVENTION

The present invention relates generally to a data acquisition and perusal system and method for locating, indexing, and accessing information, and more particularly to a data acquisition and perusal system and method for acquiring, creating, manipulating, indexing, and perusing data, and to a method and system for locating and retrieving known or unknown data for the same purposes.

## BACKGROUND OF THE INVENTION

Computers were intended to provide an effective and efficient way for humans to manage, locate, peruse and manipulate data or objects. For example, a first, basic system and method is that demonstrated by modern word processor applications which have some search and text access capabilities; however, as far as is known, they are limited to the current file that is open. Employing this method, the user can request the location of a word in the text. Within an individual file, the computer will then take the user sequentially to each location of that text. Only string searches are allowed. By repeatedly running the search, the user can sequentially move from result to result. While it might be possible to open, many files simultaneously, the available resources and memory make this impractical.

A second, improved system and method enabled by some computer operating systems include applications that allow users to search all available files, accessible by certain software applications, for words or simple phrases. They still require the user to open each of the files of interest in a word processor, viewer or other application referred to in the first system and method to access the data. The search time required is relatively great because the data available has to be sequentially read and compared with the query.

A third system and method used by software applications provides improved search capabilities and is commonly known as a "search/retrieval engine". Among other things, search/retrieval engines can essentially search and access many thousands of files simultaneously and very quickly by using pre-generated indexes of the data. For example, a user can query an encyclopedia converted to an indexed database, and by the use of highlighted text, quickly determine every place a word or phrase occurs in the text, and have the ability to instantly view those occurrences as desired. These products even take the user sequentially to each incident of highlighted text or "hit." The computer can then take the user from hit to hit.

Converting a database like an encyclopedia into a format useable by a search/retrieval engine is not simply a matter of converting its volumes into electronic files accessible by the user's computer. For efficient search performance, the contents of the files are logically indexed as to location, frequency, etc. The search functions of the computer actually search the index to determine if the query criteria are met, and then the locations of valid results are passed to the retrieval functions to display them. Without a well-designed index, a computer could take a long time to perform a search for a simple phrase that can otherwise be performed in a fraction of a second. Some search/retrieval engine application vendors allow users to generate indexes for their own files through an indexing utility, and others intend for indexing to be done only by electronic database publishers by use of a separate application designed for that purpose.

2

Currently, a user desiring to employ the speed of a computer to search for and retrieve data from multiple disparate source files generally has three choices: (1) use the basic first system and method above to open each file in a word processor application and search them individually; (2) use the second system and method above, search each file using an operating system application, and then open each file in the list of results in a word processor application; and (3) obtain an indexed database of the sources along with a search/retrieval engine from an electronic publisher, or create a database usable by a search/retrieval engine.

As far as is known, no application has been devised, however, to adequately deal with the internet and yield the results described in the third system and method above. The internet is a vast and burgeoning source of information concerning nearly every subject. But the internet is comprised of files available in SGML and its derivatives including HTML and XML and other hypertext type formats. A hypertext markup language such as HTML is a structured, yet ambiguous language. In this application, reference is generally made to HTML files and documents, which is the most common format. However, it is understood that this includes the SGML format and its other derivatives, including XML and future modifications, implementations, and standards for use in data files, databases and the internet. As far as is known, having a computer automatically and accurately determine the exact location of text within an HTML type formatted document, object, or file is not accomplished in the prior art. Consequently, there is no known practical method or system whereby a user can efficiently and effectively use a computer's speed to search for and retrieve data from a set of files accessible by the computer and get pinpoint, highlighted display of the designated text. It should be noted that the information desired may be in files, objects, or files that are unknown, and available to the user. In addition to the internet, many enterprises have extensive repositories of information stored in electronic form that may contain information an authorized user may desire and want to locate and access. Even at the lowest level, an individual computer generally contains unknown or forgotten data that the user would find valuable. All of these repositories of information cannot be as efficiently accessed by the current art as is desired.

Using the current art in the third system and method above, users can add electronic bookmarks to enable them to quickly return to any part of any volume of an encyclopedia, referred to in the example above, and they can copy portions for insertion into other documents of their own creation. By use of hypertext links appearing within the database, a user is able to instantly view related data for which he had not searched. The links are generated according to a rationale applied when the database index was prepared. Adding hypertext links usable within a database is generally a more complex process. The links are intended to appear to the user in a color or format distinguishable from other data, and when activated, the computer is directed to display another highlighted portion of the database. By naming the instructions to the computer within links as "pointers" and what they link to as "targets", the process will be facilitated. A database can theoretically have an unlimited number of identical pointers (even though what the user sees can be different for some or all of them), but any pointer can generally only have one target (a specific area of the database to display), and targets are invisible to the user. Links must be sensitive to the context of the document and context sensitivity requires intelligence. Thus, adding links to a database requires human intervention because current

US 6,834,276 B1

**3**

computers inherently lack any intelligence. Although simple linking based upon discernible patterns within text and targeted toward files matching those patterns can easily be done programmatically, human intervention is still required to design and initiate the process. Further, such favorable linking circumstances rarely exist within typical, disparate data and even greater human intervention is required. Consequently, search/retrieval engine vendors essentially leave linking up to the creator of the search engine software or electronic publisher to do manually, and the links are generally not customizable by the user. Thus, the vendors commonly provide technical specifications on how to craft pointer and target codes for the software and how to write programs to link their unique databases. However, some word processing and other applications permit users to craft links among compatible files using manual processes.

If a user desires to have the searchable data include context-sensitive links, the choices are generally reduced to: (1) obtaining a pre-linked database from an electronic publisher; or (2) creating a custom database and manually inserting links individually or by use of a custom program written for the unique situation. Beyond the problems of availability and lack of customization, a fundamental problem with the first choice is that a publisher may not consider the same links to be important as a user does. Thus, the publisher may include links that are not important to the user and may not include links that would have been important. A fundamental problem with the second choice is that manually inserting links requires a substantial amount of time and trouble that quickly outweighs any potential benefit to manually inserting links as the quantity of data increases. As far as is known, the current art does not include a system to create links by designating "pointers" and "targets" and having the program automatically create links that are all valid.

It would be highly beneficial to have the results from computer searches of various sources of information that locate information from the various sources, to be quickly and easily saved locally for accessing at a later time, without having to redo the search and re-access the sources of information. This saves search time and repeating the search, which may not locate the previous information. The locally saved information can also be quickly accessed without having to relocate the information. An object of the invention is to allow someone to create his or her own custom, organized database that can be utilized effectively. Each time relevant information and files are located, they can be put into a database, indexed and made available for use.

The limitations of prior systems are overcome by the present invention, which is an improved method and system for acquiring, creating, manipulating, indexing, and perusing data, and for locating and retrieving known or unknown data for the same purposes. In a preferred embodiment, the system is a stand-alone application residing on a user's personal computer that enables the user to create fully searchable databases or local sources of any size from any electronic documents accessible by the computer and selected by the user. It also enables the user to accurately and methodically locate undiscovered documents that may be of interest. By use of a word processing means integrated into the application, it enables the user to create and include new documents into the database or to create retrievable documents within the database. Any databases or documents that the user creates can be password protected to restrict access by unauthorized users who may have access to the computer.

**4**

The invention provides a user with the ability to train a search engine to automatically and methodically search the internet or other data sources according to derived or evolved limitation criteria. Each set of such criteria is stored for reuse or modification as the user desires. Without limiting the criteria, the system could be directed to retrieve and completely index every file that existed on its available data sources. While that would guarantee that all data in those files would be searched for data that the user wants, there are practical limitations.

If the data source is vast, like the internet, the system would attempt to index all of its files, objects, or documents, but it would quickly encounter storage limitations on the user's computer if default limitations were not automatically imposed. By artfully estimating the time and storage requirements and matching them to available resources, the system guides the user to impose limitations to produce the desired results. This method allows users to completely index all of some data sources, to filter and sort smaller percentages of greater data sources, or to survey large data sources such as the internet. In the latter case, the user can refine the resultant survey to identify smaller, but more relevant, parts of the data sources. After sufficiently iterating the refinement process, the user will be able to index and search all selected and relevant data. Thus, this system and method enable a user to predictably and efficiently solve the problem of selecting and comprehensively searching relevant data from sources with unknown content by combining human intelligence with the indexing and search/retrieval capabilities of a computer. Since the system can be trained to repeat all or parts of previous actions, the user's instructions can be perfectly carried out while repeatedly using different search criteria.

Uses of the system include those identified herein as well as many others. For example, a vendor could prepare a database, kept on a remote server that contains continually updated information, to be accessed by a computer running this system. Among other things, the database could contain information authorizing the user to continue to use the system and query the database. Independent of the server, the user could then employ all or part of the system's capabilities for other purposes as desired.

In one embodiment, commercial electronic database publishers could use a system according to the present invention as a publishing system to create databases with more or less homogeneous content. For example, one publisher may produce a monthly searchable, linked database containing issued United States patents, another might produce a linked database containing decisions of appellate courts, and another might produce a linked database containing documents required to be filed by various regulatory agencies, etc. Using prior systems to produce such databases requires substantial programming skills to incorporate reference links within the database, but in practice, many such links are invalid because a referenced document does not exist. Using the system according to the present invention does not require such skills because it automatically creates only valid and verified links. The graphical user interface is easily modified to comport with a particular "look and feel" desired by the publisher.

In another embodiment, a data provider could maintain a continually updated database of information (e.g., statistical or a glossary) on a remote server that the user accesses via a network such as the internet. Upon being started by the user, an application automatically connects to the remote database when information from the database is needed and disconnects once it is obtained. If the remote database has

US 6,834,276 B1

5

changed, the user will be notified and the user's database index can be regenerated to accommodate the changes. By storing user authorization codes on the remote server in a database or table for that purpose, the provider can verify that the user is still entitled to access the service provided. The application on the user's computer can automatically be rendered dysfunctional by the passage of time unless it successfully renews its operating status by connecting to the provider's authorization code database. This embodiment provides advantages to both the data provider and the network service provider: (1) the system application can essentially be provided on a subscription or rental basis without the necessity of distribution media or elaborate license or copyright protection schemes; and (2) the network service provider's effective bandwidth is greatly increased because the system only connects to the remote server on an as-needed, when-needed basis instead of requiring an active modem connection continuously.

Another object of the invention is to provide a method and system for storing search results from various sources including the internet with internet format files, objects, or documents. The locally stored results can be automatically indexed for fast searching and hyper linked by the user to make subsequent finding of the previously located information quick and simple

The system and method of the invention overcomes the above-noted problems of the prior art and can be used for general purpose data acquisition, creation, manipulation, indexing, and perusal while connecting to remote data sources only as needed.

## SUMMARY OF THE INVENTION

A data acquisition and perusal system and method according to the present invention includes a database selection module, a link module, a database index generator module and a search module. The database selection module enables selection of a plurality of files, objects, or documents for inclusion into at least one selectable database. The link module enables custom links to be defined between selected terms of selected files of the selectable database. The database index generator module enables generation of a searchable index of the data contained in the selectable database including the custom links so that the searchable index includes only valid links. The search module enables a search to be performed of the searchable index according to a search criterion.

The plurality of different files may include a plurality of different file types, such as internet formatted files, objects, or documents, including HTML type formats, and word processor formats, text formats, RTF formats, etc. Generally, each database includes one or more files of a particular type. The database selection module may be configured to enable selection of the plurality of files both locally and remotely via a network. For example, the data acquisition and perusal system and method may be implemented on a computer coupled to a network, where the network may further be connected to the internet. The data acquisition and perusal system and method may be configured to copy internet files to a local storage disk, or to simply maintain a link to the internet files of interest.

The link module enables association of any selected link term with any of the plurality of files in the selectable database. The link module may further enable at least one alias term to be defined for any selected link term to enable a link to be established between each alias term and any of the files in the database. Each of the files may further include

6

one or more fields. The link module further enables field links to be defined between any two or more of the plurality of files. Such field links may be defined according to patterns, where the patterns may further be defined using wildcard characters that each replace one or more digits or characters.

The search module may further enable sorting of any files of the selectable database that meet the search criterion. In one embodiment, such sorting may be according to the respective fields of the files. For example, the files may be sorted by date, by name, or by any other field types or descriptions.

The data acquisition and perusal system and method may further include at least one input device and a display utility including a graphic user interface (GUI). The input device and display utility enables graphic interaction with the database selection, the link, and the search modules via the input device. The display utility displays at least portions of files in the selectable database that meet the search criterion. The portion of a displayed file typically includes any text that meets the search criterion. Such text is usually graphically indicated, such as via color, style, highlighting, etc. Also, any selected link terms defined via the link module are also indicated in a similar manner. Further, the display utility enables interaction with any indicated selected link terms via the input device to enable perusal of linked files in the selectable database. For example, a user may double click on highlighted text indicating a link term in a displayed file, where the data acquisition and perusal system and method jumps to and displays the linked file. Operation is similar for alias link terms if defined.

The system and method may automatically, unambiguously, and accurately place reference links among documents within a database it creates according to a schema controlled by the user. These links enable the user to instantly view a file, object, or document referenced by another file, object, or document currently being viewed and to backtrack to any point of origin in the database. The system and method does not modify or make extraneous copies of the contents of the original database files, objects, or documents. If a file, object, or document is modified or deleted, the integrity of the database is not affected with respect to the other files, objects, or documents because either the database (i.e., the index) will be regenerated, or an error message will be presented telling the user that the file, object, or document has been modified or deleted. The application may also give the user the option to create compressed, password-protected databases for secure dissemination to other users or simply to secure the files, objects, or documents and database indexes for personal use.

Embodiments of a system and method, in accordance with the principles of the present invention, provide methods and systems for acquiring, creating, manipulating, indexing, and perusing data; for locating and retrieving known or unknown data for the same purposes; for automatically connecting to remote network computers on an as-needed, when-needed basis; for validating a user's rights to use the system; and for securing pertinent data from unauthorized use.

## BRIEF DESCRIPTION OF THE DRAWINGS

A better understanding of the present system can be obtained when the following detailed description of the preferred embodiment is considered in conjunction with the following drawings, in which:

FIG. 1A is a block diagram of an exemplary computer system that is used to illustrate various aspects of the present invention.

7

FIG. 1B is a block diagram of an exemplary network system that is used to illustrate various aspects of the present invention, where a computer is coupled to other computers in a network environment which also may be coupled to the internet.

FIG. 1C is a block diagram illustrating a data acquisition and perusal system and method implemented according to the present invention.

FIG. 2 is a block diagram of an exemplary searchable database index that is generated by the computer system of FIG. 1A.

FIG. 2A is a schematic of an exemplary word position table as contained in a DSF file of FIG. 2.

FIG. 2B is a schematic of an exemplary locator string from the word position table of FIG. 2A.

FIG. 3 is a flow diagram of an exemplary startup sequence of a database application program implemented according to the present invention.

FIG. 4 is a flow diagram of an index generator processing sequence of the database application program of FIG. 3.

FIG. 4A is an expanded flow diagram of an index generator processing step for word locations in HTML files depicted by step 406 of FIG. 4.

FIG. 5 is a screen display illustrating an exemplary database registration dialog of a graphic user interface (GUI) embodiment of a database application program implemented according to the present invention.

FIG. 6 is a screen display illustrating an exemplary unregister confirmation dialog of the GUI database application program introduced in FIG. 5.

FIG. 7 is a screen display of an exemplary index generator dialog of the GUI database application program introduced in FIG. 5.

FIG. 8 is a screen display of an exemplary search/retrieval dialog of the GUI database application program introduced in FIG. 5.

FIG. 9 is a screen display of an exemplary dialog displaying a document retrieved from a searchable database index using the GUI database application program introduced in FIG. 5.

FIG. 10 is a screen display of an exemplary display options dialog of the GUI database application program introduced in FIG. 5.

FIG. 11 is a screen display of an exemplary link generator dialog of the GUI database application program introduced in FIG. 5.

FIG. 12 is a screen display of an exemplary dialog implemented as an integrated word processor of the GUI database application program introduced in FIG. 5.

FIG. 13 is a screen display of an optional field links dialog of the GUI database application program introduced in FIG. 5.

FIG. 14 is a screen display of an exemplary Browser Mode Window showing an HTM (HyperText Markup Language) document retrieved from the internet using the GUI database application program introduced in FIG. 5.

FIG. 15 is an example screen display of the HTM document of FIG. 14 after being saved and edited in the Browser Mode window in accordance with the principles of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings, FIG. 1A is a block diagram an exemplary computer system 100 that could be used to

8

illustrate various aspects of a data acquisition and perusal system implemented according to the present invention. The computer system 100 is preferably a conventional IBM brand compatible, personal computer (PC) system or the like, and includes a motherboard and bus system 102 coupled to at least one central processing unit (CPU) 104 and a memory system 106. The motherboard and bus system 102 include any kind of bus system configuration, such as any combination of a host bus, one or more peripheral component interconnect (PCI) buses, an industry standard architecture (ISA) bus, an extended ISA (EISA) bus, micro-channel architecture (MCA) bus, an AGP bus, a universal serial bus (USB), etc., along with corresponding bus driver circuitry and bridge interfaces, etc., as known to those skilled in the art. The CPU 104 preferably incorporates any one of several microprocessors, such as the 80486, Pentium™, Pentium II™, Pentium II™, etc. microprocessors from Intel Corp., or other similar type microprocessors such as the K6 microprocessor by Advanced Micro Devices, and supporting external circuitry typically used in PCs. The external circuitry preferably includes an external or level two (L2) cache or the like (not shown). The memory system 106 may include a memory controller or the like and be implemented with one or more memory boards (not shown) plugged into compatible memory slots on the motherboard, although any memory configuration is contemplated. The invention is also applicable to other microprocessors, other architectures and other operating systems.

The computer system 100 may include one or more output devices, such as speakers 109 coupled to the motherboard and bus system 102 via an appropriate sound card 108 and a monitor or display 112 coupled to the motherboard and bus system 102 via an appropriate video card 110. One or more input devices may also be provided such as a mouse 114 and a keyboard 116, each coupled to the motherboard and bus system 102 via appropriate controllers 115, 117, respectively, as known to those skilled in the art. A storage system 120 is coupled to the motherboard and bus system 102 and may include any one or more data storage devices, such as one or more disk drives including floppy and hard disk drives, one or more CD-ROMs, one or more tape drives, etc. Other input and output devices may also be included, as well as other types of input devices including a microphone, joystick, pointing device, voice recognition, etc. The input and output devices enable a user to interact with the computer system 100 for purposes of data acquisition and perusal, as further described below.

The motherboard and bus system 102 may be implemented with at least one expansion slot 122, which is configured to receive compatible adapter or controller cards configured for the particular slot and bus type. Typical devices configured as adapter cards include network interface cards (NICs), disk controllers such as an IDE or a SCSI (Small Computer System Interface) disk controller, video controllers, sound cards, etc. The computer system 100 may include one or more of several different types of buses and slots, such as PCI, ISA, EISA, MCA, AGP, USB, etc. Each slot 122 is configured to receive an expansion card 124, such as a sound card, a modem card, a network interface controller (NIC) or adapter, etc.

Other components, devices and circuitry are normally included in the computer system 100 but are conventional and are not part of the present invention and are not shown. Such other components, devices and circuitry are coupled to the motherboard and bus system 102, such as, for example, an integrated system peripheral (ISP), an interrupt controller such as an advanced programmable interrupt controller

US 6,834,276 B1

9

(APIC) or the like, bus arbiter(s), one or more system ROMs (read only memory) comprising one or more ROM modules, a keyboard controller, a real time clock (RTC) and timers, communication ports, non-volatile static random access memory (NVSRAM), a direct memory access (DMA) system, diagnostics ports, command/status registers, battery-backed CMOS memory, etc. Although the present invention is illustrated with an IBM-compatible type PC system, it is understood that the present invention is applicable to other types of computer systems and processors as known to those skilled in the art.

A data acquisition and perusal system or application program according to the present invention may be stored in the storage system 120. The database application program is retrieved into the memory system 106 and executed by the CPU 104. As described more fully below, the database application program retrieves local files, such as stored in the storage system 120, and remote files, such as accessed via a network, and generates a searchable database index. Although reference is made in the specification and claims to computer files, it is understood that the term filed encompasses documents and any other digital object that contains machine or individual readable or searchable information. The searchable index may be generated in the memory system 106 or the storage system 120 for longer term storage. The database application program further includes search and retrieval functions that enable a user to search the searchable index as more fully described below. The computer system 100 is included to illustrate that a data acquisition and perusal system and method according to the present invention may be realized on a modern computing machine with a CPU, random access memory (RAM) and external storage, such as the storage system 120. The computer system 100 enables a user-friendly graphic user interface (GUI) implementation with display and input capabilities. There are no explicit restrictions on CPU architecture or display technology.

Referring now to FIG. 1B, a block diagram is shown of a network system 150 that communicatively couples a plurality of computer systems or computing devices 152, 154, 156, 158, 160, etc. together via a communication medium 162. Any one or more of the computing devices 152–160 may be implemented in the same or a similar manner as the computer system 100. The network system 150 may include any one or more network devices (not shown), such as hubs, switches, repeaters, bridges, routers, brouters, etc. The network system 150 may operate according to any network architecture, such as Ethernet™, Token Ring, Token Bus, ATM, etc., or combinations of such architectures at any available speed, such as 10 Megabits per second (Mbps), 100 Mbps, 1 Gigabits per second (1 Gbps), etc. The network 150 may form any type of Local Area Network (LAN) or Wide Area Network (WAN), and may comprise an intranet and be connected to the internet.

The computer system 100 can operate a data acquisition and perusal system and method according to the present invention in a standalone mode. If coupled to a network, such as the network system 150, the computer system 100 can also access and retrieve remote files located on the networked computers 152–160. Of note, the communication medium 162 may be configured for an internet connection, an intranet connection, or other network connection. If the computer system 100 is coupled to the internet, to an intranet, or to another network via the connection medium 162, the computer system 100 can likewise access and retrieve files located through those connections. A system according to the present invention does not require that

10

either original database source files or generated index files be located on the computer system 100.

Database source files (or documents) are typically divided into fields or areas when they are created. These fields may result from word processing application that is used to create the documents. For example, WordPerfect® formatted files/documents contain both hidden and visible fields in almost every document that is created. Likewise, Microsoft® Word (hereinafter MS-Word) formatted files/documents contain certain fields. In addition, internet or HTM (or HTML, HyperText Markup Language) type format files, objects or documents contain many hidden and unhidden fields. Thus, the files/documents/objects referred to herein should be understood to contain fields.

Further, a system according to the present invention includes special features for handling composite file types, such as HTML format files used over the internet. Composite files can include display codes for arrangement, graphics, fonts, hyperlinks, and other characteristics that allow "assembly" of what appears to be a single document presented on the computer monitor but which actually may be a compilation of multiple text and graphic elements stored in separate files. Unlike integral files, composite files are more efficient from a disk storage space standpoint than integral files because their reusable components, such as graphics, can be used many times by different files without having to be replicated for each file. Composite files can also include small integral programs called scripts (e.g., Java applets or Java scripts) that instruct the computer to perform other tasks while the HTML page is displayed. Regardless of the visual complexity of an HTML composite file, from a searchable database perspective, the crucial parts of the HTML composite file are those parts that contain text.

FIG. 1C is a block diagram illustrating a system 170 implemented according to the present invention which performs the method of the invention. Although not limited to a single computer system, the present invention is illustrated using the computer system 100 as a standalone system as shown in FIG. 1A or as coupled to the network system 150 as shown in FIG. 1B. A file database 171 is shown in FIG. 1C which represents any file that is accessible, either locally or remotely, by the computer system 100. For example, the file database 171 may includes files located on the storage system 120 and files accessed from remote sources, such as via the internet, via the network system 150 and the expansion card 124 configured as a NIC or modem.

The file database 171 includes one or more files of type A, shown as files AF1, AF2 . . . AFn, where "n" is any positive integer. The file database 171 may further include one or more files of type B, shown as files BF1, BF2 . . . BFn, one or more files of type C (not shown), etc. Examples of file types include internet or HTML format (or simply HTM), word processor format including DOC files generated by MS-Word, or similar word processing files generated by WordPerfect®, text format, RTF (Rich Text Format) files, drawing files, database files, etc. The incompatibilities and between various formats has become less since several types of formats may be included in a single file, object, or document. In this manner, the present invention contemplates any number of files or documents of any type. It is noted that any one or more of the files may be copied into local storage or may be simply accessed via an existing link to that file. For example, in a default mode, internet files are copied locally. However, the user may choose to simply access the file via a valid link or address.

The system 170 shown in FIG. 1C includes a database selection module 173 that enables a user to select any

US 6,834,276 B1

11

number of any type of files from the file database **171** for inclusion into a selectable database **175**. Of note, the term "module" represents any combination of hardware and software implemented to achieve the desired functions. For example, one or more modules described herein may be incorporated into a database application, which is stored on the storage system **120** and retrieved into the memory system **106** for execution by the CPU **104**. The selectable database **175** comprises one or more databases, shown as D1, D2, D3, etc., where each database includes one or more files selected by the user from the file database **171**. The selectable database **175** may include a single database with a single file or multiple files, or a plurality of databases, each including a single file or multiple files. The database selection module **173** enables the user to select and define the selectable database **175**. For example the selectable database **175** may include a database D1 including files of a first type (AF1, AF2, etc.), a database D2 including files of a second type (BF1, BF2, etc.), and so on.

The system **170** may further include a link module **177** that enables a user to define one or more custom links between selected files of the selected database **175**. Such links are typically referred to as hypertext links. For example, the user may choose one or more link terms that should be linked to at least one file, either in the same database or a different database, in the selectable database **175**. The link module **177** allows an essentially unlimited number of such link term/file pairs to be created. As further described below, when a link term is encountered in a file or document, the link term is indicated or otherwise highlighted so that the user can select the indicated link term to jump to the linked file. The link module **177** may further enable the user to define one or more aliases for each link term. For example, the user may define the terms "grape", "tomato", "raspberry", etc., as aliases of a link term "vine fruit". Each alias is treated in a similar manner as its corresponding link term. Each of the files in the selected database **175** may further include one or more fields. The link module **177** enables the user to define field links to link similar fields between two or more files. Such field links may be generated according to patterns, where such patterns may further be defined using wildcard characters that each substitute for one or more digits or characters depending upon the function of the respective wildcards, as further described below.

The system **170** further includes a database index generator **179** that generates a searchable index **181** based at least on the selectable database **175**. The database index generator **179** may further include the link information from the link module **177**, so that the searchable index includes valid user-defined links. In this manner, the database index generator **179** is capable of processing the user-defined links in view of the selectable database **175** and incorporate only valid links into the searchable index **181**. The system **170** further includes a search module **183** that enables the user to perform any number of searches of the searchable index **181** according to any desired search criterion. The search criterion may be according to any desired function or defined expression(s), such as a single term, literal phrases or terms comprising text in quotes, multiple words and Boolean operators (e.g. AND, OR, XOR, etc.), etc.

The system **170** may further include a display/input utility **185** that interfaces one or more of the modules of the system **170**, such as the database selection module **173**, the link module **177** and the search module **183**. For the computer system **100**, the display/input utility **185** may be implemented using the display devices such as the video card **110**

12

and corresponding display **112**, and input devices including the mouse **114** and mouse interface **115** and the keyboard **116** and the keyboard interface **116**. Further, the display/input utility **185** includes one or more software programs or drivers executed from the memory system **106** by the CPU **104** to interface the respective modules. Such programs or drivers may be separate or integrated into a single application including the modules.

The display/input utility **185** preferably includes a GUI (Graphic User Interface) that enables the user to select and display one or more of the files of the file database **171**, such as by pathname including directories and filenames or URL (Uniform Resource Locator) addresses, as well as one or more of the databases of the selectable database **175**. The display/input utility **185** enables the user to interactively define link information via the link module **177**. The display/input utility **185** enables the user to launch the database index generator **179** to generate the searchable index **181**. The display/input utility **185** enables the user to define search criterion via the search module **183** and to view the results of a search. As described further below, the results may be viewed as a list of files that match the search criterion, and the user may select and view the contents any of the listed files. The display/input utility **185** displays portions of the files that match the search criterion, as well as any predefined links defined via the link module **177**.

The system **170** shown in FIG. 1C is exemplary only and may include other modules and functionality. For example, the system **170** may include an integrated word processor dialog, one or more link generator dialogs, a search/retrieval dialog, a display options dialog, an integrate browser dialog, etc.

The system **170** provides several advantages over other types of search/retrieval applications or database programs. The system **170** enables a searchable index to be generated that includes valid, customized links. The searchable index provides a static and enables a snapshot of files or databases to be taken at a given time for perusal by a user at any time, even if the originating files change or are no longer valid. The searchable index is also dynamic in that the user may update the selected files and links and generate an updated index. The system **170** also enables pinpoint searches of multiple files at the same time, including multiple HTML files retrieved or accessed locally or via the internet.

FIG. 2 is a block diagram of an exemplary searchable database index **200** generated by a data acquisition and perusal system and method according to the present invention, such as the system **170**. The database index **200** corresponds to, and is a more specific embodiment of, the searchable index **181** shown in FIG. 1C. The user makes an inquiry about specific words or phrases by entering those specific words or phrases via the search module **183**. The search module **183** first parses the inquiry into a list of its discrete terms, i.e., words, numbers, spaces, etc., and then accesses the database index **200** to locate the terms in various files/documents of selected databases.

In operation, the search module **183** first compares each term of the search query against "words" contained in a stop word list **201** of the database index **200**. The stop word list **201** is a file containing a list of "noise words", or words that frequently occur in a file/document that do not contain distinguishable characteristics. For example, stop words are "words" such as "and", "as", "the", "a", "I", "for", certain punctuation, etc. Although a default stop word list is provided for each database index that is to be generated, a user may edit the stop word list **201** for a particular database

A073

US 6,834,276 B1

13

index that is to be generated and include additional stop words or remove unwanted stop words from the default stop word list. If a stop word is found among the terms of a It search query, the search for that term is terminated because the search module 183 considers that term to be a noise word and does not allocate further resources toward searching the files for that term. However, the length of the term is stored in the search engine's dynamic buffers for future phrase analysis. For example, if the search query contains the terms "big for tall", the word "for" is considered a stop word and a length of the stop word, i.e., five (three letters plus two white space delimiters), is stored in place of the spaces and the word "for". Thus, as described in greater detail herein, the search query becomes a search for files/documents that include the words "big" and "tall" with five spaces/characters between the words. If the search had been the search query "big as tall", where the word "as" is considered a noise word, the search query becomes a search for the words "big" and "tall" with four spaces/characters there between.

If a stop word is not found that corresponds to a term of a search query, the search module 183 then searches a master word index 202 for the term of the search query. The master word index 202, like the stop word list 201, is generated at the time the database index 200 is generated and is typically a binary file that includes a reference to each word, other than stop words, that appears in each of the files/documents of the database that is to be searched using the search module 183. Each word of the master word index 202 is associated with information regarding the word's length and regarding the files/documents in which the word appears.

The master word index 202 is best conceived as being a file made up of three parts which are referred to herein as Part 1, Part 2, and Part 3. Conceptually, Part 1 of the master word index 202 file is a list of segments, each segment corresponding to a file/document number. For example, segment number one corresponds with file/document number one, segment number two corresponds with file/document number two, etc. Further, each segment is actually a smaller list whose beginning and end points are known by Part 2 of the master word index 202 file. Of note, Part 1 of the master word index 202 file is written only if it is needed and thus only if there is more than one file in the database. In the case of a one file database, Part 1 is not written because it is not needed to distinguish one file from another.

Part 2 of the master word index 202 file, like Part 1, is a list of segments; however, each segment corresponds to each of the words in the database and is combined with information needed to find files/documents in which a given word appears in a single file. Of course, if the database contains a single file, Part 2 becomes the first part of the master word index 202 file. In one embodiment, the standard segment of Part 2 is broken down thusly:

(a) First, a tagged binary string. Although the tag is arbitrary, in this embodiment, the tag is an ASCII 8, ASCII NULL pair, which tells the search module 183 that a word string follows. Following this pair is a two-byte binary coded integer representing the length of the word string. Following this integer is an ASCII representation of the word string.

(b) Following the tagged binary string is a sequence of twelve bytes comprised of three sets of four-byte integers or "long integers". Each long integer provides additional information necessary to find the word string in its database file(s). These twelve bytes are broken down thusly:

(i) The first four of the twelve bytes encode the word's word number as a long integer.

14

(ii) the next eight of the twelve bytes encode two long integers whose interpretations depend upon one another.

The following Table I indicates possible values of the two long integers and their interpretation:

TABLE I

| | | Long Integer Interpretation |
|---|---|---|
| If first long integer (x) is: | And second long integer (y) is: | Interpretation: |
| Positive and less than the number of files in the database. | Positive. | First number (x) is the number of files in the database containing the word. Second number (y) is an index to the file position in Part 1 of the Master Word Index at which starts the list of file numbers containing this word. The list of numbers is x entries long. |
| Positive, and greater than the number of files in the database. | Positive | x indicates the number of files that DO NOT contain the given word. This number is determined by subtracting the number of files in the database from x. y is an index to the file position in Part 1 of the Master Word Index at which starts the list of the file numbers that do NOT contain this word. The length of this list is the number x, less the number of files in the database. |
| Positive | −1 | x is the file number of the one and only file in the database which contains this word. (No entry is needed in Part 1.) |
| −1 | −1 | All files in the database contain this word. (No entry is needed in Part 1.) |

The information contained in Part 2 of the master word index 202 enables the search module 183 to expedite searching procedures for any search query that may be entered into the search module 183.

Part 3 is a sequence of three indices, herein referred to as a first index, a second index, and a third index, for eliminating search terms that do not appear in Part 2 of the master word index file. Essentially, once a database index has been generated, the search module 183 uses Part 3 as a "negative search" index, i.e., an index to quickly eliminate search terms that do not appear in the database. In one embodiment, before the first of these three indices, there is a two-byte ASCII 5, ASCII NULL pair that serves as a dividing point between Parts 2 and 3.

The first index of Part 3 is a numeric index which consists of 110 long integers. The first ten long integers are indices into the Part 2 information for words starting with "0"–"9". Thus, when the database index 200 is generated, offsets for the words starting with "0"–"9" in the Part 2 data are recorded in each of the first ten long integers. If no word in Part 2 starts with the given single digit, four ASCII 255's are written into the corresponding long integer of the first ten long integers. Following these ten long integers are 100 long integers for words starting with the pairs "00"–"99". Similar to the first ten long integers, offsets for words in the Part 2 data are recorded, but if no word starts with the given pair, four ASCII 255's are written to that long integer of the first index.

A074

**15**

The second index is an index for "odd" leading characters. This index is a list of 255 long integers, corresponding to ANSI characters 1–255. Like the first index, offsets for words in the Part 2 data are recorded, but if no word in Part 2 starts with a given character, four ASCII 255's are written to the corresponding long integer of the second index. Also, if the given character is a letter, a numeric digit, or any other character that a user is not intended to find with the search module **183**, four ASCII 255's are written to the long integer that represents that character.

The third index is a list of long integers that index words with alphabetical leading characters. The third index is of variable length depending on whether the index is a (two or a three dimensional index (to be described herein). The first 26 long integers in the third index are offsets for words in the Part 2 data that begin with the single letters "a" through "z". If no words in Part 2 begin with a given letter, four ASCII 255's are written to the corresponding long integer. The next 676 (26 squared) long integers of the third index are offsets for words that begin with the pairs "aa", "ab", "ac", etc., ("aa" through "zz", thus, creating a "two dimensional" index from the third index. Offsets for these words in the Part 2 data are recorded in the 676 long integers, but if no word begins with a given pair, four ASCII 255's are written to the corresponding long integer. If desired, the third index can be a "three dimensional" index, i.e., an index including references to single alpha characters (**26**), pairs of alpha characters (**676**), and three alpha characters. If the index is three dimensional, then 26 cubed (17576) long integers follow "zz". These long integers index words beginning with the triplets "aaa", "aab", "aac", etc., through "zzz". Again, if no word begins with a given triplet, four ASCII 255's are written to the corresponding long integer for that triplet.

Following these three indices is a nine byte string. The string begins with a single character that is ASCII 2 if the third index is two dimensional, and ASCII 3 if the third index is three dimensional. Following this character is a long integer corresponding to the offset at which the Part 2 data begins, i.e. the first character following the Part 1 data, if there is any Part 1 data. The last four bytes are a long integer corresponding to the first byte that follows the last byte of the Part 2 data. This is the offset for the ASCII 5 in the ASCII 5, ASCII NULL pair that tags the beginning of At the three indices of Part 3. Because the size of the three indices of Part 3 can be computed exactly based on the known dimensions of the alpha locator string as coded in byte 1 of this 9 byte string, this final four-byte long integer is not strictly necessary.

After the search module **183** determines which files contain the search terms, a word number index **203** is accessed to find the exact location of the search terms in each file of the database. The word number index **203** is included in the database index **203** and can be described by two files, a DSI file **204**, and a DSF file **205**. The terms "DSI" and "DSF" are somewhat arbitrary character strings and are commonly used as file extensions for the respective files in the word number index **203**. Broadly speaking, the terms represent a file (DSF) and an index (DSI) to that file, but for purposes of understanding, each term is referred to as a file from a portion of the database index **200**. It should be noted that, in a similar manner, the remaining portions of the database index **200** are also designated with similar character strings to designate files included in the respective portions of the database index **200**.

The word number index **203** is used by the search module **183** to find the character and slot positions of words in database files. A character position is defined as the number

**16**

of the logical byte or character in a file at which a word starts. For text files this is straightforward. For RTF, DOC (MS-Word), and HTM files, a translation from the actual binary file as stored on the disk to the logical file is necessary. A slot position is defined as the numeric position of the word in the file, a "word" being defined as any contiguous unit of text, including stop words, that appears between white space. Hence, for a file whose sole contents is the string "Have a nice day!", the word "nice" has a character position of 7 because the count starts at 0, where 'H' is at position 0. In addition, the word "nice" has a slot position of 3 because the count starts at 1, where "Have" is at position 1.

As stated, the DSI file **204** is an index into the DSF file **205** and contains a list of indices. This list contains a sequence of long integer pairs, encoded as eight bytes, for each file in the database. For a file which contains searchable words and has an entry in the DSF file **205**, the first long integer in a DSI long integer pair is a start position in the DSF file **205** of information relating to that file and the second long integer in the pair is an end position of the information in the DSF file **205**. For a file which contains no searchable words such as an HTM file that is simply a frame container, or a nonsense file that is filled with stop words only, each long integer of the long integer pair has a value less than 0, indicating that no DSF entry exists for the particular file.

With reference to FIG. 2A, the DSF file **205** for a database index **200** contains a sequence of word position tables **219** for each file in the database that contains searchable terms. Of note, some files of the database may be without searchable terms and, thus, not included in the DSF file **205**. As stated, examples of files without searchable terms might include HTM pages that describe frame containers only, and thus have no searchable data of their own, or nonsense files which contain only stop lot words. The beginning and end of each word position table **219** in the DSF file **205** is coded in the companion DSI file **204**. For each file which has a word position table, **219**, the table **219** is laid out in columns as shown by a single row view.

The first column of the word position table **219** includes character positions **220**. The character positions **220** comprise variable length binary strings containing a sequence of long integers indicating character positions at which a given word appears in the file for which the word position table **219** was generated. In the second column of the word position table **219**, a word slots list **222** is provided which is another variable length binary string containing another sequence of long integers, each indicating a slot position at which given words in the file appear. The correspondence between the character positions **220**, the word slots **222** and their associated words is recorded in a locator string **224**, i.e., the third column of the file's word position table **219**.

In this embodiment, the locator string **224** is a variable length binary string containing a sequence of twelve-byte sub-segments, each sub-segment coding three long integers. As illustrated in FIG. 2B, each twelve-byte sub-segment of the locator string **224** begins with a word number **228**. The word number **228** is followed by a character position index **230** which is an index into the first column of the word position table **219** and indicates the location of the long integer that represents the position of the first character of the word in the file. This character position index **230** is followed by a slot position index **232** which is an index into the second column of the word position table **219**, the word slots list **222**, and indicates the location of the long integer that represents the position of the word in the file.

US 6,834,276 B1

**17**

Referring to FIG. 2A, a number of elements in locator string **226** comprises the fourth and last column in the word position table **219**. The number of elements in locator string **226** is a long integer and stores the number of sub-segments in the locator string **224**.

Referring back to FIG. 2, a WDN file **216** is shown that represents a streamlined master word index **202** and contains data that is loaded into WDN maps, which are used for word searches on primary databases. These searches are typically faster than direct searches of the master word index **202** because the WDN file **216** is commonly loaded directly into the memory **106** of the computer system **100**. Of course, compared to accessing the hard disk storage system **120** of the computer system **100**, the memory **106** provides faster access for the word search module **183**. However, the memory **106** is limited in size and, thus, the size of the WDN file **216** may be limited.

In this embodiment, the data in the WDN file **216** consists of segments, one segment per each word in the database, where each segment consists of 52 bytes. The first 40 bytes contain the string representation of a given word (e.g. "apple"). This string is padded on the right with spaces, so that it is always 40 bytes long, thus allowing easier loading into the word map. The next twelve bytes precisely duplicate the data in the three long integers stored in Part 2 of the master word index **202**. In other words, the first long integer of the twelve bytes encode the word's word number. The next eight bytes encode the two long integers, whose interpretations depend upon one another. Refer to Table 1 for possible interpretations.

For file/document organization, the database index **200** also includes a contents table **209** to assist the search module **183** to organize files/documents for display when a search has completed. In this embodiment, the contents table **209** includes two files, a COI file **210** and a COF file **211**. The contents table **209** operates in conjunction with fields list files **212**. The COI file **210** is an index into the COF file **211**. The COI file **210** contains a sequence of four-byte binary encoded long integers, one long integer for each file in the database. These long integers encode a start position in the COF file **211** at which information for the given file begins. For example, to find the field information for the thirteenth file in a twenty-file database, the software of the computer system **100** retrieves the thirteenth long integer encoded in the COI file **210**. The system **100** retrieves the fourteenth long integer encoded in the COI file **210** to determine where the fourteenth file's information begins and the thirteenth file's information ends in the COF file **211**. Using these two values, the system **100** then extracts the characters from the COF file **211** and thus obtains all the field information for file thirteen of the database. Of course, for file twenty in this example, the system **100** simply reads the twentieth long integer in the COI file **210** to find the start position 1D for the information in the COF file **211**. Since no file follows the last file, the end position for the information is simply the end of the COF file **211**.

The COF file **211** contains the field information for each file in the database. Although each file in a given database has the same number of fields, though a particular file may have several blank fields, it should be noted that different databases may have different numbers of fields for the files in their databases. For example, HTM databases typically have fewer fields per file than databases containing MS-Word documents. Field information for a particular file is tab delimited. In the embodiment shown, characters are not used to delimit the field information for one file from the field information for another file. Instead, the last text

**18**

character of field information for one file is immediately followed by the first character of field information for the next file.

When performing a search of a database, search results for a database may be ordered based on a number of different file fields taken from the fields list files **212**, including title and date fields. The fields list files **212** aid in determining a proper sort order for files based on different fields. These different files are designated C01, C02, . . . C0# Files **213**. Each of these files **213** is a list of four-byte binary encoded long integers. The long integers correspond to the numbers of each file in the database. The file numbers are presented in the order in which those files should be presented so that the files are sorted according to the given field order. For example, in a four-file database where field 1 is a title field and the files in the database are as follows:

File 1—TITLE: "Warthogs Eat Wooly Worms"

File 2—TITLE: "Canaries Crave Caraway Seeds"

File 3—TITLE: "Aardvarks Ate Ants"

File 4—TITLE: "Dogs Dine on Dairy Dumplings":

the C01 file contains the file numbers 3, 2, 4, 1 bin that order, because the alphabetical sort order for these files by title is Aardvarks (file 3), then Canaries (file 2), then Dogs (file 4), then Warthogs (file 1). In this example, the C02 file is based on a date field in the files so that the file numbers are in a different order based on date. Thus, the files **213** each contain a presorted list of file numbers that assist the search module **183** to organize the files found in a search based on a selected field.

Referring to FIG. 2, the WDN file **216** is part of a word lists structure **214**. The word lists structure **214** includes files that contain different organizations of information associated with the words from the selected databases, the files being available to expedite the search of the database index **200** for the terms of a search phrase. In this embodiment, the word lists structure **214** includes a word length (WDL) file **215** that comprises an index of words according to their length, a reverse word order (WDR) file **217** that comprises an index of words spelled in reverse order (i.e., right to left order) and that are alphabetized according to the reverse spelling of the words, and the WDN file **216**. Thus, the word lists structure **214** is useful when a search query includes terms such as leading conflation searches, i.e., searches that call for all words meeting a search criteria in which only the last few letters of the search term are required to be met in the search query. For example, a search for "*ample" creates a hit for the words "sample", "example", "ample", etc.

In this embodiment, if the search term is not found in the WDN file **216**, the search for that term is terminated because the files/documents of the selected databases do not contain the term of the search query. If the search term is found in the WDN file **216**, the exact location of additional information about the term stored in the master word index **202** is provided to the search module **183**. If the computer does not have enough memory **106** to store the WDN file **216** in a memory map, the master word index **202** is searched directly for all information about the word, thus bypassing the WDN file **216** of the database index **200**. In one embodiment, WDN files **216** of three databases are stored in memory **106**, if possible, because users frequently select three or less databases to search and, typically, three or less WDN files **216** do not overly burden the memory **106** of a computer system operating the search module **183**.

Of note, the search module **183** must still perform more tasks before displaying the documents that fit the search conditions, and these tasks are not necessarily related to any specific search. Any document displayed also exhibits any

US 6,834,276 B1

**19**

hypertext jump links tying it to other files in the database to which it belongs. When the database is indexed to generate the index files, a jump link list **206** is also generated. It contains an OAI file **207** comprising an index into an OAI file **208**, which contains expansive data about represent links that exist in the database files.

To assist in the understanding of the database index **200**, the following narrative of a search for the word "unique" from the perspective of FIG. 2 is offered. In this example, a database index is created for each of three databases. One database includes three HTM files, a second database includes three RTF files, and a third database includes four DOC files. In each of the databases, the word "unique" appears twice in one document and once in another document. Therefore, upon a search for the word "unique", each database has two files with at least one hit, one file with two hits and one file with one hit. The user selects the three databases and generates database indexes. The user presses "Enter" in the search dialog, requesting a search of the selected databases for the word "unique". The search module **183** determines that there are three databases selected, and all are primary databases. Because they are primary databases, the corresponding WDN files **216** are loaded into memory **106**. Starting with database 1 (the HTM database), the search module **183** searches the HTM WDN file for the word "unique". The return value indicates that "unique" exists in this database, has a given word number (e.g., **138**), and has two associated numeric values. In this case, the two values might be 4 and 68. The interpretation of the numeric values is carried out according to the interpretations described in Table I, where x=4 and y=68.

Because the HTM database is a three-file database, and x is 4, then row **2** of Table I applies, i.e., x (or 4) minus the number of files (3) equals one. Thus, one file does NOT contain the word "unique", but the other files do. The file number of the single file that does not contain the word "unique" may be found at position y=68 in the master word index **202**. The search module **183** next looks in the master word index **202** at position 68 and reads one four-byte binary encoded long integer, whose value is 1. This is interpreted to mean that files 2 and 3 in this database contain the word "unique". Thus, all the files in the first database that contain the word "unique" are known. The search module **183** next performs a search on the second RTF database with similar results, perhaps finding that "unique" was word number **122** and files 1 and 3 contain the word "unique".

This is followed by a check of the third database, i.e., the four-file MS-Word DOC database, where the word number is 190 and the numeric values are x=6 and y=156. Again, according to Table I, the return values indicate that two (6−4=2) of the four files in the database do not contain the word "unique", and those two files are recorded at position **156** of the master word index file **202**. Reading the two four-byte binary encoded long integers at position **156** in the master word index **202** indicates that files 1 and 2 do not contain the word "unique", and thus files 3 and 4 do contain the word "unique". Thus, at this point, the user knows that each of the three databases has two files that contain the word "unique". These files include Files 2 and 3 of Database 1, Files 1 and 3 of Database 2 and Files 3 and 4 of Database 3.

With this information in hand, the next step of the search module **183** is to display the titles and other appropriate fields of the found files in the dialog, in the sort order specified by the user. In this example, assume that the user is sorting by document title and that the document title corresponds to field number four.

**20**

First, the search module **183** reorders its file number hits list to correspond to the final display selected by the user. Initially, the file number order may be represented as the following ordered pairs (database number, file number): (1,2), (1,3), (2,1), (2,3), (3,3) and (3,4). The search module **183** begins by loading the full contents of the first database's CO4 file (**213**, member of **212**), since ordering is by field number four. A comparison of the ordered contents of the CO4 file to the two "hit" file numbers for database 1 indicates that file 3 should be displayed before file 2. This process is repeated for databases 2 and 3, resulting in a final sorted list of: (1,3), (1,2), (2,1), (2,3), (3,4), (3,3).

Now that the search module **183** has sorted the complete hits list, the numeric pairs are translated to field list strings **212**. The search module **183** begins by looking in the COI file **210** of Database 1's contents table **209**. In this example, the COI file **210** indicates that the field information for file 3 begins at position 112. Further, because 112 is the third and final number stored in the COI file **210**, and the total file length for the COF file **211** is 172, the field information for file 3 ends at position 172. Reading the data in the COF file **211** from position 112 to 172, the search module **183** gives the fields for the file, including a file name (field one) of "1 uniq.htm", a title field (field four) of "Unique appears only once", and a closing date field, with blank fields in between. The search module **183** sorts these fields and composes a string in which field four is presented first, followed by the database name, followed by a number of other mostly blank fields (excluding the file name), and concluding with the file date. This string is output to the display. A similar process is carried out for each file hit, allowing a total of six field strings to be output to the dialog display **112**.

At this point, it is up to the user to select a file to view. If the user selects the third file in the list, which would be the first file of database 2, the dialog is closed and file 1 of database 2 starts to open. During the opening process, OAI and OAF files **207** and **208** for database 2 are checked to see if any string ranges in the RTF file need to be highlighted and treated as jump links. In this case, no jump links exist in the file. Also during the opening process, the word number index **203** for database 2 is used to determine the character ranges in file 1 of database 2 that are to be highlighted and treated as search terms located in the file.

The first step in using the word number index **203** occurs when the search module **183** opens the DSI and DSF files **204** and **205** for database 2. The DSI file **204** is a binary file listing pairs of long integers, each long integer coded as a four-byte binary number. Every file in a database has a corresponding pair of long integers in the DSI file **204**, listed in file number order. Hence, file 1 corresponds to the first pair of long integers in the DSI file **204**, and the last file in the database corresponds to the last pair of long integers in the DSI file **204**. If both long integers are positive in value, then they are interpreted as beginning and ending indices into the DSF file **204**, indicating the start and end of a word position table **219** describing a database file. If both long integers are less than 0, then the DSF file **205** contains no entry for this file.

In the case of file 1, a DSF **205** entry exists, so the first two long integers in the DSI file **204** indicate the beginning and ending ranges for this entry in the DSF file **205**. The search module **183** temporarily extracts this segment into main memory **106** and examines it. The layout of information in this segment is determined by first examining the last four bytes of this segment, and translating it into a number. The number is the number of elements in the segment's locator string **224**, which immediately precedes the last four bytes

US 6,834,276 B1

of the segment. The search module **183** knows that each locator string **224** entry is twelve bytes long, and thus the locator string **224** is 1200 bytes long if the number of elements is **100**. The search module **183** then examines the first entry in the locator string **224**. This entry, as is true of all the entries, codes three long integers in its twelve bytes. The first four bytes code the word number **228** for the first indexed word in the file. For example, the file may begin with the word "Zebra" and end with the word "aardvark", but since "aardvark" lexically precedes "Zebra", "aardvark" is considered the first indexed word in the file. The second four bytes indicate the **100** character position index **230** information for this first word, which should be 0, indicating the beginning of this DSF **205** segment. The third set of four bytes indicates the start of the slot position index **232** information for this first word, which will thus be the position in this DSF **205** segment at which the word slots list **222** information begins. Thus, the DSF **205** segment has been divided into four parts, including the character positions **220** addressed by the second byte of each locator string **224**; the word slots list **222** addressed by the third byte of each locator string **224**; the locator string **224**, in this case containing 100 twelve-byte segments; and the number of elements in locator string **226**, in this case **100**.

As stated earlier, if the word number for "unique" in database 2 is **122**, the locator string **224** is searched for an entry whose word number portion is **122**. Once this locator string **224** entry is found, the second long integer in the locator string **224** is read and interpreted, for example, a value of 68. Following this, the next locator string **224** entry is read and interpreted, for example, a value of 76. Thus, the eight bytes starting at 68 and ending at 76 in this segment indicate the starting positions for the word "unique" in file 1. Since these bytes are interpreted as four-byte long integers, this indicates that "unique" occurs twice in file 1. For example, the first long integer could indicate that "unique" begins at character position **100** and the second long integer could indicate another instance beginning at character position **200**.

With this information, plus the knowledge that "unique" is six characters long, the search module **183** is able to identify character positions **100** to **106** and **200** to **206** of by file 1 in database 2 as the location of the two instances of the search term in this file. These text ranges are indicated through operations such as highlighting, and the file is finally displayed for the user. Of course, the search module **183** treats the character positions in the remaining files in a similar fashion for indicating or highlighting the terms for a user.

FIG. **3** is a flow diagram of an exemplary startup sequence of a database application program implemented according to the present invention. When a user starts the program, a user logon sequence is initiated at a block **301**. The user logs in to the system, and the program first loads the previous interface display settings or default settings if there are no previous interface display settings at next block **302**. The interface display settings include a list of selected databases. The program checks each database that has been selected for searching and validates selected database files at next block **303**. If the validation fails as indicated at next block **304**, a message is displayed alerting the user that the database has corrupt or missing files at block **305** and deselects the problem database from the program. If there are more databases that have not been validated as determined at block **306**, then operation returns to block **303** to resume the validation procedure.

Each database has an initialization file that the software of the system **100** uses to generate the database index **200**.

Once all selected databases have been validated and deselected and success is achieved at block **304**, the validated databases' initialization files are loaded at next block **307** and then operation proceeds to next block **308**, where a start screen is displayed and the program waits for user instructions.

When logged in to the program, a user may generate a database index. FIG. **4** is a flow diagram of an index generator processing sequence of the database application of FIG. **3**. When the user starts the database application, a database generator initializes and loads previous settings at block **400**. The database generator then generates a table of files to process at block **401** based on the generator settings when the user begins the index generation process. The database generator then extracts field information (or data) from the top file in the processing table at block **402** and proceeds to the next file in the processing table as indicated at block **404** until all of the files have had their field data extracted for later compilation into the content stable **209** as determined at decision block **403**.

The next series of steps corresponds to producing data for creating the master word index **202** and the word lists **214**. For each file that is processed, valid words are extracted from the file and inserted into a word table at next block **405**, an index of the word locations in the file is generated at next block **406**, and a table of link patterns and field matches among the files th at have been processed up to that point is then generated at next block **407** as described in conjunction with the jump link list **206**. Each file in the table of files is sequentially processed in like manner as indicated by block **409** until the last file has been processed as determined at block **408**. In particular, operation loops between blocks **405**–**409** until the last file is processed as determined at block **408**.

Block **406**'s functions regarding HTML format files are more fully illustrated by FIG. **4A**. The format is first determined to be an HTML file or a non-HTML file at block **417**. If the file is not an HTML file, a fast and straightforward string analysis method is used to determine the locations of words within the displayable text string of the file. For example, if a file consists solely of the string "hello, world", the first word occupies file positions 1–5, and the second word occupies file positions 8–12. Once the search engine reports that "world" is in the file, it determines its file positions so the word can be set off with different color text or by some other means. If the file position information for the word is not accurate, then the retrieved word will not be highlighted accurately.

The string analysis method first requires obtaining an index string wherein all visible characters occupy positions absolutely relative to each other. The index string is then parsed into words entered into an index along with the numeric word location in the string. In the "hello, world" example, the search engine can then go to the absolute position of 8 as the beginning of "world" instead of the relative position of "the end of 'hello' plus 3" to get the display data for the word.

A string analysis method can be adapted to handle embedded control characters provided their behavior and characteristics are consistent. For example, an image in a RTF file may consist of thousands of bytes, but the beginning and end of the sequence is consistently identified, and the entire sequence always affects the file position the same way. Thus, the string analysis method can simply discard all image byte sequences without affecting the absolute position determination of visible characters in words.

HTML files involve major complications for using a string analysis method to determine file positions. HTML

23

control tags are placed in line with visible characters. Some of the tags cause the file position to increase, and some do not. Furthermore, the parameters and tag content can be of unlimited and indeterminate length. A simple HTML file that only displays "hello, world", can have thousands of invisible control characters before the first word, thousands between it and the second word, and thousands after that. Furthermore, whether those control characters cause the file position of a visible character to increase or not depends on the type of HTML tag and the interaction of other HTML tags. Consequently, obtaining an accurate index string to parse is immensely difficult when HTML files are involved. Other mark up language file types, such as SGML, etc., present similar but less egregious problems in obtaining accurate index strings. The method described herein for HTML files can also be used for other types of mark up language files.

The problem is that there is no known accurate way to determine what the effect of present and future HTML control tags will be relative to the file positions of visible words displayed by an HTML viewer when using a string analysis method. HTML viewer technology includes a text ranging method to determine where visible characters are displayed. Essentially, this method assigns a null value to non-incrementing control tags, including their parameters, and a byte value to tags that cause the display to advance the "file position pointer" when they are encountered. The technology also includes rules for determining whether the interaction of tags changes their behavior with respect to advancing the file position pointer. An accurate index string representing not only the relative file positions of words within an HTML file but also the starting position can be generated using a text ranging method. However, the method is slow compared to a string analysis method because each byte in the file has to be analyzed individually, and single byte analysis using the text range method requires beginning at the first byte of the html string. Thus, the time required for analysis increases exponentially with increasing lengths of files to be analyzed. The present invention overcomes the inaccuracy of the string analysis method used on HTML files and the slowness of the text ranging method.

The entire HTML file is a string of bytes, which will be referred to as the html string. From it, a second string consisting of only visible characters and single byte representations of all adjacent control characters combined will be derived and referred to as the visible character string. The objective is to generate an index string for parsing that will contain visible characters positioned absolutely relative to one another numerically. The index string is analogous to a plain text file string or structured file strings, such as RTF, etc., and can be unambiguously parsed to determine word locations absolutely relative to one another.

At block 418, all HTML control tags and their contents are converted to single characters in the non-displayable range, typically ASCII 1 through ASCII 31. In the same block 418, adjacent strings of these control characters are then combined into just one control character. Thus, the example of "hello, world", would be reduced at most to 15 characters regardless of the length and complexity of embedded HTML tags. This is the visible character string.

The HTML viewer starting position of the first visible character must next be determined relative to the html string, which is done at block 419 by using the text ranging method. From that point, the objective is to maintain synchronization between the html string and the visible character string. String analysis is used for adjacent visible characters, and the method involves designating a sub-string with its start

24

being the character following a control character and the end of the sub-string being the character preceding a subsequent control character. Such a sub-string segment is then added to the building index string in one step, whether it is one or thousands of characters in length as depicted by block 420.

At this point, the effect of the encountered control character must be determined, and that first involves synchronizing the entry point for the text range method into the html string. Depicted by block 421, the length of the sub-string added to the index string in block 420 is added to an html string processing variable, and that is where the text range method is applied to the html string. One by one, each byte is analyzed as depicted by block 422. If it advances the file position pointer, it is added to the index string. If the next character is not visible (block 423), a test for the end of the html string is performed at block 424. If so, the index string is completed, and processing is transferred to block 427 for string parsing and subsequent word location index generation, block 428.

If the next character is visible, resynchronization of the HTML string processing variable is performed at block 425 so that the next entry point will land on the next control character after the length of the next sub-string is added when block 421 is next encountered. Before leaving block 425, the next byte is analyzed at block 426 to determine if the end of the string has been encountered. If so, processing is transferred to block 427 as previously described. If not, the processing is transferred to block 420 again, and the process continues until the entire index string is accreted.

The process of block 407 on FIG. 4 is straightforward. Link patterns and field matches are designated by the user through the Linking Control Panel depicted by FIG. 11 and the Options for Field Links dialog depicted by FIG. 13. When a user designates a custom link word by entering it in text box 1101, associates it with a specific file (such as a glossary) by entering its path into text box 1102, and then clicks the Add New Link button 1104, instructions for that link have been programmed into the index generator. Likewise, when a user specifies a link pattern by entering it (with or without optional wildcard characters) in text box 1106, associates it with a particular field number by selecting one in the options box 1107, and then clicks the Add New Link button 1108, instructions for that link pattern have been programmed into the index generator. The user selectable options depicted on FIG. 13 allow refinement of the link pattern choices. For example, a user may want to use aliases or synonyms so that "equine" is also linked when "horse" is the primary pattern.

Functionally, generating valid links automatically as depicted by block 407 of the database index generation process of FIG. 4 is a two step process. First, the virtual list of link pointers (words and patterns) is checked each time a word is extracted in block 405. If the word is on the list, the virtual list of all the files that will be in the final database (that is, a virtual table of contents) is checked to determine if a link target exists for the link pointer. For example, a pattern of "# S.W.2d #" might match a potential link pointer of "877 S.W.2d 200" that designates a file with a field likewise containing "877 S.W.2d 200" as the target. However, if the target file is not in the virtual table of contents, the pattern will not be designated as a link pointer. This avoids having link pointers that have no target being created.

Generating valid links from patterns requires knowing the potential link pointers associated with specific target files. If a target file exists in the virtual table of contents, the link pointer can be inserted during the first pass through the files.

US 6,834,276 B1

25

The process is simpler in the case of words becoming link pointers. The virtual table of contents is examined to determine if the target file for a word is included. If so, a link pointer is created when the specified word is encountered. As with link patterns, the validity of all links is assured because no link is created before the existence of its target is established.

At block 410, the master word index 202 is then compiled with the index of word locations. Block 411 entails assigning unique numbers to every unique word in the database which produces the word number index 203 having its two parts, the DSI 204 and DSF 205. Based on the data collected, the generator program's jump link index is compiled at block 412, resulting in the jump link list 206 having its two parts, the OAI 207 and the OAF 208. At next block 413, the word lists 214 are generated, resulting in the WDL 215, the WDN file 216, and the WDR 217. The fields list 212 is then generated at next block 414 to include the individual presorted lists CO1, CO2 . . . CO# 213. The contents tables 209 then are generated at next block 415 to include the COI 210 and the COF 211. The generator program returns to the start dialog allowing a user to generate another database's index or to exit.

A graphic user interface (GUI) embodiment of a database application program according to the present invention will now be described which provides utilities for database index generation and database selection and searching. The following FIGS. 5–15 are exemplary screen shots at various stages of the database application program in order to demonstrate the principles of the present invention. The database application program may be executed on the computer system 100, where each of the screen shots or displays are displayed on the display 112 and viewable by a user of the computer system 100. The GUI database application program may comprise a more specific embodiment of the system 170 shown in FIG. 1C, and may further incorporate the principles described in relation to the flow diagrams shown in FIGS. 3 and 4.

FIG. 5 is a screen display illustrating an exemplary database registration dialog of a graphic user interface (GUI) embodiment of a database application program implemented according to the present invention on a computer, such as the computer 100. The screen display includes a view options button 500, a database generator button 501, a search button 502, a database display window 504 which provides a list of database names 503, a Register New Database button 505, an UnRegister Selection button 506, and an Enable Word Lists control 507. The database display window 504 shows that four databases are registered as a result of previous use of the Register New Database button 505. As indicated by associated checkmarks 508, three of the registered databases have been selected. For example, a database may be selected when the user performs a standard operation with the mouse 114 by clicking a button on the mouse 114 while a cursor is on the database name, thus, causing a checkmark 508 to appear adjacent to the database name 503.

FIG. 6 is a screen display illustrating an exemplary unregister confirmation dialog 601 of the GUI database application program introduced in FIG. 5 that appears when a user has highlighted a database name 503 and then selects the UnRegister Selection button 506. The unregister confirmation dialog 601 presents the user with an unregister confirmation message 602 that reminds the user of other options that are available. A message box 603 presents the user with various messages according to the position of the mouse pointer. A message 604 is shown in the message box 603 when the mouse pointer hovers over a Cancel Unreg-

26

ister button 606. The message 604 in the message box 603 changes when the mouse pointer is moved to other positions such as over an Unregister ONLY button 605, over a Delete Database Index Files button 607, or over a Delete All Files In Database button 608 to perform the indicated functions.

FIG. 7 is a screen display of an exemplary index generator dialog of the GUI database application program introduced in FIG. 5 as it might appear after a user 1 presses the database generator button 501. The index generator dialog includes a source file location edit box 700, a database output directory edit box 701, a generator type selection box 702, a set link properties or Linking button 703, a New Database Name edit box 704, a Register New Database check box 705, an enable Pause feature button 706, a Run button 707, and an Exit button 708. The index generator dialog is used for registering a database or regenerating the database index 200 from a previously registered but changed database. Should the user press the Run button 707 without changing any of the FIG. 7 parameters, the database indicated is registered and appears as shown at 503 in the database display window 504. If the database has already been registered, the database index 200 is regenerated when the Run button 707 is pressed. Checking the register new database check box 705 causes the generator to register new databases or to reregister changed databases and add them to the database display window 504. A user might choose to regenerate a database index in this manner if any of the source files in the source file location edit box 700 have been changed or if any files matching the generator type selection box 702 were added or deleted. The Pause button 706 toggles a feature that allows the user to suspend database processing indefinitely. When the pause feature is disabled, the generator completes its tasks faster.

Database indexes are made from documents or files located at a path to a directory or folder indicated in the source file location edit box 700 and according to the file type indicated in the generator type selection box 702. If the documents of the database are located remotely, e.g., on the World Wide Web (WWW) of the internet, the source file location edit box 700 contains a hypertext transfer protocol address, i.e., an "http" (HyperText Translation Protocol) address to the location. Of course, other types of addresses/designations are available for remotely accessible files, and these various types of addresses/designations are entered into the source file location edit box 700 in a similar manner. A database index is placed in the location shown in the database index output directory edit box 701 when generated from the selected files. Before pressing the Run button 707, the user can press the Linking button 703 in order to cause the documents of a database to have custom links to one another automatically generated at the same time the database index is generated (see FIG. 11 and related discussion). However, in order to understand searching operations of the software of the invention, at this point it is assumed that links have already been set and a database index has already been generated.

FIG. 8 is a screen display of an exemplary search/retrieval dialog of the GUI database application program introduced in FIG. 5 that is displayed when a user presses the search button 502. The search/retrieval dialog presents the user With a search expression edit box 803 in which the user enters search terms of interest. In this case, the search terms "second amended petition" (including the quote marks) have been entered into the search expression edit box 803. The search expression edit box 803 supports search expressions of any degree of complexity by using the following techniques: parentheses; phrases set off by double quotations;

US 6,834,276 B1

27

proximity expressions; single- and multiple-character conflation in any combination of leading, middle, and trailing conflation; and default or overriding explicit Boolean operators, such as AND, OR, XOR, etc. Other search expression techniques are also contemplated.

In addition, the search/retrieval dialog includes default Boolean operator controls 805 to determine how the system interprets multiple words entered in the search expression edit box 803. For example, if only two terms are entered without being surrounded by double quotation marks and the default Boolean operator is AND, the system finds all occurrences of both terms in documents that contain both terms. If the default Boolean operator is set to OR using the same example, the system finds all occurrences of either term in all documents with either term. If the default is set to XOR, the system finds all occurrences of either term only in documents that contain one term but not the other. Further, when checked, a Search within current results box 801 causes the system to perform the search called for in the search expression edit box 803 only for those documents found by the previous search.

Once search terms are entered into the search expression edit box 803, a search of the database indexes for each of the selected databases 503 is performed by the search module 183 when an Execute button 806 is pressed. Further, the Execute button 806 causes all selected databases 503 to have instructions applied such as where to position a document when viewing it on the display 112, how to order search results, etc. For example, some instructions are set with a Document Position control 800 that designates whether the document, when a View button 810 is pressed, is displayed from its first line at the top of the document or from the location of the first search term that was found. Further, an Order Search Results By control 802 determines the sort order for the list of documents found that are to be displayed in a documents found window 815. If a Display first document found checkbox 804 is checked, the system displays the first document found that satisfies the search expression without the intermediate display of the completed search results.

After the Execute button 806 is pressed, the system records and displays its progress in a Search terms found window 809 and includes the number of documents found that match the search criterion. After all documents satisfying the expression are found, a document number is displayed in a document counter 807 and the documents found window 815 is populated in the order indicated by the order search results by controls 802. The View button 810 causes a highlighted document 812 to be displayed according to the Document Position control 800 setting. Should the number of documents found exceed the number that can be displayed in the documents found window 815, a scroll bar, the down arrow, and the Page Down keys are available so that the user can see the other documents found.

Since a database application program, in one embodiment, is configured to simultaneously search over two billion databases, each with over two billion files, and each file with over two billion characters, the user may want to stop a search after it has started. For that reason, a Stop button 808 is provided. Further, a Clear button 811 allows all data to be cleared from the search expression edit box 803, the search terms found window 809, and the documents found window 815. If the Enable Word Lists control 507 is enabled, a Word List button 814 is enabled. When pressed, the Word List button 814 causes a list of all words that appear in all selected databases 503 arranged in alphabetical order to be displayed. Words can be placed directly into the

28

search expression edit box 803 from the word list. A Close button 816 closes the search/retrieval dialog and returns the user to the previous screen without taking any further actions that may be available. Finally, a Sort Again button 813 is used to repeat the above procedure after changing the terms in the search expression edit box 803.

FIG. 9 is a screen display of an exemplary dialog displaying a document, such as the highlighted document 812, retrieved from among the documents indicated in the documents found window 815. A document display window 928 displays text and graphics of a selected document being viewed in a similar manner as it would be seen in a word processor application such as MS-Word or the like. A word wrap button 921 toggles between two display states. The first state shows text as wrapping to the next line when the right side of the document display window 928 is too narrow to show all of the text in a paragraph on a single line. The second state of the word wrap button 921 displays all the text in a paragraph on a single line, and, if necessary, a horizontal scroll bar appears at the bottom of the document display window 928 which allows the user to move the contents of the window to see any portion of the text. This second state of the word wrap button 921 is especially useful when viewing documents with table type data where columns were determined by use of tabs or spaces. Since most computers use a proportional font to display text, such table type data may not align properly unless a fixed-pitch, non-wrapping display format is used. The word wrap button 921 allows the user to instantly toggle between either display format as desired.

A field link 925 is illustrated in the text in FIG. 9, in which the underlying text is shown highlighted with selectable color and font different from the surrounding text to indicate the link, where the highlight selections are made in a Search Terms display control 1011 (FIG. 10). When the user double clicks on the field link 925, the system displays the document that the field link 925 targets. To return to the text displayed, the user need only press a jump backward button 916. The document display window 928 then shows the text of the document 812. A found terms display 927 shows that two terms were found in the highlighted document 812 of the documents found window 815. The same information about the document 812 is accessible through activation of a title bar 906. The Document Position controls 800 were set to display the document at the first search term, and the order search results by controls 802 were set to sort the results by database name 503. A database named "RTF12231" is the first one shown in the selected databases 503, and the system assumes that the user prefers that order.

The search expression edit box 803 shows that the phrase "second amended petition" was searched for, and the document display window 928 shows two instances 926 of the phrase appearing near the center of the screen display for user convenience in determining the context of a term. The terms of the phrase are shown in font attributes determined by the Search Terms display control 1011. The previous search term button 911 is not available because the first search term in the document is displayed and current as indicated by a text cursor 950. The next search term button 912 is available because there is one more instance 926 in the document. Both the next document with search terms button 915 and the previous document with search terms button 914 are shown as available because the document displayed is the thirteenth of forty documents found as shown in the document counter 807.

Also shown in the document display window 928 is a phrase 909, "Texas Rules of Appellate Procedure". The

US 6,834,276 B1

phrase **909** is shown in bold italics to indicate that it has a legal pad note attached to it, where the bold italics is determined by a LegalPad Notes display control **1009**. Legal pad notes allow a user to create reference notes that are accessible from a document in a manner similar to document access through the field link **925**. The LegalPad Notes display control **1009** shows that bold italics is used when the system displays text where legal pad notes are attached. As discussed in relation to FIG. **12**, a legal pad button **918** is used to create new legal pads from highlighted text.

A SmartScreen button **900** causes the system to display the same screen shown when the database application program is started (initialized) as in the example embodiment of FIG. **5**. The first document in universe button **901**, the "universe" including all files/documents in all selected databases, is not available and thus not highlighted because the document shown in the document display window **928** just happens to be the first document in all of the documents in the selected databases.

The same situation applies to a previous document in universe button **902**, which is also not highlighted. However, a next document in universe button **903** is available as indicated by being highlighted. When the button **903** is pressed, the document following the one currently displayed is displayed. When pressed, a last document in universe button **904** causes the system to immediately display the last document in the list of all of the selected databases **503**. Further, when pressed, a table of contents button **905** displays a dialog with collapsible table of contents to allow a user to quickly determine and view any file in any of the selected databases **503**. The find document in entire universe button **907** displays a dialog allowing a user to type fragments of a sought document in order to find it and quickly view it.

A find button **908** allows a user to search within the document currently displayed. A direct from text button **910** causes a phrase search to immediately be executed for all text that is selected by a user and highlighted. It is not available unless some text is selected. A bookmark button **917** allows a user to place an electronic q bookmark at any point in any document through a dialog that allows the user to name and manage bookmarks. A copy button **919** allows the user to copy any highlighted text to the computer's memory for insertion elsewhere. A print button **920** displays a print dialog which provides full print utilities to the user. A font change button **922** allows the user to toggle from a proportional pitch font to a fixed pitch font for ease of viewing text formatted with spaces and tabs for columnar alignment or back to the original font. A help button **923** displays information about the system. An exit button **924** causes the system to terminate and asks the user whether data about the session should be saved or not.

In summary, the document display window **928** illustrates examples of field links **925**, legal pad phrases **909**, and instance **926** of search phrases. The appearance of these portions of the document display window **928** is controlled by a display options dialog that is discussed in relation to FIG. **10**.

FIG. **10** is a screen display of an exemplary display options dialog, i.e., a view options dialog **1012**, of the GUI database application program introduced in FIG. **5** that appears when a user has pressed the view options button **500**. A FastSearch button **1002** allows the user to set a variable that controls the speed with which the system preloads certain index components when it is started. Colors and Styles controls **1001** enable the user to set display options for the document display window **928**. For example,

a Document Background screen color box **1000** is used to select background colors of the document display window **928**. Further, a Jump Tags section **1006**, a LegalPad Notes display control **1009**, and the Search Terms found section **1011** are available in the view options dialog **1012**, each for selecting the color, weight, and font of the text in the document display window **928**. The effects of each control are immediately shown in the window appearing below the Colors and Styles controls **1001**. A Default Text Font Size **1003** is set by the user. Pressing a Restore Defaults button **1005** resets all controls to their original state. Pressing an OK button **1004** accepts any changes the user has made and restores the display to the document display window **928**, where the text of the document is displayed with the new display settings. In this manner, the user selects the highlighting functions, such as font options, colors and styles, for text to be highlighted from background text for text of interest, such as jump tags, legal pad notes, search terms, etc.

FIG. **11** is a screen display of an exemplary link generator dialog of the GUI database application program introduced in FIG. **5** for creating links between documents such as field link **925**. A user can instruct the database index generator to insert custom links by entering a custom link word in a New Custom Link Word edit box **1101** and then entering a path and name of a file or document to which all such words should link in the File To Link To edit box **1102**. For user ease and convenience, the path and name of the file to link to can be selected using the browse utility provided by pressing a Browse button **1103**. When the user presses an Add New Link button **1104**, a custom link word and file to link to pair are displayed in a custom link display window **1100**. An essentially unlimited number of such pairs can be created. After the database index **200** is generated by pressing the Run button **707**, whenever a user encounters the custom link word in any document displayed in the document view window **928**, except the corresponding file to link to file, it is set off from surrounding text according to the display view options set by the Colors and Styles controls **1001**. When the user double clicks such a word, the database application program immediately displays the file that is specified by the user as the linked file. To return to the previous document at the previous position, the user need only press the jump backward button **916**. The jump backward button **916** allows the user to retrace any number of forward jumps.

The link generator dialog of FIG. **11** also allows a user to instruct the database index generator to insert field links that are based on link field patterns. A field link based on a link field pattern is a pattern sequence found in a file that exactly matches the same pattern sequence that is found in the appropriate field in another file in the database source files. To create these types of field links, a pattern is entered into a New Link Pattern edit box **1106**. When the pattern of the New Link Pattern edit box **1106** matches another pattern located in a certain field of another file, a field link can be created between the files. The "certain field" of a file that is linked to corresponds to a link field number that is selected in a Link Field Number edit box **1107**. After the pattern is entered into the New Link Pattern edit box **1106** and the link field number is entered into the Link Field Number edit box **1107**, in this case "1", an Add New Link button **1108** is pressed and the database index is updated with the new information. The resultant field link pattern corresponding to the link field number then appears in the link field pattern window **1105**.

Advantageously, a pattern entered into the New Link Pattern edit box **1106** can use "wildcard" characters. Wild-

US 6,834,276 B1

**31**

card characters are characters such as %, ?, *, and #, where each of the characters has a special meaning. In the embodiment shown, the "%" character substitutes for any digit, the "#" character substitutes for any integer greater than zero, the "*" character substitutes for any number of characters or digits between delimiters, and the "?" character substitutes for any single character. For example, a pattern "# s*d #" matches "9 sand 977", "843 S.W.2d 955", etc. An essentially unlimited number of field link pairs can be created. Of course, any number of wildcard characters may be defined depending on a particular embodiment.

Also of note, files/documents have many different file formats for their respective fields (e.g., WordPerfect® format). These formats provide for normally hidden fields to contain data about the file such as title, subject, author, etc. A system according to the present invention provides for placing visible fields in the first line of the file with each field separated by a delimiter such as a tab character.

After the database index has been generated and when the user encounters a field link in any document displayed in the document view window 928, it is set off from surrounding text according to the display view options set by the Colors and Styles controls 1001. When the user double clicks such a field link, the system immediately displays the linked file. To return to the previous document at the previous position, the user need only press the jump backward button 916.

If the database index generator has previously generated an index for a particular source file location 700, database Output Path 701, and the New Database Name 704, the linking control panel settings used previously are automatically loaded. If the user wants to migrate linking control panel settings from any previous instance, pressing a Retrieve Settings button 1109 causes display of a list of all such instances, and the desired one may then be selected and used. An Options button 1111 causes a optional field links dialog 1300 (see FIG. 13 and related discussion) to be displayed and makes additional options available to the user for creating a custom field link. Finally, pressing an OK button 1110 indicates that the user has completed customizing the field links and instructs the database generator to use the settings in the link generator dialog when creating the database index. Of course, the database index is not created until the Run button 707 is pressed.

FIG. 12 is a screen display of an exemplary legal pad dialog implemented as an integrated word processor of the GUI database application program introduced in FIG. 5. As stated, the legal pad button 918 is available when text of a document has been highlighted by the user or when a legal pad entry exists for any document in any of the selected databases 503. Pressing the legal pad button 918 displays the legal pad dialog shown in FIG. 12. If some text was highlighted before the legal pad button 918 was pressed, the system assumes that the user wants to create a new entry. The next sequential note name is automatically assigned in the note name edit box 1200, but the user can change it to whatever is desired. Existing note names are shown in a note name window 1201. The user can copy or write any text into a Legal Pad Entry Text window 1205. Note Type controls 1202 allow the user to designate whether the note is to be available to other users or to have restricted access. A Lock button 1203 allows the user to prevent any modifications to the note displayed in the Legal Pad Entry Text window 1205.

A Locate button 1204, when pressed, displays the document at the position where the note is attached. The original text that was highlighted when the legal pad button 918 was pressed to create the note is displayed with the font and color attributes set by the legal pad notes section 1009 as shown

**32**

by the example phrase 909. A Delete button 1212 allows the user to delete a note. A Rename button 1211 allows the user to change the name of a saved note. An Export button 1210 allows the user to save the note to an external file on any drive available to the computer. A Save button 1206 allows the user to save changes to the note without changing the current display. A Print button 1207 causes a print utility dialog box to appear enabling the user to print the current note. A Close, Save Changes button 1208 allows the user to save changes to the note and return to the document being viewed. A Close, Cancel Changes button 1209 causes any changes to the current note to be discarded and the system returns to the display as it was before the legal pad button 918 was pressed.

FIG. 13 is a screen display of an optional field links dialog 1300 of the GUI database application program introduced in FIG. 5 that is displayed when the Options button 1111 is pressed. The optional field links dialog 1300 includes additional options that are available to the user for creating custom field links. An Alias Control section 1301 allows the user to define an unlimited number of aliases in a Current Aliases window 1303 for a link term so that strict correlation between terms linked to target files is not necessary. For example, whenever the term "vine fruit" appears in any of the database files, the user may want the term to be linked to a glossary file that defines the term. By setting or defining aliases for "vine fruit" to include alias terms "grape", "tomato", and "raspberry", those words also have a link generated to the glossary file just as "vine fruit" does. Pressing an OK button 1302 sets the options and restores the display of the linking control panel to its previous state.

In addition to the above described example embodiment, FIG. 14 is an example screen display of a Browser Mode Window showing an HTM document retrieved from the internet using the GUI database application program introduced in FIG. 5. The Browser Mode works in a similar manner as commonly used browsers, such as Netscape Navigator or Microsoft® Explorer. The internet address of the document is shown in an Address bar 1405. If the user puts the cursor (or focus) on the Address bar 1405 and presses the Return or Enter keyboard key, or presses a Refresh button 1404, the document would again be retrieved from its internet source. By pressing a Back button 1400, the Browser Mode Window displays the previous document that was viewed. By pressing a Forward button 1402, the Browser Mode Window displays the document that was previously viewed before the Back button 1400 was pressed to display the document shown.

Pressing a Stop button 1403 terminates any internet retrieval action currently underway. Pressing a Home button 1406 causes the Browser Mode Window to retrieve and display the document at the specific internet address designated as the "Home Page" for the Browser Mode Window. Pressing a Search button 1407 causes the Browser Mode Window to retrieve and display the internet search engine page designated by a user option in an Options dropdown menu 1401. A Print button 1408 allows the user to print the document displayed and to set printing options in a dialog box that is displayed. A DB Name button 1409 displays a dialog box and list of previous database names that have been used. The current database selected is shown in a database name label 1412. A more extensive dialog box that allows the user to change other database particulars is also available as a user option in an Options dropdown menu 1401.

A SpeedSave button 1411 immediately saves the displayed document, along with all of its pictures, graphics,

US 6,834,276 B1

33

images, hypertext links, and layout into the database named in the database name label **1412**. The first time the Speed-Save button **1411** is 1Q pressed in a session of the software, the same dialog displayed by pressing the DB Name button **1409** is displayed to safeguard against the user inadvertently saving a file into a forgotten about database. Double clicking the database name label **1412** also displays the same dialog. Depending upon the settings for the database particulars accessible under the Options dropdown menu **1401**, the file can be saved as a normal "Text" file, an HTM file without images, an HTM file with images linked to their internet source, or an HTM file with all images retrieved and saved on the local computer's hard drive. Pressing an Exit Browser button **1410** causes the software of the system **100** to create a fully indexed and searchable database of all files saved into the database name shown in the database name label **1412** according to the default behavior. The database is automatically registered and shown on the database display window **504**. The default behavior can be changed to accommodate a variety of user preferences through the appropriate selection on the Options dropdown menu **1401**. A document location label **1413** indicates to the user whether the source of the document being viewed is remote or local, and the label **1413** changes automatically when the viewed document changes its source. A status bar message **1414** changes as appropriate to give the user information about the status of the Browser Mode Window. A Browse Mode label **1420** indicates to the user whether the software is functioning in its Browser Mode or its Viewer Mode.

The document depicted in FIG. **14** has several elements referenced in order to illustrate the capability of a system according to the present invention for allowing the user to easily edit content and arrangement of documents saved in the Browser Mode. For example, FIG. **14** illustrates a "Contact Information" graphic **1415**, a "What's New" graphic **1417**, a "Services" graphic **1418**, a Footer Text **1416**, and a Body Text **1419** which have all been manipulated, deleted, or changed as shown in FIG. **15**.

FIG. **15** is an example screen display of the HTML document of FIG. **14** after being saved and edited in the Browser Mode window. FIG. **15** shows the "Contact Information" graphic **1415** as having been moved in the left column of the document, which is now shown as Contact Information graphic **1500**. The "What's New" graphic **1417** and the "Services" graphic **1418** have been deleted. A new "Super Sweeps" graphic **1503** has been added. The Footer Text **1416** has been moved to be the first paragraph of the document's new body text. The Body Text **1419** has been moved down and edited to delete the text ("IDC")" from it. Since the internet address shown in the Address Bar **1405** of the document of FIG. **14** has been saved, the Address Bar **1501** has changed to a pathname to reflect the document's location on the local computer's hard drive. The document location label **1413** indicating "internet" has also changed to be Document Location Label **1502** indicating "Local" to help ensure that the user knows the source location of the document being viewed. The editing process automatically makes all adjustments to HyperText links and other HTM codes associated with text or graphic elements that are added, deleted, or moved. When the SpeedSave button **1411** is pressed, the edited file is saved after the user selects an option to save it under a different name or to replace the existing file.

In accordance with the present invention, the disadvantages of the prior art have been overcome through the implementation of a system and method for creating at least one customizable database index for assisting in navigation

34

of at least one database. The system includes a database index generation module that enables a user to specify at least one database for access by the user. The at least one database includes at least one document. Also included is a database index generator module that enables the user to generate a customizable database index associated with the at least one database. Further, an integration tool is included that enables the user to add references of additional databases to the customizable database index and to modify references of existing databases in the customizable database index. Also commonly included is interconnection logic that enables the user to place links within the customizable database index such that the user can cross reference one of the at least one documents from the at least one database with another of the at least one documents of the at least one database.

Another implementation of the invention uses multiple external search engines during the same search. Each search engine typically requires a different syntax to do a search. When activated, each search engine responds with different search results. The results may have different contents and formats and priorities. The results may include graphics and text that are not relevant to the information sought by the search and are therefore extraneous. The invention rejects discernable extraneous information by taking advantage of the communication method by signaling the search engine that the unwanted results are already received so they are in fact never sent. Non-discernible extraneous information is filtered out and discarded. The remaining results which are received often include duplicates which are initially compiled into lists of all results. The lists are then compiled into a single list without duplicates. The list is prioritized and presented to the user as a single, prioritized list for viewing. The list contains checkboxes that the user can check to select documents which the invention will retrieve and put through the storing and indexing processing for search and retrieval. When the user positions a mouse pointer over a URL on the list, a popup window is generated that displays the text, so the information can be screened to ascertain if it contains relevant information to the search inquiry. If the text contains relevant information, the user can then check the box for selection for downloading and insertion in the database.

The above-listed sections and included information are not exhaustive and are only exemplary or the invention. The particular sections and included information in a particular embodiment may depend upon the particular implementation and the included devices and resources. Although a system and method according to the present invention have been described in connection with the preferred embodiments, it is not intended to be limited to the specific form set forth herein, but, on the contrary, it is intended to cover such alternatives, modifications, and equivalents, as can be reasonably included within the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

1. A data acquisition and perusal system, comprising:
   a database selection module that enables selection of a plurality of files for inclusion into at least one selectable database;
   a link module that enables custom links to be defined between selected terms of selected files of the at least one database;
      wherein the link module enables association of any link term with any of the plurality of files in the at least one selectable database; and
      wherein the link module enables at least one alias term to be defined for the any link term to enable a link to

US 6,834,276 B1

be established between the at least one alias term and the any of the plurality of files;

a database index generator module that enables generation of a searchable index of the data contained in the at least one selectable database, including the custom links, the generator module enabling only valid custom links to be added to the searchable index; and

a search module that enables a search of the searchable index to be performed according to a search criterions.

**2.** A data acquisition and perusal system, comprising:

a database selection module that enables selection of a plurality of files for inclusion into at least one selectable database;

a link module that enables custom links to be defined between selected terms of selected files of the at least one database;

wherein the link module enables designation of a pattern that corresponds to one or more text strings, and wherein the link module is operable to link instances of the one or more text strings in the selected files with other of said selected files having identification data that matches the text strings;

a database index generator module that enables generation of a searchable index of the data contained in the at least one selectable database, including the custom links, the generator module enabling only valid custom links to be added to the searchable index; and

a search module that enables a search of the searchable index to be performed according to a search criterion.

**3.** The data acquisition and perusal system of claim **2**, wherein the link module enables designation of a pattern that includes wildcard characters.

**4.** A data acquisition and perusal system, comprising:

a database selection module that enables selection of a plurality of files for inclusion into at least one selectable database;

a link module that enables custom links to be defined between selected terms of selected files of the at least one database;

the link module enabling association of at least one selected link term with any of the plurality of files in the at least one selectable database;

at least one selected link term including at least one alias;

a database index generator module that enables generation of a searchable index of the data contained in the at least one selectable database, including the custom links, the generator module enabling only valid custom links to be added to the searchable index;

a search module that enables a search of the searchable index to be performed according to a search criterion;

at least one input device; and

a display utility including a graphic user interface that enables graphic interaction with the database selection, the link and the search modules via the at least one input device, wherein the display utility displays at least portions of files in the selectable database that meet the search criterion, indicates terms in the displayed file portions that meet the search criterion, indicates any of the at least one selected link term in the displayed portions of files in the selectable database that meet the search criterion, enables interaction with any indicated selected link terms via the at least one input device to enable perusal of linked files in the at least one selectable database;

the display utility further indicating the at least one alias; and

the display utility enabling interaction with the at least one alias via the at least one input device to enable perusal of linked files in the at least one selectable database.

**5.** A data acquisition and perusal system for finding, storing and retrieving useful information, comprising:

means for locating a plurality of accessible computer files according to a selected search criteria;

means for selecting files containing relevant information from the located files for inclusion into at least one selectable database;

means for enabling user defined custom linking relationships among selected terms of said selected files of the at least one database;

wherein said link means enables association of any link term with any of the plurality of files in the at least one selectable database;

wherein said link means enables at least one alias term to be defined for the any link term to enable a link to be established between the at least one alias term and the any of the plurality of files;

means for generating a searchable index of the data contained in the selected database including the custom links so that the searchable index includes only valid links;

means for searching the searchable index to be performed according to a search criterion to locate words and phrases in the selected database; and

means for accurately highlighting the located words and phrases in the display from the search results.

**6.** A data acquisition and perusal system, comprising:

means for locating a plurality of accessible computer files according to a selected search criteria;

means for selecting files containing relevant information from the located files for inclusion into at least one selectable database;

means for enabling user defined custom linking relationships among selected terms of said selected files of the at least one database;

wherein the link means enables designation of a pattern that corresponds to one or more text strings, and wherein the link means is operable to link instances of the one or more text strings in the selected files with other of said selected files having identification data that matches the text strings;

means for generating a searchable index of the data contained in the selected database including the custom links so that the searchable index includes only valid links;

means for searching the searchable index to be performed according to a search criterion to locate words and phrases in the selected database; and

means for accurately highlighting the located words and phrases in the display from the search results.

**7.** The data acquisition and perusal system of claim **6** wherein the link means enables designation of a pattern that includes wildcard characters.

**8.** A data acquisition and perusal method for finding, storing and retrieving useful information, comprising the steps of:

locating a plurality of accessible files according to a selected search criteria;

US 6,834,276 B1

37

selecting a plurality of the located files containing relevant information for automatic inclusion into at least one selectable database;

defining custom linking relationships between selected terms and designated files of the selected database;

wherein said link definition step includes defining at least one alias term for at least one of the selected terms to establish linking relationships between the at least one alias term and one of the designated files;

verifying the validity of the custom linking relationships;

generating a searchable index of the data contained in the selected database including the custom linking relationships so that the searchable index includes only valid custom linking relationships; and

searching the searchable index according to a selected search criterion to locate words and phrases in the data and accurately highlighting the located terms and phrases.

9. A data acquisition and perusal method for finding, storing and retrieving useful information, comprising the steps of:

locating a plurality of accessible files according to a selected search criteria;

selecting a plurality of the located files containing relevant information for automatic inclusion into at least one selectable database;

defining custom linking relationships between selected terms and designated files of the selected database;

wherein the step of defining the linking relationships includes designating a pattern that corresponds to one or more text strings and linking instances of the one or more text strings in the selected files with other of said selected files having identification data that matches the text strings;

verifying the validity of the custom linking relationships;

generating a searchable index of the data contained in the selected database including the custom linking relationships so that the searchable index includes only valid custom linking relationships; and

searching the searchable index according to a selected search criterion to locate words and phrases in the data and accurately highlighting the located terms and phrases.

10. The data acquisition and perusal method of claim 9 wherein the step of defining the linking relationships includes designating a pattern that includes wildcard characters.

11. A data acquisition and perusal method for finding, storing and retrieving useful information comprising the steps of:

locating a plurality of accessible files according to a selected search criteria;

selecting a plurality of the located files containing relevant information for automatic inclusion into at least one selectable database;

defining custom linking relationships between selected terms and designated files of the selected database;

verifying the validity of the custom linking relationships;

generating a searchable index of the data contained in the selected database including the custom linking relationships so that the searchable index includes only valid custom linking relationships;

searching the searchable index according to a selected search criterion to locate words and phrases in the data and accurately highlighting the located terms and phrases;

38

displaying a graphic user interface that enables graphic interaction with the database selection, the link and the search means via the at least one input device;

displaying at least portions of files in the selectable database that meet the search criterion;

indicating terms in the displayed file portions that meet the search criterion;

identifying at least one alias of at least one of the selected terms for which custom linking relationships with designated files are defined;

displaying the at least one alias; and

enabling interaction with the at least one alias via at least one input device to enable perusal of linked files in the at least one selectable database.

12. A data indexing and perusal system comprising:

an index module that enables generation of an index of a plurality of selected source files;

a custom link module that enables a user to create links between two of the plurality of selected source files; and

a search module that enables a search to be performed according to a search criterion to locate words and phrases in the plurality of selected source files;

wherein the link module enables designation of a link term and designation of one of the plurality of selected source files to be linked to the designated link term; the link module being operable to automatically link multiple instances of the designated link term in the plurality of selected source files with the designated file;

wherein the link module further enables identification of a plurality of alias terms to be associated with the designated link term, the link module being operable to automatically link instances of the alias terms in the plurality of selected source files with the designated file.

13. A data indexing and perusal system, comprising:

an index module that enables generation of an index of a plurality of selected source files;

a custom link module that enables a user to create links between two of the plurality of selected source files; and

a search module that enables a search to be performed according to a search criterion to locate words and phrases in the plurality of selected source files;

wherein at least some of the plurality of selected source files have predefined fields containing identification data;

wherein the link module enables designation of a link field pattern, including wild card characters, that correspond to one or more text strings; and

the link module being operable to automatically link instances of the one or more text strings in the plurality of selected source files with source files having identification data that match the text strings.

14. A method of linking, indexing, and searching a plurality of selected source files, the method comprising:

enabling users to create custom links between two or more of the plurality of selected source files;

enabling designation of a link term and designation of one of the plurality of selected source files to be linked to the designated link term;

automatically generating links between all instances of the link term within the plurality of selected source files and the designated file;

US 6,834,276 B1

**39**

enabling identification of a plurality of alias terms to be associated with the designated link term; automatically generating links between all instances of the alias terms in the plurality of selected source files and the designated file;

generating a searchable index of the plurality of selected source files;

incorporating any user-created custom links into the index; and

searching the searchable index according to a search criterion to locate words and phrases in the plurality of selected source files.

15. A method of linking indexing, and searching a plurality of selected source files, the method comprising:

enabling users to create custom links between two or more of the plurality of selected source files, wherein at least some of the plurality of selected source files have predetermined fields containing identification data;

enabling designation of a link term and designation of one of the plurality of selected source files to be linked to the designated link term;

**40**

automatically generating links between all instances of the link term within the plurality of selected source files and the designated file;

enabling designation of a link field pattern, including wild card characters, that correspond to one or more text strings;

automatically linking instances of the one or more text strings in the plurality of selected source files with source files having identification data that match the text strings;

generating a searchable index of the plurality of selected source files;

incorporating any user-created custom links into the index; and

searching the searchable index according to a search criterion to locate words and phrases in the plurality of selected source files.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 6,834,276 B1                          Page 1 of 2
APPLICATION NO. : 09/257714
DATED             : December 21, 2004
INVENTOR(S)      : Robert Leland Jensen et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page
Item (56)
Please add the following:
U.S. Patent Documents -
5,744,123  06/30/1998  Matson
4,815,029  03/21/1989  Barker et al.
5,754,840  05/19/1998  Rivette et al.
5,752,244  05/12/1998  Rise et al.
5,752,242  05/12/1998  Havens
5,742,816  04/21/1998  Barr et al.
5,797,619  04/07/1998  Judson
5,721,908  02/24/1998  Lagarde et al.
5,717,913  02/10/1998  Driscoll
5,706,502  01/06/1998  Foley
5,687,367  11/11/1997  Dockter et al.
5,557,722  09/17/1996  DeRose et al.
5,659,742  08/19/1997  Beattie et al.
5,652,880  07/29/1997  Seagraves
5,537,586  07/16/1996  Amram et al.
5,649,186  07/15/1997  Ferguson
5,535,382  07/09/1996  Ogawa
5,519,865  05/21/1996  Kondo et al.
5,455,945  10/03/1995  VanderDrift
5,466,891  08/29/1995  Kaplan et al.
5,251,294  10/05/1993  Abelow
5,367,621  11/22/1994  Cohen et al.
5,297,249  03/22/1994  Bernstein et al.
5,222,234  06/22/1993  Wang et al.
5,201,046  04/06/1993  Goldberg et al.



Signed and Sealed this

Thirtieth Day of November, 2010

David J. Kappos
Director of the United States Patent and Trademark Office

**CERTIFICATE OF CORRECTION (continued)**                    Page 2 of 2
**U.S. Pat. No. 6,834,276 B1**

On the Title Page
Please add the following:
Other publications - Item (56)
C. Mic Bowman, Peter B. Danzig, Darren R. Hardy, Udi Manber, Michael F. Schwartz, The Harvest
Information Discovery and Access System, 119-125 Computer Networks and ISDN Systems (1995)

Christian Neuss and Robert E. Kent, Conceptual Analysis of Resource Meta-Information, 973-984,
Computer Networks and ISDN Systems (1995)

S.A. Dobson and V.A. Burrill, Lightweight Databases; 1009-1015, Computer Networks and ISDN
Systems (1995)

Yoelle S. Maarek and Israel Z. Ben Shaul, Automatically Organizing Bookmarks Per Contents,
1321-1333, Computer Networks and ISDN Systems (1996)

Fred Douglis, Thomas Ball, Yih-Farn Chen, Eleftheriof Koutsofios, WebGUIDE: Querying and
Navigating Changes in Web Repositories, 1335-1344, Computer Networks and ISDN Systems (1996)

K.J. Maly, A. Gupta, B. Kvande, et al. A Privilege Management and Enforcement System for Distributed
Resource Sharing, 106-111, 5th Workshops on Enabling Technologies: Infrastructure for Collaborative
Enterprises (June 1996)

Laks V. S. Lakshmanan, Fereidoon Sadri, Iyer N. Subramanian, A Declarative Language for Querying
Restructuring the Web, 12-21, Sixth International Workshop on Research Issues in Data Engineering
(February 1996)

K. Voigt, Skipper, A Tool that Lets Browsers Adapt to Changes in Document Relevance to Its User,
61-68, Sixth International Workshop on Research Issues in Data Engineering (February 1996)

Michael R. Genesereth, Arther M. Keller, Oliver M. Duschka, Infomaster: An Information Integration
System, 539-542, SIGMOD Record (May 1997)

Naveen Ashish and Craig A. Knoblock, Wrapper Generation for Semi-tructured Internet Source, 8-15,
SIGMOD Record, Vol. 26, No. 4 (December 1997)

Paolo Atzeni, Giansaalvatore Mecca, Paolo Merialdo, Semistructured and Structured Data in the Web,
Going Back and Forth, 16-23, SIGMOD Record, Vol. 26, No. 4 (December 1997)

Jason McHugh and Jennifer Widom, Integrated Dynamically-Fetched External Information into a
DBMS for Semistructured Data, 24-31, SIGMOD Record, Vol. 26, No. 4 (December 1997)

Robert A. Nado and Scott B. Huffman, Extracting Entity Profiles from Semistructured Information
Spaces, 32-38, SIGMOD Record, Vol. 26, No. 4 (December 1997)

Svetlozar Nestorov, Serge Abiteboul and Rajeev Motwani, Inferring Structure in Semistructured Data,
39-43, SIGMOD Record, Vol. 26, No. 4 (December 1997)

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the Federal Circuit using the appellate CM/ECF system.   Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.


Dated:  March 26, 2015                    */s/ Pratik A. Shah*
                                                     Pratik A. Shah

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 9,711 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type style.